## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

DAVID GROCHOCINSKI, not individually )
but solely in his capacity as the Chapter 7 )
Trustee for the bankruptcy estate of )
CMGT, INC., )
           )
           Plaintiff, )    No. 06 C 5486
           )
       v. )    Judge Virginia M. Kendall
           )
MAYER BROWN ROWE & MAW LLP, )
RONALD B. GIVEN and CHARLES W. )
TRAUTNER, )
           )
           Defendants. )

## LAWYER DEFENDANTS' MEMORANDUM
## OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

Defendants Mayer Brown Rowe & Maw LLP ("Mayer Brown") and Ronald B. Given

("Ronald") (collectively, "Lawyer Defendants" or "Defendants"), by their attorneys, Novack and

Macey LLP, submit this memorandum of law in support of their Motion to Dismiss.

### HOW THIS CASE CAME TO BE FILED

The Complaint alleges that CMGT's lawyers should pay the $17 million default judgment

entered against CMGT (the "Default Judgment") because the lawsuit underlying the Default

Judgment was utterly <u>meritless</u> and the Default Judgment should <u>never</u> have been entered.  Indeed,

these facts have to be true for the plaintiff to have any chance of succeeding.

Well, believe it or not, the party who is financing this case and who would take the lion's

share of any recovery ("Spehar") is the very party that brought the meritless litigation and wrongfully

obtained the Default Judgment in the first place.  Talk about seeking an unjust windfall.  And the

surrounding facts are just as egregious.  The Default Judgment damages supposedly represent the

Dockets.Justia.com

amount that Spehar says it would have received if CMGT had closed a financing transaction. But that did not happen -- and that was because Spehar, knowing CMGT was broke and could not defend itself, brought the meritless litigation in a distant forum (California) and obtained an ex parte TRO preventing the closing of the only financing available to CMGT. Later, when CMGT ceased operations, Spehar amended its complaint and got the Default Judgment for the ridiculous sum of $17 million.

Ultimately, the Default Judgment did Spehar no good. After all, CMGT had no money to pay it -- and never will pay even one penny of it. So, using its Default Judgment for creditor status, Spehar filed an involuntary bankruptcy petition against CMGT, and now (with the Trustee's complicity) seeks to parlay the wrongful and worthless Default Judgment into a $17 million bonanza by shifting blame for the Default Judgment away from Spehar -- the party who orchestrated and obtained it -- on to CMGT's lawyers on the theory that CMGT's lawyers failed to defend CMGT. In short, the claim is that CMGT's lawyers should pay Spehar $17 million because they did not prevent Spehar from committing an injustice.

So, at bottom, the Trustee (financed by Spehar) asks this Court to reward Spehar for filing meritless litigation, preventing CMGT's financing, obtaining the phony Default Judgment and then using the Default Judgment to put CMGT into bankruptcy. Without more, this Court should exercise its supervisory authority to put an end to this case and stop Spehar's continuing perversion of the civil and bankruptcy systems.

But there is more. In particular, the malpractice Complaint in this case is completely infirm, suffering from many fatal defects, all of which will be explained in detail in the Argument section below. But, first, we provide a statement of the relevant facts, which are taken from the Complaint

2

and its exhibits. For this Motion only, the factual allegations that are not defeated by the exhibits are accepted as true.

## FACTS

**CMGT Is Formed And Later Hires The Lawyer Defendants.** CMGT was founded in January, 1999 to provide management services to the healthcare insurance industry. (Complaint, ¶11.) When one of its founders died unexpectedly, CMGT had to radically change its business plan. It acquired a company that had a software program and a telephone call center and started keeping track of employee absences for other companies. (Id., ¶¶11-16.)

By letter dated January 31, 2000 (the "Engagement Letter"), CMGT hired the Lawyer Defendants as counsel "in connection with its initial capitalization, formative acquisition activities, and other general corporate activities." (Id., Ex. 1.) The Engagement Letter says nothing about providing any litigation services and states that its scope may be expanded only by "mutual consent," which "must be in writing." (Id.)

**CMGT Hires Spehar.** In June, 2001, CMGT hired Spehar to find $2,000,000 in financing that was needed to continue CMGT's operations. (Id., ¶¶20, 24.) The terms of Spehar's retention were set forth in an October 1, 2001 letter agreement, and later revised by a September 30, 2002 letter agreement (together, the "Spehar Agreement"). (Id., ¶¶24-25.) Pursuant to the Spehar Agreement, Spehar was to be paid a "success fee" if it introduced CMGT to financing that was accepted by CMGT. (Id., ¶26 and Ex. 2.) The Spehar Agreement included an Exhibit A that listed the financing sources for which Spehar would be given credit. Spehar was not entitled to compensation if CMGT obtained financing from a different source. (Id., ¶27 and Ex. 2.)

3

**Spehar Fails To Place Financing.** After more than two years of effort, Spehar failed to place any financing for CMGT. (Id., ¶¶32-46.)

**CMGT Independently Secures The "Newco Deal".** In May, 2003, Charles Trautner ("Trautner"), a CMGT shareholder, proposed that CMGT contribute its assets to "Newco" -- a new corporation to be formed -- in exchange for $500,000 or 20% of Newco's stock (the "Newco Deal"). (Id., ¶¶40-41.) On August 1, 2003, Louis Franco ("Franco"), the COO and sole officer of CMGT, signed a letter of intent relating to the Newco Deal. (Id., ¶43.) Franco transmitted the Newco Deal to CMGT's shareholders, who overwhelmingly approved it -- opting to trade all of CMGT's assets for 20% of Newco's stock. (Id., Exs. 5 and 12.)[1]

**Spehar Asserts Right To Payment.** On August 8, 2003, Spehar sent CMGT a letter demanding compensation if CMGT consummated the Newco Deal. (Id., ¶47 and Ex. 8.) CMGT disagreed because Trautner was not included on Exhibit A of the Spehar Agreement and the Newco Deal resulted from communications that did not involve Spehar. CMGT and Spehar had many communications about this dispute, but were unable to resolve it. (Id., ¶¶47-53 and Exs. 8-12B.)

**The Spehar Dispute Is Disclosed To CMGT Shareholders.** By letter dated August 26, 2003, Franco informed CMGT's shareholders that Spehar was asserting a right to compensation on the Newco Deal, but that "management and legal counsel strongly disagree." (Id., Ex. 12B.) Franco's letter further informed the shareholders that efforts to resolve the dispute had not been productive. (Id.) Franco also prepared an internal risk assessment dated September 1, 2003. (Id.,

---

[1]    The Complaint contains two attachments labeled Exhibit 12. The document referred to here is the second Exhibit 12 -- an August 26, 2003 letter from Franco to CMGT Investors and Interested Parties -- which should have been labeled Exhibit 13. This Exhibit will hereafter be cited as Exhibit 12B, while the first Exhibit 12 -- an e-mail sent by Ronald on August 19, 2003 -- will be cited as Exhibit 12A. Exhibits 14-17 are properly numbered.

Ex. 14.)  The assessment notes that Spehar's claim to compensation for the Newco Deal is without merit, but that Spehar "indicated [it] will take legal action to enforce his contract" (id., Ex. 14 at CMGT-3), and that the risk of litigation was "High" (id., ¶57 and Ex. 14 at CMGT-4).

**Spehar Sues And Scuttles The Newco Deal.**  In September 2003, Spehar initiated its suit against CMGT in California (the "Spehar Suit").  (Id., ¶58.)  Instead of seeking to freeze the proceeds of the Newco Deal until Spehar's alleged right to compensation could be decided, Spehar obtained a TRO that prohibited CMGT from closing the Newco Deal at all. (Id., ¶59.)  The day after he received the TRO, Ronald e-mailed it and other materials to CMGT and its shareholders (the "September 17 E-mail").  His e-mail stated: "Mayer Brown has not been retained to deal with this matter, and we do not expect to be." (Id., Ex. 15.)

Two days later, Ronald sent a long e-mail to Franco and CMGT's shareholders (the "September 19 E-mail").  (Id., Ex. 16.)  In it, Ronald stated that he had been advised that unless the Spehar Suit was immediately withdrawn: (i) Franco would leave CMGT; and (ii) the Newco Deal would be terminated.  (Id.)  Ronald also stated that he believed the Spehar Suit was without merit, that the California court did not have personal jurisdiction over CMGT, and that injunctive relief was inappropriate because the case involved money damages.  (Id.)  However, Ronald did not advise CMGT that it could ignore the Spehar Suit with impunity.  Instead, he stated:

> Spurious or not, CMGT has no money to fight this battle. . .
>
> Many have questioned how it is that an individual who does not seem to have done anything for CMGT can inflict such direct and intentional harm on those whose contributions are beyond dispute. The answer may simply be that CMGT has run out of time and can no longer act on your behalf to protect your interests from Gerry Spehar.

(Id.)  On October 2, 2003, Ronald notified CMGT's shareholders that because of the Spehar Suit,

the Newco Deal was terminated. (Id., ¶61.) On October 3, the California state court entered a preliminary injunction preventing the closing of the Newco Deal. (Id., ¶62.)

**The Default Judgment.** On March 18, 2004, after amending its complaint to seek money damages, Spehar obtained the $17 million Default Judgment. (Id., ¶63 and Judgment And Permanent Injunction Against CMGT, Inc., Exhibit A hereto.)[2] The Default Judgment was based on the fictional and speculative theory that if CMGT had rejected the Newco Deal: (i) CMGT promptly would have obtained $2.5 million in financing from another source; (ii) within two years, CMGT would have been wildly successful and worth almost $200 million; and (iii) CMGT would have done an IPO, CMGT would have hired Spehar to do it, and Spehar would have received more than $16.5 million therefrom. (Transcript of Proceedings dated February 26, 2004 at pp. 2-6, Exhibit B hereto.)

**Spehar Funds and Directs This Malpractice Action.** Having already destroyed CMGT -- but having no means to collect on his Default Judgment against a worthless entity -- Spehar turned its sights on the Lawyer Defendants. First, armed with the bogus Default Judgment, Spehar filed a single-creditor involuntary bankruptcy petition, forcing CMGT into bankruptcy. (Involuntary Petition of CMGT, Inc., Exhibit C hereto.) Next, Spehar funded this malpractice lawsuit against the Lawyer Defendants. (Order dated September 2, 2005, Exhibit D hereto.) The essential element of this claim is that Defendants are guilty of malpractice because the Spehar Suit was without merit

---

[2]    The exhibits attached to this Memorandum are public records from the Spehar Suit and the CMGT Bankruptcy. The Court may consider such public records in deciding this Motion to Dismiss. In re Salem, 465 F.3d 767, 771 (7th Cir. 2006) (taking judicial notice of New York state court proceedings); Davis v. Central Can Co., No. 05 C 1563, 2006 WL 2255895, at *4 (N.D. Ill. Aug. 4, 2006) (similar).

and, if Defendants had simply appeared and defended CMGT in the Spehar Suit, then CMGT would have prevailed and the Default Judgment would not have been entered. (Complaint, ¶¶58-65.)

## ARGUMENT

## I.    THE COMPLAINT SHOULD BE DISMISSED AS A FRAUD ON THE JUDICIAL SYSTEM

All federal courts have the inherent authority to sanction litigants for bad-faith or fraudulent conduct. REP MCR Realty, L.L.C. v. Lynch, 363 F. Supp. 2d 984, 998 (N.D. Ill. 2005) (collecting cases), aff'd.,--- Fed. Appx. ---, 2006 WL 2266742 (7th Cir. Aug. 3, 2006). This includes the power to impose the sanction of dismissal with prejudice. Id. That sanction is appropriate here to defeat Spehar's attempt to perpetrate a fraud on three courts and the system of justice generally.

As set forth above, Spehar's fraud began in California state court, where it filed the litigation against CMGT that is now concedes to have been meritless. There, knowing CMGT could not afford to defend itself, Spehar obtained an injunction preventing CMGT from getting the only financing that was available to it and, later, obtained a bogus Default Judgment based upon far-fetched speculative future damages. Spehar then shifted his fraud to our Bankruptcy Court, where, based on the Default Judgment, it filed a single-creditor involuntary bankruptcy proceeding. Next, Spehar orchestrated and funded the filing of this malpractice suit in Illinois state court. (See Ex. D.) Through this fraud, if successful, Spehar stands to take the lion's share of any recovery CMGT obtains. (Id.) Yet, to be successful, Spehar's own claims would have to be proven to have been meritless in the first instance.

There is no other way to describe Spehar's use of three courts to attempt to parlay a meritless claim into a $17 million windfall -- it is a fraud on the courts and should not be tolerated.

## II.    THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(b)(6)

A 12(b)(6) motion to dismiss should be granted where it is clear that a plaintiff cannot prove any set of facts upon which relief may be granted. Cleveland v. Rotman, 297 F.3d 569, 572-75 (7th Cir. 2002) (affirming dismissal of legal malpractice claim asserted under Illinois law).

In considering such a motion, documents attached to the complaint -- including letters -- are considered part of the complaint. Berbas v. Bd. of Educ. of the City of Chicago, No. 00 C 2734, 2000 WL 875728, at *4 (N.D. Ill. June 28, 2000). When they contradict the allegations, the exhibits trump the allegations. In re Wade, 969 F.2d 241, 249-50 (7th Cir. 1992); Berbas, 2000 WL 875728, at *4. Indeed, a plaintiff may plead itself out of court by attaching documents that show it is not entitled to judgment. Wade, 969 F.2d at 249; Berbas, 2000 WL 875728, at *4; see also Talley v. Yonan, 391 N.E. 2d 79, 81 (Ill. App. Ct. 1979) (dismissing malpractice claim where exhibit contradicted complaint). Although courts must draw all reasonable inferences in favor of the non-moving party, they may not draw inferences that contradict the complaint's exhibits. Wade, 969 F.2d at 250.

Under Illinois law, the elements of a legal malpractice claim are as follows:

> To prevail on a legal malpractice claim, the plaintiff client must plead
> and prove that the defendant attorneys owed the client a duty of due
> care arising from the attorney-client relationship, that the defendants
> breached that duty, and that as a proximate result, the client suffered
> injury. . . . The existence of actual damages is . . . essential to a
> viable cause of action for legal malpractice.

Tri-G, Inc. v. Burke, Bosselman & Weaver, Nos. 99584, 99595, --- N.E.2d---, 2006 WL 1702282, at *1 (Ill. June 22, 2006).

Here, the Complaint fails to state a valid claim for malpractice for any one of three reasons, as follows:

8

**A.    As To Both Counts -- The CMGT Trustee Himself**
**Proximately Caused The Claimed Loss Or Failed To Mitigate It**

If anyone, it is the CMGT Trustee that caused the alleged loss or failed to mitigate the damages. The Default Judgment was entered on March 18, 2004 (Ex. A) and was the result of utterly meritless litigation (Complaint, ¶64). Under California law, CMGT could have moved to vacate the Default Judgment up until September 18, 2004. Cal. Civ. Proc. Code § 473(b) (2006). Indeed, the California trial judge anticipated this would happen. (Ex. B at p. 5.) The order for bankruptcy relief was entered on September 15, 2004, a few days before the six-month period elapsed. (Order dated September 15, 2004, Exhibit E hereto.) Moreover, under bankruptcy law, the CMGT Trustee had an additional sixty days after the order of relief was signed, or until November 15, 2004, to move to vacate the Default Judgment. 11 U.S.C §108(b). He failed to do so, and he is the one responsible for any purported "loss," or for failing to mitigate the same. Thus, his Complaint should be dismissed. See Land v. Greenwood, 478 N.E.2d 1203, 1205 (Ill. App. Ct. 1985) (dismissing malpractice claim against original attorney because successor attorney could have averted the harm caused by the original attorney's alleged negligence); see also Mitchell v. Schain, Fursel & Burney, Ltd., 773 N.E.2d 1192, 1195 (Ill. App. Ct. 2002) (same, affirming summary judgment for original attorney).

**B.    As To Count II -- There Are No Damages**

Count II seeks $17 million based on the amount of the Default Judgment. Notably absent is any allegation that CMGT has actually paid (or will ever pay) any portion of the Default Judgment.

The Illinois Supreme Court has ruled that:

> The plaintiff must affirmatively prove that he suffered actual damages as a result of the attorney's malpractice, and a plaintiff who obtains recovery in a malpractice suit can be in no better position by bringing

suit against the attorney than if the underlying action [was handled properly].

Eastman v. Messner, 721 N.E.2d 1154, 1158 (1999) (internal quotation marks and citations omitted). As a result, a judgment debtor that has not paid -- and never will pay -- any part of a money judgment (like CMGT here) cannot sue a lawyer for malpractice in connection with that judgment. Sterling Radio Stations, Inc. v. Weinstine, 765 N.E.2d 56, 62 (Ill. App. Ct. 2002).

In Sterling, WSDR, Inc. obtained a $778,460.38 judgment against Sterling Radio and Alex Seith. Id. at 59. Sterling Radio's assignee paid $300,000 to satisfy the judgment against both defendants. Id. Seith himself paid nothing. Later, Seith brought a malpractice action against his attorneys, seeking to recover the $300,000. In language equally applicable here, the court affirmed the dismissal of Seith's claims on the ground that he had suffered no damages:

> Seith personally paid nothing in satisfaction of the judgment rendered against him and [Sterling Radio] as a result of defendants' malpractice. Therefore, his measure of damages is zero. To allow Seith to recover $300,000 in this malpractice claim would unjustly enrich Seith and permit a double recovery. Further, Seith would be in a better position by bringing the legal malpractice claim than if he had won the underlying action. We do not believe this result is allowed under Illinois law as our supreme court held in Eastman . . ..

Id. at 62.

Here, too, CMGT has paid nothing to satisfy the Default Judgment, it has suffered no damages, and it would be better off if it received $17 million than if it had avoided the Default Judgment. Thus, it has no malpractice claim.

10

C.    **As To Both Counts -- The Nine Purported Acts Of Malpractice Fail**

The Complaint alleges nine acts or omissions of purported malpractice. As set forth below, these nine acts are defeated because: (i) Defendants had no duty to perform them; (ii) they are contradicted by the Complaint's exhibits; and/or (iii) they did not cause any damages.

1.    **Failing To Advise That Spehar Would Sue (¶69)**

**No Duty.** The Engagement Letter states that CMGT retained Defendants only in connection with its formation and corporate activities. It says nothing about litigation services, and its scope could be expanded only by written mutual consent. (Complaint, Ex. 1.) The Complaint does not allege that CMGT sought Defendants' consent to represent it in the Spehar Suit -- much less that consent was obtained in writing. (Id.) Accordingly, advice that Spehar might sue was outside the scope of Defendants' representation. See Ill. R. Prof. Conduct, 1.2(c) (objectives of attorney representation can be limited by mutual agreement); Keef v. Widuch, 747 N.E.2d 992, 998 (Ill. App. Ct. 2001) (lawyer "may limit the scope of representation"). Thus, because there was no attorney-client relationship for this purpose, this claim should be dismissed. See Majmudar v. Lurie, 653 N.E.2d 915, 918 (Ill. App. Ct. 1995). In any event, litigation may result whenever there is an unresolved business dispute. An attorney has no duty to state the obvious.

**Contradicted By Exhibits.** CMGT knew that Spehar would file suit. Exhibit 14, authored by CMGT's COO, expressly states that Spehar "has indicated he will take legal action to enforce his contract" and that the chances of litigation are "High." (Complaint, ¶57 and Ex. 14 at CMGT-3 and 4.) Likewise, Exhibits 9-12A are August, 2003 e-mails referring to Spehar's demands and indicating that Spehar would sue if its demands were not settled. Thus, there was no failure to warn.

11

**No Causation Or Damages.** In all events, a warning would not have prevented Spehar from filing suit. And, even after Spehar filed suit, CMGT could have avoided any damages by defending itself. (Id., ¶64.) Without causation and damages, there is no valid claim. Farm Credit Bank of St. Louis v. Gamble, 554 N.E.2d 779, 781 (Ill. App. Ct. 1990).

## 2.    Failing To Advise That CMGT Could Lose The Spehar Suit (¶69)

**No Duty.** As shown above, any such advice was outside the scope of Defendants' representation. Moreover, CMGT did not lose on the merits, but only because it defaulted (Complaint, ¶63), so this allegation is irrelevant. Perhaps the Complaint means to say that Defendants did not advise CMGT that it could lose the Spehar Suit if it did not defend itself and defaulted. Such an allegation is also invalid, because lawyers have no duty to inform their sophisticated clients of the obvious.

**Contradicted By Exhibits.** After receiving the TRO from Spehar's counsel on September 16, 2003, Defendants promptly transmitted it to CMGT and its shareholders. (Id., Ex. 15.) The TRO prohibited CMGT from closing the Newco Deal, demonstrating rather concretely that when a party is not defended in court, that party can lose. Defendants made this same point to CMGT and its shareholders two days later:

> CMGT has no money to fight this battle [the Spehar Suit] . . .
>
> Many have questioned how it is that an individual [Gerry Spehar, President and owner of Spehar Capital] who does not seem to have done anything for CMGT can inflict such direct and intentional harm on those whose contributions are beyond dispute. The answer may simply be that CMGT has run out of time and can no longer act on your behalf to protect your interests from Gerry Spehar.

(Id., Ex. 16.) This clearly informed CMGT and its shareholders that unless money was raised and a defense mounted, the Spehar Suit would be lost as well as the shareholders' interests in CMGT.

**No Causation Or Damages.** CMGT had a clear opportunity to avoid any damages. After being told that Defendants had not been retained to defend the Spehar Suit and that the TRO had been entered, CMGT had ample time to hire counsel and defend itself so as to prevent a preliminary injunction or money judgment from being entered. Indeed, the preliminary injunction was not entered until October 3, 2003 and the Default Judgment was not entered until March 18, 2004, three weeks and six months, respectively, after the TRO. (Id.,¶¶59, 62 and 63 and Ex. A hereto.) Had CMGT defended itself, it would have won. (Id., ¶64.) Thus, Defendants caused no loss. Farm Credit, 554 N.E.2d at 781 (no malpractice damages where plaintiff may still win underlying action).

### 3. Failing To Advise That Defendants Would Not Represent CMGT (¶69)

**No Duty.** As shown above, Defendants' representation of CMGT did not include litigation or the Spehar Suit. Thus, Defendants had no duty to advise CMGT that they would not represent it in the Spehar Suit.

**Contradicted By Exhibits.** In all events, Defendants did advise CMGT that they would not represent it in the Spehar Suit. Defendants' September 17 E-mail to CMGT's COO and shareholders expressly stated that "Mayer Brown has not been retained to deal with this matter [i.e., the Spehar Suit], and we do not expect to be." (Complaint, Ex. 15.)

**No Causation Or Damages.** As shown earlier, CMGT had plenty of time to find new counsel before the preliminary injunction hearing three weeks later and before the Default Judgment was entered six months later. Thus, any purported damages could have been easily avoided. Farm Credit, 554 N.E.2d at 781 (no malpractice damages where underlying action is still pending.)

**4.     Failing To Advise That The Spehar Suit Would Preclude Financing (¶¶51, 56)**

**No Duty.**  The potential effect of litigation on one's ability to get financing is not legal advice, but a business judgment for the client to make.  Defendants had no duty to provide such advice, particularly because they were not representing CMGT in litigation matters.

**Contradicted By Exhibits.**  Defendants' September 17 E-mail to CMGT and its shareholders attached the TRO, which expressly prohibited CMGT from closing the Newco Deal; this clearly demonstrated that the Spehar Suit would impede financing.  (Complaint, Ex. 15.) Likewise, Defendants reported that the Trautner group would terminate the Newco Deal unless the Spehar Suit were withdrawn and that "no one should expect [the investors in the Newco Deal] or any other third-party to go forward [with financing] in the face of [Spehar's] despicable tactics." (Id., Ex. 16 at p.1.)  These emails provided the very warnings the Complaint says were missing.

**No Causation Or Damages.**  In all events, CMGT could have pursued settlement with Spehar at any time if it wanted to do so.  In fact, even after the preliminary injunction was entered, Spehar was willing to continue its effort to find financing for CMGT.  (Id., ¶63.)  CMGT chose not to pursue these options.  That decision on CMGT's part did not constitute legal malpractice by Defendants.  Tri-G, 2006 WL 1702282, at *1 (malpractice damages will not be presumed).

**5.     Telling CMGT Not To Defend The Spehar Suit (¶¶58-59)**

The Complaint alleges -- but only on information and belief -- that Ronald advised CMGT not to appear and defend the Spehar Suit, because he erroneously believed the California courts had no jurisdiction over CMGT and if CMGT did file an appearance, it would be in danger of submitting itself to California jurisdiction. (Complaint, ¶¶58-59.)

**Contradicted By Exhibits**. The Lawyer Defendants were not representing CMGT as to litigation matters generally and, when the TRO was issued, specifically told CMGT that they had not been, and did not expect to be, retained to represent CMGT in the Spehar Suit. (Id., Exs. 1 and 15.) Two days later, the Lawyer Defendants told CMGT and its shareholders that although the Spehar suit was "spurious," CMGT had "no money" to defend itself and would not be able to protect the shareholders' interests. (Id., Ex. 16.) These exhibits are inconsistent with Ronald telling CMGT not to defend the Spehar Suit because the California court had no personal jurisdiction. To the contrary, if the California court had no jurisdiction, that would be another basis for CMGT to defend itself, not a reason for CMGT to default. The exhibits show that CMGT was out of money and that its shareholders decided not to invest any new money that would be used for litigation.

**No Causation Or Damages.** Assuming for the sake of argument that the "information and belief" allegations are true -- and they are not -- they did not cause any loss. After being notified of the TRO and the fact that Defendants had not been retained to represent CMGT in the Spehar Suit, CMGT and its shareholders could have hired counsel to defend them. If they had done so, they would have won the case. (Id., ¶64.) It was their own decision not to do so that resulted in the preliminary injunction and, months later, the Default Judgment, not any action or inaction by Defendants.

### 6.    Failing To Recommend That CMGT Settle The Spehar Litigation (¶¶51-56)

**No Duty.** Because Defendants were not representing CMGT in the Spehar Suit, they had no duty to advise CMGT whether or not to settle it.

**Contradicted By Exhibits.** Defendants and CMGT agreed that the Spehar Suit was meritless. (Id., Ex. 12B, Ex. 14 at CMGT-3 and Ex. 16.) Nonetheless, Defendants advised CMGT

that the suit prevented CMGT from getting the financing that it needed. (Id., Ex. 16 at p.1.)  CMGT therefore had all the information it needed to decide what to do.  CMGT could: (a) raise money to defend or settle the Spehar Suit; or (b) give up and go out of business.  CMGT chose the latter, and Defendants cannot be blamed for that decision.

Moreover, CMGT did try to settle the Spehar dispute, but without success.  Franco had "numerous conversations" with Spehar in an attempt to resolve the dispute "but they were not productive." (Id., Ex. 12B.)  Therefore, one of three things happened: (a) Defendants did advise CMGT to settle the dispute; (b) CMGT already knew it should settle the dispute; and/or (c) any such advice would have been futile because no mutually agreeable settlement terms could be reached.  Under any of these scenarios, there is no valid malpractice claim.

Indeed, the Complaint explains why no settlement was possible.  CMGT had "no money" and eventually was forced into bankruptcy. (Id., Ex. 5 and Ex. 16 at p. 1.)  Without money, CMGT had nothing to offer Spehar to settle the case, except the opportunity to share in the proceeds from the Newco Deal.  CMGT made this offer, and Spehar rejected it. (Id., Ex. 16.)

**No Causation Or Damages.**  In legal malpractice cases, damages will not be presumed.  Tri-G, 2006 WL 1702282, at *1. The idea that a lawyer's failure to advise a client to settle caused damages is, at best, speculative, because it presumes the client would have followed the lawyer's advice and that a settlement could have been reached.  Here, such presumptions would be particularly inappropriate, because, as explained above, CMGT already knew the benefits of settling the case and did not need any advice from Defendants.  In addition, no settlement was possible, because CMGT had no assets.  Accordingly, Defendants' alleged failure to recommend settlement did not cause any loss.

16

7.  **Failing To Suggest That CMGT Search For Better Offers (¶¶43, 69)**

**No Duty.**  Whether one can obtain better financing terms in the marketplace involves business judgment; it is not a legal issue.  CMGT hired Spehar, not Defendants, to provide that advice.  (Complaint, Exs. 1 and 2.)  Even if Defendants had such a duty, at most, the Complaint alleges an error of judgment -- whether to sign the Newco Deal or keep looking for better terms.  However, "Illinois adheres to the rule that an attorney is not liable to his client for errors in judgment, but only for failing to exercise a reasonable degree of care and skill."  Goldstein v. Lustig, 507 N.E.2d 164, 168-69 (Ill. App. Ct. 1987) (dismissing legal malpractice complaint).  This is true even if "the exercise of that judgment may have led to an unfavorable result for the client."  Id. at 169.

CMGT was in terrible financial shape and facing a crisis.  (Complaint, Ex. 5 at p. 1.)  Among other things, if it did not act fast, it was going to lose Franco, its only officer, and probably have to shut its doors.  (Id., Ex. 5 at p. 2.)  Franco had been trying to find financing for CMGT for more than three years, had considered hundreds of proposals, and thought the Newco Deal was the best deal available.  (Id.)  In fact, Spehar, a hired professional, had failed to find any financing for CMGT despite more than two years of trying.  (Id., ¶¶32-46.)  Attempts to get financing from Sealaska also had failed, and the Complaint offers no reason, other than blind hope, to believe that a second effort to obtain financing from Sealaska would succeed.  (Id., ¶37.)  Under these circumstances, the Court can and should reject any claim that Defendants were unreasonable because they did not tell CMGT to forsake the certain financing it had in hand and go back to the marketplace to try (yet again) to find something better.

In addition, Defendants could not possibly have a duty to suggest that CMGT should try to get the best financing possible. Such a condescending suggestion would have no value to CMGT's sophisticated management, who already were obligated to act in the best interests of the company and had been looking for financing for years.

**Contradicted By Exhibits.** As shown above, CMGT already had tried to obtain the best financing arrangement, but no other options were known and Spehar, who was hired to find such financing, had failed to deliver for more than two years. (Id., ¶¶32-46 and Ex. 5.) Franco stated that the Newco Deal was "a better commitment than I have been able to obtain for you from any of the hundreds of potential investors I've worked with on your behalf over the last three years." (Id., Ex. 5 at p. 2.) On the strength of Franco's recommendation, CMGT's shareholders voted overwhelmingly to approve the Newco Deal. (Id., Ex. 12B at p. 1.) Thus, even if Defendants suggested that CMGT keep looking, the result would not have changed.

**No Causation Or Damages.** Apart from speculation, the Complaint does not allege that any financing was available to CMGT other than the Newco Deal. Accordingly, Defendants' alleged failure to recommend that CMGT look for other financing did not cause any damages. Farm Credit, 554 N.E.2d at 787 (speculative damages cannot sustain legal malpractice claim.)

### 8. Failing To Advise That Mayer Brown Favored The Newco Deal (¶¶43, 68)

The Complaint alleges that Defendants negligently failed to advise CMGT that the reason they favored the Newco Deal was because: (a) it ensured they would be paid their fees; and (b) it was in the best interests of Defendants' other clients and other third persons. (Complaint, ¶¶43,68.)

**No Duty.** The Complaint's attempt to set up a conflict of interest fails. First, under the Engagement Letter, CMGT already had agreed that Defendants would be paid out of any financing

(id., Ex. 1), so the fact that Defendants would receive some payment did not make the Newco Deal different from any other deal. Second, the Complaint does not allege that Trautner or Newco were Defendants' clients (in fact, they were not), nor does it identify the "other third persons." In light of such omissions, this malpractice claim is barren.

**Contradicted By Exhibits.** The fact that Defendants were going to receive some payment was fully disclosed in the letter of intent setting forth the Newco Deal that was signed by CMGT. (Id., Ex. 3 at pp. 2-3.) A client may consent to a lawyer's representation in a transaction where the lawyer has an interest, (Ill. R. Prof. Conduct 1.7 (b)), and CMGT did so. The letter of intent also was circulated to CMGT's shareholders, who voted by a "decisive majority" to approve the Newco Deal. (Complaint, Ex. 5 at p.1 and Ex. 12B at p. 1.)

**No Causation Or Damages.** The fact that the Lawyer Defendants were going to receive some payment from the Newco Deal is irrelevant, because the Newco Deal was never consummated.

### 9.    Failing To Give Advice To CMGT's Shareholders (¶56)

**No Duty.** Defendants owed no duty to CMGT's shareholders. The attorney for a corporate entity owes a duty only to the corporation itself -- not to any officer, director, or shareholder. Parsons Tanning Co. v. Schwartz, No. 03 C 7972, 2004 WL 1593909, at *7 (N.D. Ill. July 15, 2004) (dismissing shareholders' malpractice claim against corporation's attorney); Kopka v. Kamensky & Rubenstein, 821 N.E.2d 719, 723-24 (Ill. App. Ct. 2004); Majmudar, 653 N.E.2d at 918; Felty v. Hartweg, 523 N.E.2d 555, 556-57 (Ill. App. Ct. 1988) (dismissing shareholders' malpractice claim). Consistent therewith, CMGT is the plaintiff here and cannot possibly recover on a shareholder's claim.

19

**Contradicted By Exhibits.** As explained earlier, CMGT's shareholders were kept fully advised of everything the Complaint alleges they were not told. (Complaint, Exs. 5, 12B, 15 and 16.)

**No Causation Or Damages.** In all events, Defendants' alleged omission caused no loss, because CMGT was out of money and Spehar rejected the sole asset CMGT could offer -- an interest in Newco. (Id., Ex.16.) Furthermore, Defendants told CMGT's shareholders that CMGT had "no money" to fight the Spehar Suit and that, if they did not step up, they would lose their interests in CMGT. (Id.) They decided not to act.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed, and Defendants should be granted such other and further relief as is appropriate.

Respectfully submitted,

MAYER BROWN ROWE & MAW LLP AND
RONALD GIVEN

_____/s/ Stephen Novack_____
One Of Their Attorneys

Stephen Novack
Mitchell L. Marinello
Steven J. Ciszewski
Novack and Macey LLP
100 N. Riverside Plaza
Chicago, IL 60606
(312) 419-6900
Doc. #164238

## CERTIFICATE OF SERVICE

Stephen Novack, an attorney, hereby certifies that he caused a true and correct copy of the foregoing Memorandum of Law in Support of the Lawyer Defendants' Motion to Dismiss to be served through the ECF system upon the following:

> Edward T. Joyce
> Arthur W. Aufmann
> Robert D. Carroll
> Edward T. Joyce & Assoc., P.C.
> 11 S. LaSalle St.
> Chicago, IL 60603

on this 30th day of November, 2006.


_____/s/ Stephen Novack_____