## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION



DAVID GROCHOCINSKI, not individually, )
but solely in his capacity as the Chapter 7 )
Trustee for the bankruptcy estate of )
CMGT, INC. )
             Plaintiff, )
              )
     v. )
              )
MAYER BROWN ROWE & MAW LLP, )
RONALD B. GIVEN, and CHARLES W. )
TRAUTNER, )
              )
          Defendants. )
              )

### COMPLAINT

Plaintiff, DAVID GROCHOCINSKI, not individually, but solely in his capacity as the

Chapter 7 Trustee for the bankruptcy estate of CMGT, Inc. ("CMGT"), by and through his

attorneys, Edward T. Joyce & Associates, P.C., states as his Complaint against defendants,

Mayer Brown Rowe & Maw, LLP, Ronald B. Given ("Given") (collectively, "MBRM"), and

Charles W. Trautner ("Trautner") as follows:

### I.    NATURE OF THE CASE

1.    This case arises out of (a) defendants MBRM and Given providing CMGT with

negligent legal advice and representation, and (b) defendant Trautner's breach of his fiduciary

duty to CMGT, his interference with CMGT's prospective business opportunities, and his

inducement to MBRM and Given to breach their duties to CMGT.

2.    MBRM was hired by CMGT to provide legal advice with respect to CMGT's

initial capitalization, formative activities, financing activities, and other general corporate

activities.  As CMGT's legal counsel, MBRM regularly gave legal advice on a wide range of

Dockets.Justia.com

subjects, including a dispute that arose between CMGT and a venture capital consulting firm, Spehar Capital, LLC ("SC"), which had been retained by CMGT to help it obtain financing.

3. While providing CMGT with these services, MBRM (a) rendered negligent advice with respect to CMGT's financing efforts and the dispute that arose with SC, (b) breached its duty to CMGT by abandoning CMGT after SC filed a suit against CMGT, and (c) accepted engagements which created irreconcilable conflicts between their clients CMGT and SC.

4. As a result of MBRM's negligence and Trautner's intentional interference and breach of fiduciary duty, CMGT had a $17 million default judgment entered against it, lost valuable financing opportunities, filed for involuntary bankruptcy, and lost its substantial value.

## II.    PARTIES

5. Plaintiff David Grochocinski was appointed trustee in bankruptcy for CMGT on or about September 21, 2004. CMGT, a Delaware corporation, involuntarily petitioned for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, on or about August 24, 2004. On November 18, 2005, Edward T. Joyce & Associates, P.C., was appointed special counsel to investigate and, if appropriate, prosecute actions against professionals, shareholders, agents, officers and/or directors of CMGT on behalf of the estate and Trustee.

6. Defendant MBRM is a law firm formed as a limited liability partnership doing business in Illinois and elsewhere.

7. Defendant Given is and has at all relevant times been a partner at MBRM.

8. Defendant Trautner was at all relevant times one of CMGT's largest shareholders. As of June 30, 2003, Trautner owned approximately 146,790 preferred shares of CMGT stock.

2

### III.    **JURISDICTION**

9.    This Court has subject matter jurisdiction over this matter and personal jurisdiction over the defendants under the common law of the State of Illinois and 735 ILCS §5/2-209(a)(1), (a)(2), (a)(7), (a)(11).

10.    Venue is proper in this Court under 735 ILCS §5/2-101(1) and (2).

### IV.    **FACTS**

#### A. **CMGT's History**

11.    CMGT, f/k/a Caremanagement.com, Inc., was founded in January 1999 to provide unique case/care management and third party administration services to the disability/healthcare insurance industry, and to implement an aggressive growth plan through key acquisitions. However, when one of CMGT's founders unexpectedly died in July 1999, CMGT found a replacement executive, Louis Franco ("Franco"), to run the company and reevaluate its business strategy.

12.    CMGT's management underwent significant changes in or around July 1999. Among other changes, Franco became CMGT's chief operating officer ("COO").

13.    At the time Franco was appointed CMGT's COO, he had a long-standing friendship with Given. Through Franco's relationship with Given, MBRM became CMGT's legal counsel. (As more fully described below, MBRM's engagement was memorialized in a letter agreement on January 31, 2000.) Franco relied heavily on Given's advice throughout Franco's tenure at CMGT.

14.    CMGT's new management team redesigned CMGT's business plan to focus on delivering integrated comprehensive absence, disability, and care management services. CMGT's software and services were used to track employee absences, which helps employers

3

minimize the cost of absences, maximize the value of time-off and disability programs, and ensure compliance with federal labor laws, such as the Family Medical Leave Act ("FMLA"). This new business strategy also replaced CMGT's aggressive acquisition plan with one favoring strategic organic growth.

15.    In furtherance of this new business plan, CMGT acquired Touch Speed Technology, Inc. ("Touch Speed") on April 17, 2000. Touch Speed was a software development and absence management company that specialized in absence/disability management software and services. Touch Speed added significant value to CMGT, primarily because of its proprietary *Absence Expert*™ software and its *First in Touch* ™ call center/live operator absence/disability intake service. In addition to its proprietary software and services, Touch Speed brought two existing and valuable clients to CMGT -- Sun Life of Canada and Packard Bell/NEC.

16.    Touch Speed's *Absence Expert* ™ software and *First in Touch* ™ call center provided three primary benefits to CMGT and CMGT's clients/potential clients. First, the software could interface with the systems being used by CMGT's clients to track employee absence data such as payroll, disability insurance, and absences. Unlike these systems, which tracked each category of employee absence data individually, the *Absence Expert* ™ software integrated all of the data submitted by a CMGT client so that the client could have a comprehensive review of its employee absence data. Second, the *First in Touch* ™ call center provided a live operator who was trained to respond to inquiries relating to absence management. Finally, Touch Speed's *Absence Expert*™ software and *First in Touch*™ call center allowed CMGT's services to be accessed from anywhere in the world. Thus, CMGT had great flexibility in determining where to base its call center and executive office.

4

17.    In or around May 2000, CMGT's management was still redesigning its business plan and marketing strategy. At that time, CMGT decided to focus CMGT's marketing efforts on developing strategic partnerships with key insurance companies and insurance broker-consultants. This strategy was designed to leverage the relationships and reputations of CMGT's key principles, who were and are well-known in the insurance industry. Also, in October 2000, Franco (CMGT's COO) became CMGT's president and chief executive officer.

18.    After CMGT acquired Touch Speed, it solidified and began implementing its new business plan and marketing strategy. As a result, CMGT became an established business with several significant clients and strategic partnerships.

19.    · For example, in or around May 2001, CMGT signed a binding letter of intent to establish a strategic partnership with The Harford Life Insurance Companies ("The Hartford"). CMGT obtained several important clients through its relationship with The Hartford, including NCS Pearson, Honda Manufacturing of Alabama, Honda Manufacturing of Ohio, Platinum Equity and Ball Corporation. CMGT also developed strategic partnership relationships with several other major insurance companies, such as CIGNA, Liberty Mutual, ICS, and the Standard Insurance Company. CMGT also acquired clients such as Howard Hughes Medical Institute, McCord Travel, Atlanta Gas and Light Resources, ZiLOG and eBay, Inc. through these strategic partnerships/relationships.

20.    Although CMGT had an established business plan and valuable relationships in place, it required approximately $2,000,000 in additional financing to fully exploit its potential. Thus, while CMGT was developing strategic partnerships and a solid client base, it was also engaged in discussions with several financing prospects. CMGT conservatively projected that it would achieve a net profit of over $10 million per year within four years of receiving

approximately $2,000,000 in financing. CMGT also projected that it would have $24,000,000 in working capital within four years of receiving additional financing.

### B. The CMGT and MBRM Letter Agreement

21.    CMGT and MBRM memorialized an agreement on or about January 31, 2000 for MBRM to render certain legal services to CMGT. (A copy of the January 31, 2000 letter agreement is attached hereto and incorporated herein as Exhibit 1).

22.    Per the terms of this letter agreement, MBRM charged CMGT by the hour. However, MBRM agreed to defer payment until CMGT received an initial capitalization of at least $1,000,000. The agreement provided that: (a) the deferred payment would be billed at 125% of MBRM's regular hourly rates, and (b) MBRM had the unilateral right to terminate the engagement if the balance of unpaid fees ever exceeded $50,000, or if CMGT was not capitalized by May 1, 2000. MBRM also agreed not to be paid at all (except for reimbursement of costs) if CMGT did not receive necessary additional financing.

23.    Given performed or supervised all of MBRM's work for CMGT.

### C. The CMGT and SC Letter Agreement

24.    In or around June 2001, CMGT retained SC to help CMGT obtain financing. CMGT's agreement with SC was memorialized in writing on October 1, 2001. The terms of CMGT's letter agreement with SC (as revised) are described in greater detail below.

25.    CMGT and SC revised their October 1, 2001 letter agreement on or about September 30, 2002. (A copy of the September 30, 2002 letter agreement is attached hereto and incorporated herein by reference as Exhibit 2).

26.    Under the terms of the revised letter agreement, SC agreed to facilitate introductions and provide advisory services relating to potential debt and/or equity financing

6

deals, sales, mergers, and other potential financing transactions. SC also agreed to perform

certain "management consultant services." CMGT agreed to pay SC a "success fee" for SC's

advice and introduction to the source of debt and/or equity financing upon the successful closing

of a funding or a transaction. The success fee was to be payable in cash, and equal to 6% of the

accepted capital. The agreement also provided for a $100,000 management consulting fee and

stock compensation, which was to be awarded upon CMGT's acceptance of a term sheet, or

other commitment.

27.    The revised letter agreement between CMGT and SC included a chart ("Exhibit

A") that set forth the names of the third parties that CMGT had introduced to SC, or that CMGT

had authorized SC to have discussions with. SC was entitled to payment if the third party with

whom CMGT entered into a financing deal was listed on Exhibit A. However, it was SC's and

CMGT's regular course of dealing to "orally" add third parties to the list without updating

Exhibit A in writing.

### D. SC and Franco Form Millennium Partnership

28.    As described in more detail below, SC originally sought funding for CMGT from

Alaska Native Corporations ("ANC's") and other minority investors because of the marketing

advantages ANC minority status would provide.

29.    Beginning in 2001, SC and Franco marketed the idea of forming a minority

owned insurance company as "Millennium Partnership, LLC" with CMGT as a joint offering to

various ANCs and their venture capital partners. Although SC and Franco described the

minority owned insurance company in its proposals as "Millennium Partnership, LLC," they did

not create a legal entity known as Millennium Partnership until April 2003.

30.     In April 2003, two of CMGT's shareholders, Wayne Baliga ("Baliga") and James Wong ("Wong"), joined SC's and Franco's efforts to market and launch a minority owned insurance company. Thus, on April 8, 2003, SC, Wong, Franco and Baliga formed Millennium Partnership as a general partnership ("MP").

31.     MBRM was legal counsel for the minority owned insurance company project, first as counsel for SC and Franco and then as counsel for MP, from mid-2001 through April 2004. Thus, from mid-2001 through April 2004, MBRM was legal counsel for and owed fiduciary duties to both SC (through MP) and CMGT (directly).

### E.  CMGT's Financing Efforts in 2003

32.     Between June 2001 and January 2003, CMGT discussed possible financing deals with several companies, individuals and/or venture capitalists.

33.     One of the companies SC contacted to discuss financing for CMGT was Sealaska Corporation ("Sealaska"), which is an ANC. On or about February 5, 2003, Sealaska signed a letter of intent to purchase a 51% interest in CMGT for $2,000,000. Sealaska was a particularly attractive investor for CMGT because of its minority status and its significant strategic relationships. Both Sealaska's minority status and its strategic relationships would have greatly increased CMGT's client base.

34.     After submitting its February 2003 letter of intent, Sealaska engaged in extensive due diligence. Patrick Duke ("Duke"), Sealaska's treasurer, conducted due diligence by, *inter alia*, evaluating the market need for CMGT's services, contacting many of CMGT's clients, reviewing CMGT's industry contacts, evaluating CMGT's competition and reviewing the advantages CMGT would gain as a minority owned company.

8

35.     In or around early April 2003, Duke concluded that: (a) there was a definite and growing awareness in the marketplace of the costs associated with absences and disability management, (b) there was a heightened awareness of the risks involved in the administration of the FMLA, (c) effective absence management can reduce costs and improve productivity, (d) employers lack the resources to track absences, and (e) companies were overwhelmed with the complexities of the FMLA. In other words, Duke concluded that there was great market demand for CMGT's services and software.

36.     Duke also concluded that CMGT's clients, such as eBay, were extremely impressed with CMGT's software and services. Duke determined that CMGT's software, call center, and business plan gave it an advantage over its competitors, and that this advantage would be heightened if CMGT was a minority owned company. On information and belief, Duke submitted a glowing recommendation to Sealaska's president and chief executive officer that Sealaska invest in CMGT.

37.     Over the next month, May 2003, CMGT and Sealaska engaged in extensive negotiations over proposed term sheets. Their primary impasse was Sealaska's unwillingness to pay CMGT more than $950,000 for a 51% ownership interest in the company. Sealaska's proposed term sheet also severely subordinated and reduced by half the payment of MBRM's accrued attorney's fees; i.e., it was disadvantageous to MBRM. Although CMGT and Sealaska were on the brink of closing a deal, they ultimately were unable to reach mutually agreeable terms.

38.     While CMGT was negotiating with Sealaska in 2003, CMGT was also discussing potential deals with other prospective investors. One of those prospective investors was a group headed by Trautner.

39.    Trautner had approached Franco on a number of prior occasions with proposed funding deals. When Trautner first approached Franco about a funding deal, Franco introduced Trautner to SC and insisted that Trautner work through SC. Although SC worked with Trautner at Franco's insistence, Trautner was never formally added to the list (Exhibit A) attached to the CMGT/SC revised letter agreement.

40.    In or around January 2003, Trautner approached Franco with a new funding idea. On January 27, 2003, a conference call took place between Trautner, Franco, Given and SC's owner, Gerry Spehar ("Spehar"), regarding Trautner's proposal to fund CMGT via an asset purchase deal he called "Newco." Franco instructed Spehar to vigorously question Trautner for details on that call, which Spehar did. Trautner's proposed deal, if consummated, would not have honored any of CMGT's investor's notes or other legitimate liabilities, and would have left CMGT's shareholders with only 20% equity. Thus, Franco summarily rejected Newco as an unacceptable "sweetheart" deal for Trautner and his investors.

41.    In or around May 2003, Given and Trautner revived Trautner's Newco deal under the same terms that Franco had rejected in January. On information and belief, Given and Trautner did not tell Franco that they were reviving the Newco discussions. Given's discussions with Trautner quickly led to Given drafting a letter of intent for the Newco deal. (A copy of the Newco letter of intent is attached hereto as Exhibit 3). As set forth in the letter of intent, Newco agreed to purchase all of CMGT's assets by either, (a) paying CMGT $500,000 in cash, or (b) giving CMGT 20% of the shares of Newco. Under the Newco letter of intent, if CMGT opted to accept 20% of the shares of Newco, then Trautner and his investors were required to provide Newco's shareholders with an assurance that Newco's initial capitalization would be at least $2,500,000.

42.     The Given-drafted letter of intent also stated that Newco would not assume any of CMGT's liabilities, other than those associated with client contracts, but that MBRM's accrued fees would be paid at closing. The Given-drafted letter of intent required Newco to enter into an employment agreement with Franco and a transition services agreement with CMGT's outside accountant. The targeted closing date was September 30, 2003. On or about July 31, 2003, Trautner signed the letter of intent.

43.     On information and belief, Given pressured Franco to agree to the Newco letter of intent without advising Franco that if similar terms that were nevertheless more favorable to CMGT were offered to Sealaska or other potential investors, CMGT would likely be able to close a deal that was better than the Newco deal for CMGT. On information and belief, Given failed to give Franco this advice because the Newco deal ensured that MBRM's accrued fees would be paid. On or about August 1, 2003, Franco signed the Newco letter of intent.

44.     SC learned about the revived Newco deal on or about August 7, 2003. That same day, Franco sent CMGT's shareholders a letter notifying them about the Newco deal. At this same time, SC was in discussions with the Washoe Tribe about a financing deal. The Washoe Tribe deal would have been extremely beneficial to CMGT because CMGT would have gained minority status, financing, and would have retained more than twice the ownership it would have been left with in the Newco deal. SC kept Given and Franco fully apprised of its discussions with the Washoe. In fact, on August 14, 2003, Given and Franco pre-approved a letter of intent with the Washoe. (A copy of the August 14, 2003 pre-approved Washoe letter of intent is attached hereto as Exhibit 4.) The next day Franco sent CMGT's shareholders a letter (prepared by Given) soliciting proxies for the Newco deal and stating that there were no other alternatives.

11

(A copy of Franco's August 15, 2003 letter is attached hereto as Exhibit 5). Franco failed to tell CMGT's shareholders about the potential deal with the Washoe.

45.    On or about August 29, 2003, the Washoe committed to deliver a signed letter of intent by September 2, 2003, which they did. This letter of intent mirrored the letter of intent that was pre-approved by Given and Franco on August 14, 2003. In the September 2 letter of intent, the Washoe requested a due diligence period that was set to end on September 30, 2003. (A copy of the Washoe's September 2, 2003 letter of intent is attached hereto as Exhibit 6). Although not reflected in the letter of intent, Franco verbally agreed to let the Washoe have until October 15, 2003 to complete their due diligence

46.    On September 3, 2003, however, Given inexplicably modified the letter of intent to remove one day from the Washoe's requested due diligence time, and to state that the Washoe understood that, (a) CMGT expected to close the Newco deal by September 30, 2003, (b) CMGT would consider any other competing bids until such time as a transaction was consummated, (c) CMGT did not anticipate closing any other transactions before September 29, 2003, and (d) Franco was the only CMGT employee available to attend to all the various parties conducting due diligence. (A copy of the Given-modified Washoe letter of intent is attached hereto as Exhibit 7). Given did not offer any explanation for the modifications. Franco, in reliance on Given, agreed to the changes Given made. The Washoe rejected the modified letter of intent.

### F.    CMGT'S Dispute With SC – Before SC Filed Suit Against CMGT

47.    After learning about the revived Newco deal, Spehar immediately sent Franco and Given a letter telling them that the Newco deal was within the scope of SC's letter agreement with CMGT. Spehar also asked Franco to acknowledge/confirm that, consistent with their

regular course of dealing, the Trautner/Newco deal was verbally added to Exhibit A of the letter agreement. (A copy of Spehar's August 8, 2003 letter is attached hereto as Exhibit 8).

48.    On or about August 8, 2003, Given responded to Spehar on behalf of Franco and CMGT. Given stated that he had kept a "separate" channel of communications open with Trautner and that the Newco letter of intent was a result of those communications. Given also stated that Franco had not initiated or orchestrated the Newco letter of intent. With respect to SC's claim that the Newco deal fell within the scope of SC's letter agreement, Given said that he and Trautner had not discussed any of the prior communications to which Spehar had been a party, and that Spehar's assistance was neither required nor requested. Given did not confirm or deny that the Trautner/Newco deal had been verbally added to Exhibit A.

49.    Finally, despite MBRM's obvious and irreconcilable conflict, Given said that he would be asking Franco to refer Spehar's questions regarding the Newco deal to him (Given). MBRM expressly undertook the responsibility of handling SC's dispute on behalf of CMGT *at the same time* that (a) MBRM was representing SC as one of MP's four general partners and (b) MBRM stood to gain financially from the Newco deal. ( A copy of Given's August 8, 2003 email is attached hereto as Exhibit 9).

50.    On or about August 9, 2003, Spehar replied to Given and explained why he believed the Newco deal was within the scope of SC's letter agreement with CMGT. (A copy of Spehar's August 9, 2003 email is attached hereto as Exhibit 10). Given responded to Spehar that same day, telling Spehar that, "there is nothing left to be said regarding the LOI...if you wish to pursue it, you will be in an adversarial position and should deal with us through counsel..." (A copy of Given's August 9, 2003 email is attached hereto as Exhibit 11).

51.    In responding to Spehar about the Newco deal, Given made no effort to settle the dispute over the scope of SC's letter agreement with CMGT and thus negligently increased the likelihood that the dispute with CMGT would result in litigation that would harm CMGT's financing efforts.

52.    Despite Given's adversarial responses, SC was determined to amicably resolve the dispute, and Spehar continued his attempts to settle the matter with CMGT. For example, on or about August 19, 2003, Spehar made a settlement call to Given. During this phone call, Given hurled obscenities, racial slurs and threats at Spehar, and steadfastly refused to negotiate any settlement with SC.

53.    After the call, Spehar sent Given and Franco a series of emails that again tried to resolve the dispute. Given responded to these emails with an email of his own stating that "from a legal point of view, we simply cannot play your game of throwing E-Mails back and forth. We have talked to you. We have listened to you. We have told you our view. I'm sorry, but we can do no more. I think you need to listen and think a bit more. In any event, you have told us you have counsel. I will henceforth deal only with him or her, as is appropriate." (A copy of Given's August 19, 2003 email is attached hereto as Exhibit 12).

54.    Given's hard-line responses to Spehar's attempts to settle negligently exposed CMGT to an on-going dispute that CMGT could not afford to be undertaken.

55.    Given continued to provide CMGT with negligent advice regarding the SC dispute throughout August 2003. For example, on or about August 26, 2003, Franco sent a letter ·to all of CMGT's shareholder regarding the Newco deal. This letter states, in part, that:

> Gerry Spehar/Spehar Capital has claimed that he is entitled to compensation as a result of the Newco transaction under a contract he has with CMGT, Inc. Your management and legal counsel strongly disagree with this contention. Unfortunately, our numerous conversations with Gerry on this topic have not been

14

productive...even if their claims were deemed to have merit, the appropriate venue for the resolution of those claims will be in the winding up of CMGT, Inc. That is not before us today...I am confident that any claims against the transaction will not succeed and, as a practical matter, the only substantive effect we will be facing is additional documentation complexity and a delay in the winding up of CMGT, Inc. until such time as the escrow is released...

(A copy of Franco's August 26, 2003 letter is attached hereto as Exhibit 13).

56.    Given's advice to Franco was negligent in that Given knew and/or should have known that SC would file a lawsuit if CMGT did not settle, and that litigation with SC would be fatal to CMGT's attempts to obtain financing. Given's advice was also negligent because Given failed to: (a) properly assess the risk of SC prevailing in litigation on its claim, (b) inform CMGT's shareholders that SC had expressed willingness to settle the claim, (c) inform CMGT's shareholders that CMGT had *not* made a good-faith attempt to resolve the dispute through settlement, or (d) inform CMGT's shareholders that MBRM would not defend CMGT if SC filed suit.

57.    On or about September 1, 2003, Franco prepared an internal risk assessment document regarding the SC dispute. (A copy of the September 1, 2003 memorandum is attached hereto as Exhibit 14). In this document, Franco rated the degree of risk of SC filing suit as "high," and said that there was "no curative action required." Franco called SC's claim "meritless" and noted that "All legal issues subject to opinion of Mayer Brown Rowe & Maw (legal counsel for CMGT, Inc.)." On information and belief, Franco's statement that all legal issues were subject to the opinion of MBRM meant that Franco's evaluation of the SC dispute was based on opinions already expressed by MBRM.

### G. CMGT Dispute with Spehar -- After SC Lawsuit Commenced

58.    Because of Given's negligent advice and handling of the SC dispute, SC filed a lawsuit against CMGT in California in September 2003. Initially, SC requested injunctive relief

15

seeking to stop the Newco deal. On information and belief, Given negligently advised CMGT not to appear and defend the SC lawsuit because: (a) he erroneously believed that California court's had no jurisdiction over CMGT, and (b) if CMGT filed an appearance, it would be in danger of submitting itself to California's jurisdiction.

59.    On September 12, 2003, the California court held a hearing on SC's request for a temporary restraining order ("TRO"). No one appeared on behalf of CMGT, and the court awarded SC a TRO preventing the Newco deal from proceeding. On information and belief, CMGT failed to appear and defend at the TRO hearing because of the negligent advice provided by Given as described in paragraph 58, *supra*.

60.    After the TRO hearing, the court scheduled a preliminary injunction hearing for October 3, 2003. On September 17, 2003, Given sent a copy of the TRO order and an email to CMGT's shareholders. In that regard, even though Given's advice had been directly responsible for the SC lawsuit, Given asserted that MBRM had not been retained to deal with the SC litigation, and that he did not believe MBRM would be retained to defend the suit. (A copy of Given's September 17, 2006 email is attached hereto and incorporated herein by reference as Exhibit 15). Even though Given stated that MBRM was not going to defend CMGT in the SC lawsuit, Given nevertheless continued to negligently opine on SC's claim. For example, in a September 19, 2003 email to CMGT's shareholders, Given opined that:

> ...we believed, and continue to believe, that Gerry Spehar's claim is absolutely spurious...It seems obvious that there is no jurisdictional basis for Gary Spehar to bring his lawsuit in Los Angeles when CMGT is a Delaware corporation operating from Illinois. Moreover, injunctions are only appropriate if regular "legal" remedies are inadequate...Injunctive action is also clearly inappropriate if, as seems likely, all Gerry Spehar is really seeking is money...

(A copy of Given's September 19, 2003 email is attached hereto and incorporated herein as Exhibit 16).

16

61.    On or about October 2, 2003 Given notified CMGT's shareholders that because of the SC lawsuit, Newco had terminated the letter of intent with CMGT.

62.    No one from CMGT appeared at the October 3, 2003 preliminary injunction hearing, and the court entered a preliminary injunction. On information and belief, CMGT did not appear and defend at the preliminary injunction hearing because of the negligent advice provided by Given as described in paragraph 58, *supra*.

63.    On October 4, 2003, Spehar sent Given and Franco an email, informing them that the preliminary injunction was entered and asking for cooperation in trying to find funding for CMGT. Given and Franco never responded. On December 1, 2003, SC served CMGT with an amended complaint seeking damages. On February 26, 2004, SC obtained a default judgment for $17 million. (A copy of the order awarding SC a $17 million judgment is attached hereto as Exhibit 17). On information and belief, CMGT did not appear and defend SC's amended lawsuit because of the negligent advice provided by Given as described in paragraph 58, *supra*.

64.    If Given/MBRM had (a) not abandoned CMGT after SC filed suit, (b) advised CMGT to file a special and limited appearance to contest California's jurisdiction, (c) defended CMGT in the SC litigation, and/or (d) advised CMGT to contest SC's motion for an injunction, SC would not have obtained injunctive relief or damages against CMGT.

65.    If SC had not obtained its injunction, CMGT would have closed the financing deal with Newco and would have received funding. If CMGT had received funding, it would have become a highly profitable company. Instead, CMGT is now bankrupt as a result of Given/MBRM's negligence and Trautner's breach of fiduciary duty and intentional interference.

## Count I
### (Legal Malpractice Preventing CMGT from Receiving Funding)

66.    Plaintiff incorporates by reference paragraphs 1-65 as through fully set forth herein.

17

67.    An attorney-client relationship existed between CMGT and defendants Given and MBRM from at least January 31, 2000 to August 2004.

68.    As a result of the attorney-client relationship between Given/MBRM and CMGT, Given and MBRM had a duty:

   a.  to provide CMGT with competent representation, which required the legal knowledge, skill, thoroughness and preparation necessary for the representation;

   b.  to represent CMGT with the reasonable care, skill, diligence and promptness ordinarily possessed and exercised by other attorneys in the community in similar circumstances;

   c.  to inform CMGT (including its shareholders) of its options with regard to the SC dispute before SC sued CMGT, as well as to explain the foreseeable risks and benefits of such, thus allowing CMGT to make informed decisions regarding its legal matters.

   d.  to timely inform CMGT (including its shareholders) that MBRM would not defend CMGT if SC filed suit;

   e.  to keep CMGT (including its shareholders) reasonably informed about the status of the various financing discussions/negotiations Given was engaging in on behalf of CMGT, and to explain these discussions/negotiations to the extent reasonably necessary to permit CMGT to make informed decisions regarding the potential deal(s);

18

    f.   to disclose to CMGT (including its shareholders) all facts and circumstances within their knowledge which might be likely to affect the performance of their (MBRM's) duties.

    g.   not to represent CMGT when such representation was materially limited by their responsibilities to other clients, third persons and their own interests;

    h.   to act in accordance with their fiduciary responsibilities; and,

    i.   not to represent interests, i.e., Trautner/Newco, versus the interests of CMGT.

69.    Given and MBRM failed to exercise their duties as described above and failed to provide the minimum, reasonable standard of care in the performance of their duties on behalf of CMGT.  Given and MBRM's negligent advice/representation includes, but is not limited to, its failure to advise CMGT:

    a.   that it was likely SC would sue CMGT if the dispute was not settled;

    b.   that CMGT could lose the SC claim in litigation;

    c.   that MBRM would not defend CMGT if SC filed suit;

    d.   that a very probable consequence of a lawsuit by SC, regardless of its merit, would be that CMGT would not receive funding from any source;

    e.   to settle the SC dispute;

    f.   to offer terms similar to the Newco terms, but ones that were more favorable to CMGT, to Sealaska and/or other potential investors before committing to a deal with Newco; and,

g.  that MBRM favored the Newco deal because, (i) it ensured MBRM would receive payment of its accrued fees, and (ii) it was in the best interest of its Trautner/Newco client.

70.    As a result of Given and MBRM's negligent failure to comply with and fulfill their duties to CMGT, CMGT sustained damages, including but not limited to its inability to obtain financing from Sealaska, the Washoe, Newco, and/or other potential sources of funding, and its eventual bankruptcy. Defendants' negligence caused CMGT to lose its substantial value.

71.    The damage sustained by CMGT was proximately caused by Given's and MBRM's negligence as set out above. But for Given's and MBRM's negligence, CMGT would not have sustained these losses.

**WHEREFORE,** Plaintiff respectfully requests the following relief:

a.  Judgment against Given and MBRM for actual damages in an amount to be proven at trial, but in no event less than $50,000.00;

b.  the costs of this action; and

c.  such other relief that this Court deems appropriate.

### Count II
### (Legal Malpractice Causing SC to Receive a $17 Million Default Judgment)

72.    Plaintiff incorporates by reference paragraphs 1-71 as through fully set forth herein.

73.    An attorney-client relationship existed between CMGT and defendants Given and MBRM from at least January 31, 2000 to August 2004.

74.    As a result of the attorney-client relationship between CMGT and MBRM, and the legal advice repeatedly provided by Given regarding the SC dispute, Given and MBRM had a duty:

20

a.  to provide CMGT with competent representation, which required the legal knowledge, skill, thoroughness and preparation necessary for the representation;

b.  to represent CMGT in the SC litigation with the reasonable care, skill, diligence and promptness ordinarily possessed and exercised by other attorneys in the community in similar circumstances;

c.  to timely inform CMGT (including its shareholders) that MBRM would not defend CMGT if SC filed suit;

d.  to inform CMGT (including its shareholders) of its options with regard to the SC dispute after SC sued CMGT, as well as to explain the foreseeable risks and benefits of such, thus allowing CMGT to make informed decisions regarding its legal matters;

e.  to disclose to CMGT (including its shareholders) all facts and circumstances within their knowledge which might be likely to affect the performance of their (MBRM's) duties; and,

f.  to act in accordance with their fiduciary responsibilities.

75.    Given and MBRM failed to exercise their duties as described above and failed to provide the minimum, reasonable standard of care in the performance of their duties on behalf of CMGT. Given and MBRM's negligent advice/representation includes, but is not limited to, its failure:

a.  to defend CMGT in the SC litigation, or at least timely notify CMGT that it would not defend CMGT in the SC litigation;

21

    b.  to advise CMGT to file an appearance in the SC litigation for the purpose of contesting jurisdiction;

    c.  to advise CMGT to appear and defend at the TRO hearing, the preliminary injunction hearing, and the default judgment hearing;

    d.  to advise CMGT of the consequences of its failure to appear in the SC litigation;

    e.  to advise CMGT to defend SC's claims; and,

    f.  to advise CMGT that MBRM favored the Newco deal because, (i) it ensured MBRM would receive payment of its accrued fees, and (ii) it was in the best interest of its Trautner/Newco client.

76.    As a result of Given's and MBRM's negligent failure to comply with and fulfill their duties to CMGT, CMGT sustained damages, including but not limited to (a) the $17 million default judgment obtained by SC, and (b) the destruction of CMGT's valuable relationships.

77.    The damage sustained by CMGT was proximately caused by Given's and MBRM's negligence as set out above.  But for Given's and MBRM's negligence, CMGT would not have sustained these losses.

**WHEREFORE,** Plaintiff respectfully requests the following relief:

    a.  Judgment against Given and MBRM for actual damages in the amount of $17,000,000.00;

    b.  the costs of this action; and

    c.  such other relief that this Court deems appropriate.

## Count III
### (Trautner – Breach of Fiduciary Duty)

78.    Plaintiff incorporates by reference paragraphs 1-77 as through fully set forth herein.

22

79.    Trautner owed CMGT and its shareholders the fiduciary duties of honesty, loyalty, fair dealing, and full disclosure as one of CMGT's dominant shareholders.

80.    Trautner breached his fiduciary duties to CMGT by:

    a.  Engaging in discussions regarding the Newco deal with Given without Franco's (or CMGT's) knowledge or consent for the purpose of causing CMGT to accept the Trautner/Newco financing proposal, which Franco had previously rejected and which was not in CMGT's best interests; and,

    b.  Inducing MBRM to breach its fiduciary duty to CMGT by including favorable terms to MBRM in the Newco letter of intent so that MBRM would convince Franco and CMGT's shareholders to accept the Newco deal, which was not in CMGT's best interests.

81.    As a result of Trautner's breaches of fiduciary duty, CMGT sustained damages, including but not limited to its inability to obtain financing from Sealaska, the Washoe, Newco, and/or other potential sources of funding, and its eventual bankruptcy. Trautner's breaches of fiduciary duty caused CMGT to lose its substantial value.

82.    The damage sustained by CMGT was proximately caused by Trautner's breaches of fiduciary duty as set out above. But for Trautner's breaches of fiduciary duty, CMGT would not have sustained these losses.

**WHEREFORE,** Plaintiff respectfully requests the following relief:

    a.  Judgment against Trautner for actual damages in an amount to be proven at trial, but in no event less than $50,000.00;

    b.  the costs of this action; and

    c.  such other relief that this Court deems appropriate.

## Count IV
### (Trautner – Intentional Interference)

83.     Plaintiff incorporates by reference paragraphs 1-82 as through fully set forth herein.

84.     On information and belief, at the time Trautner and Given were secretly negotiating and drafting the Newco letter of intent, Trautner knew that CMGT was also in discussions for financing with the Washoe.

85.     Trautner intentionally interfered with the prospective Washoe deal by inducing MBRM, through the inclusion of favorable terms to MBRM in the Newco letter of intent, to convince Franco to: (a) accept and recommend the Trautner/Newco deal over the Washoe deal, and (b) modify the agreed upon Washoe letter of intent so that the Washoe would decline to invest in CMGT.

86.     As a result of Trautner's intentional interference, CMGT sustained damages, including but not limited to its inability to obtain financing from the Washoe and its eventual bankruptcy. Trautner's intentional interference caused CMGT to lose its substantial value.

87.     The damage sustained by CMGT was proximately caused by Trautner's intentional interference as set out above. But for Trautner's intentional interference, CMGT would not have sustained these losses.

WHEREFORE, Plaintiff respectfully requests the following relief:

      a.  Judgment against Trautner for actual damages in an amount to be proven at trial, but in no event less than $50,000.00;

      b.  the costs of this action; and

      c.  such other relief that this Court deems appropriate.

Dated: August 23, 2006

                                      Respectfully submitted,
DAVID GROCHOCINSKI,
not individually, but solely as
the trustee in bankruptcy, for
THE ESTATE OF CMGT,
INC.,

BY: _____
      Plaintiff's attorneys

Edward T. Joyce
Arthur W. Aufmann
Robert D. Carroll
EDWARD T. JOYCE & ASSOC., P.C.
11 South LaSalle Street, Ste., 1600
Chicago, Illinois 60603
Telephone – (312) 641-2600
Atty No. 32513

# EXHIBIT 1



**RONALD B. GIVEN**
Direct Dial (212) 704-9333
Direct Fax (212) 704-8427
rgiven@mayerbrown.com

January 31, 2000

TO:    Richard M. Ross
       Louis J. Franco
       William W. Walker

       **CareManagement.com, Inc.**
       7369 East Krall Street
       Scottsdale, AZ 85250

              Re:    Engagement Letter

Gentlemen:

        This letter confirms our agreement for the provision of legal services to
CareManagment.com, Inc. ("CareManagement") in connection with its initial capitalization,
formative acquisition activities, and other related general corporate activities. You many limit or
expand the scope of our representation at any time, provided that any expansion must be by
mutual consent. We are very pleased that you have retained us and will, of course, answer any
questions you many have about these arrangements.

        Our fees for services are based on time (at quarter hour increments) spent on specific
projects, computed at our hourly rates for those persons performing the services required. My
current hourly rate is $350. Hourly rates are all subject to adjustment by the Firm from time to
time. Other charges for which you will be billed are described on the attached current schedule
of charges, which is also subject to adjustment from time to time. I will be leading this
engagement on behalf of the Firm and anticipate calling upon the services of other Firm lawyers
on an "as-needed" basis. Of course, all staffing decisions are subject to your approval.

        Although you have indicated confidence in obtaining your initial capitalization, we
understand that CareManagement is a start-up and have agreed to a special billing arrangement
until such initial capitalization is obtained. Our normal practice is to invoice for our services on
a monthly basis and we will follow that practice from the onset of this engagement. You may at

4823093.2 20500 2245C 042

**CMGT-01200**

Messrs. Ross, Franco & Walker
January 31, 2000
Page 2

any time request further details specifying the individuals involved, their positions here, the hours and work performed and an itemization of other charges. Payment is generally due upon receipt of our detailed statement and in no event later than 30 days thereafter, and we will expect you to observe this requirement once you have obtained your initial capitalization. However, you may delay payment of our invoices until the closing of your initial capitalization *provided, that* (x) you agree to pay an amount equal to 125% of our regular hourly rates for all of our professional (lawyer and paralegal) services rendered to you from the date hereof until payment is received, *and* (y) we will have the unilateral right to terminate this engagement immediately if the balance of our unpaid fees and other charges incurred on your behalf (whether billed or unbilled) ever exceeds $50,000 *or* you do not obtain your initial capitalization by May 1, 2000. In the event that your initial capitalization is never obtained, we understand that we will not be paid for our legal fees but nonetheless you will reimburse us for out-of-pocket costs and other charges we incur on your behalf.

For purposes of this engagement, we will consider your cumulative gross receipt of $1,000,000 or more of third-party debt or equity (or combination of debt and equity) as obtaining your initial capitalization. You have committed to us that you intend to accept any commercially reasonable offer or offers to provide you with your initial capitalization.

As you know, we are a large firm with a number of offices and a very diverse practice. As a result, circumstances giving rise to a conflict of interest may arise (because of a prospective transaction, threatened litigation or otherwise) affecting CareManagement. If the conflict circumstances involve another person or entity which was a client of our firm (or an affiliate of such a client) before this year and we cannot reach a mutually acceptable resolution, you would permit us to resign as CareManagement's counsel, and would engage other counsel. We would not bill you for the transition. You would not seek to disqualify us so long as (i) the new matter is not substantially related to any engagement of our Firm by you, (ii) we screen our lawyers who have done your work from the new, conflicting engagement, and (iii) our representation of the other client does not involve the assertion against CareManagement of fraud or other dishonest conduct (although it might otherwise involve litigation of any type or severity).

Following termination of our engagement, any otherwise nonpublic information you have supplied to us which is retained by us will be kept confidential in accordance with applicable rules of professional conduct. At your request, your papers and property will be returned to you; our own files, including lawyer work product, pertaining to the matter will be retained by us. For various reasons, including the minimization of unnecessary storage expenses, we reserve the right to destroy or otherwise dispose of any such items retained by us within a reasonable time after the termination of the engagement.

4823093.2 20500 2245C 042

CMGT-01201

Messrs. Ross, Franco & Walker
January 31, 2000
Page 3

Our attorney-client relationship will be considered terminated if more than 12 months have elapsed from the last time you requested and we furnished any services to you. If you later retain us to perform further or additional services, our attorney-client relationship will be revived, subject to these and any supplemental terms of engagement.

This letter constitutes the entire understanding between you and Mayer, Brown & Platt and supersedes all prior understandings, written or oral, relating to its subject matter. Any change must be made or confirmed in writing. If this letter correctly reflects your understanding of the terms and conditions of our engagement, please indicate your acceptance by signing the enclosed copy of this letter in the space provided below and returning it to our office, to my attention.

On behalf of Mayer, Brown & Platt, I thank you for the opportunity to be of service.

Cordially yours,

Ronald B. Given

*We agree to the foregoing terms as of the date hereof:*

CAREMANAGEMENT.COM, INC.

_____
Richard M. Ross

_____
Louis J. Franco

_____
William W. Walker

48230932 20500 2245C 042

CMGT-01202

# EXHIBIT 2



**CMGT, Inc.®**

_First InTouch™_

LOUIS J. FRANCO, RHU
Chairman, President and Chief Executive Officer

September 30, 2002

Mr. Gerry Spehar
**SPEHAR CAPITAL LLC**
1625 Grandview Avenue
Glendale, CA 91201

Re:    **Letter Agreement Between CMGT, Inc. and Spehar Capital, LLC
Representation of CMGT, Inc. In Equity/Debt Financing Discussion(s)/Transaction(s)**

Dear Gerry:

This Letter Agreement ("Agreement"), dated September 30, 2002, supercedes all previous correspondence and/or proposed agreement(s) between Spehar Capital, LLC ("Spehar Capital") and CMGT, Inc. ("CMGT"). This Agreement, and the Exhibit(s) attached hereto and incorporated herein, constitute the entire agreement and understanding between Spehar Capital and CMGT and may not be changed, modified or amended without the express written consent of the parties hereto. Furthermore, this letter is to confirm (i) CMGT wishes to engage Spehar Capital on a non-exclusive basis to (a) facilitate introductions to and perform certain advisory services pertaining to certain discussions Spehar Capital may have with third parties that may lead to debt and/or equity financing, sale, merger, acquisition, financial incentive grant(s) or other business relationship or other beneficial transaction between CMGT and others; (b) perform certain management consultant services, and (ii) our mutual understanding and agreement to a non-exclusive agreement between CMGT and Spehar Capital pertaining to these discussions, as follows:

**SCOPE OF WORK AND RESPONSIBILITIES:**

1)   Arranging Debt and/or Equity Capital Financing and/or Incentive Grant Financing And Related Advisory Services:

a)   Spehar Capital agrees to use its best efforts in a timely manner, to assist and advise CMGT in packaging and presenting business proposals, if needed, and to facilitate introductions to accredited investment firms, corporations and/or individual investors for debt and/or equity capital financing, sale, merger, acquisition, financial incentive grant(s) or to a business relationship, or other mutually beneficial transaction between CMGT and others.

b)   CMGT agrees to provide Spehar Capital with CMGT's most current Business Plan, as may be amended from time to time, and forecasts, including its product, market, and distribution analyses and forecasts (the "Evaluation Material", as defined in and subject to the terms and conditions delineated in that certain Confidentiality Agreement mutually agreed to by Spehar Capital and CMGT), which will provide the proper information for Spehar Capital to provide to sources of debt and/or equity capital financing to utilize in making informed decisions. All information CMGT provides to Spehar Capital and its sources is and will always be considered confidential information unless expressly stated otherwise in writing by CMGT.

CMGT, Inc.®

*First InTouch™*

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 2

**Deleted:** CMGT, Inc. . . ¶
*The Standard For Integrated Comprehensive¶
Absence and Disability Management™*

**Deleted:** October 1, 2001

c) Spehar Capital agrees to introduce potential investors and advise CMGT in facilitating equity facilities, as directed by CMGT, only from accredited investors, as defined under the applicable Rules and Regulations of the Securities Act of 1933, as amended.

**Formatted:** Bullets and Numbering

2) Management Consulting Services:

**Formatted**

**Formatted:** Bullets and Numbering

**Formatted:** Bullets and Numbering

a) Spehar Capital agrees to provide certain management consulting services to CMGT. Such services are contemplated to be rendered or have been rendered by Spehar Capital prior to a successful closing transaction event of a minimum of $1,000,000.00, during the term of this Agreement, as determined and directed from time to time by CMGT's President and CEO, on issues including but not limited to matters pertaining to the growth and development of CMGT, consulting on overall business planning, strategic relationships, marketing and sales strategies, mergers and acquisitions, office and space planning, risk assessment, financial analysis and planning and other issues that may arise whereby Spehar Capital could provide CMGT useful guidance and/or advice and information.

b) It is understood that Spehar Capital is acting as an advisor and/or consultant only, as the case may be, and shall have no authority to enter into any commitments on CMGT's behalf, or to negotiate the terms of any transaction, or to hold any funds or securities in connection with any transaction or to perform other acts on behalf of CMGT without CMGT's express written consent.

**Formatted:** Bullets and Numbering

3) For all purposes of this Agreement, Spehar Capital shall have the status of an independent contractor and neither it nor any of its personnel or employees are considered employees of CMGT. It is further understood that neither Spehar Capital or its personnel or employees are entitled to or eligible to participate in any benefits or privileges given to or extended by CMGT to its employees.

**Formatted:** Bullets and Numbering

4) Spehar Capital shall be responsible for the payment of taxes, including but not limited to sales tax, associated with any compensation received by Spehar Capital for services rendered to CMGT under this Letter Agreement.

**Formatted:** Bullets and Numbering

5) In the event that Accepted Capital, as defined herein, is used to fund a successor company to CMGT, all of the terms of this agreement shall apply to such successor company and this Agreement shall be made an obligation of such successor company under the terms of any asset purchase agreement with such successor company.

**Formatted:** Bullets and Numbering

**TERM OF AGREEMENT:**

The period of Spehar Capital's engagement will expire upon the occurrence of the earlier of (i) October 1, 2003, or (ii) termination by either Spehar Capital or CMGT. Such Term will not affect any obligations that have already accrued under this Agreement prior to the date of termination of the Agreement. For example, if the exclusivity provisions of this Agreement as delineated in subparagraph "1.", under the section herein entitled "COMPENSATION", has been triggered, such provisions will remain in effect notwithstanding the terms of this provision.

**Deleted:** twenty-four (24) consecutive months from the date of this Agreement

**Deleted:** unless

**Deleted:** ed earlier

**Deleted:** 10012001



*CMGT, Inc.®*

*First InTouch™*

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 3

**Deleted:** CMGT, Inc. . . ¶
*The Standard For Integrated Comprehensive
Absence and Disability Management™*

**Deleted:** October 1, 2001

## COMPENSATION:

1) Arranging Debt and/or Equity Capital Financing and/or Incentive Grant Financing And Related Advisory Services: CMGT agrees to pay or issue, as the case may be, Spehar Capital a success fee(s), as compensation for Spehar Capital's ongoing advice and introduction to the source(s) of debt and/or equity and/or incentive grant capital financing, as delineated "Exhibit A", attached hereto and made a part of this Agreement, identifying the names and pertinent related information of all accredited investors/firms and other parties either introduced to CMGT by Spehar Capital or with whom CMGT has approved Spehar Capital related discussions and exchange information regarding CMGT during the term of our Agreement, immediately at the successful closing of a funding, or a transaction(s) as outlined above, such fees(s) to be determined as follows:

   <span style="float:right">**Formatted:** Bullets and Numbering</span>

   a) A success fee, payable in cash, equal to 6% of the Accepted Capital (cash, liquid assets, assets to be used as collateral, Letter of Credit or other form of capital acceptable to CMGT) raised directly from any investor(s) either introduced by Spehar Capital or with whom CMGT has approved discussions with Spehar Capital.

   b) "Stock Compensation" of either common stock in CMGT or, if Spehar Capital so chooses, Warrants exercisable into common stock in CMGT. If the Stock Compensation is taken as Warrants, all such Warrants shall be for a term of 5 years, transferable and exercisable by the holder into common shares of CMGT at any time during the term at a strike price that results in a total cost of $1,000 per 1% of CMGT (i.e., $5,000 for 5%). Stock Compensation shall be based upon the following provisions:

      i) At such time as CMGT receives and accepts a Term Sheet or other commitment from an investor(s) (an "Accepted Commitment") for a minimum of $1,000,000.00 Accepted Capital, CMGT will award Spehar Capital Stock Compensation equal to six percent (6%) of the total common shares and common share equivalents (as detailed in "iii" of this subparagraph "1.b)" herein) issued to all shareholders. In addition, at such time as CMGT receives and accepts such commitment for said $1,000,000, this agreement will convert to an exclusive agreement under all the same terms and conditions, and CMGT will grant Spehar Capital an exclusive right of first refusal to any future debt and/or equity financing, sale merger or acquisition, including an IPO.

      ii) Upon funding of an Accepted Commitment(s) in an amount greater than $1,000,000 (the "Funded Amount") for which an investor(s) requires less than 1.333% of CMGT's common stock and equivalents per $100,000 invested (the "Required Percentage"), CMGT will award Spehar Capital additional Stock Compensation for an Additional Percentage of the total common shares and common share equivalents (as detailed in "iii" of this subparagraph "1.b)" herein) issued to all shareholders. Such Additional Percentage shall be equal to fifty per cent (50%) of the difference between 1.333% and the Required Percentage for each additional $100,000 of the Funded Amount that is over and above $1,000,000.

      <span style="float:right">**Deleted:** equal to / **Deleted:** or more / **Deleted:** / **Deleted:** .</span>

      iii) All of the Stock Compensation awarded under "i" and "ii", above, shall not exceed ten percent (10%) of the total number of common shares and common share equivalents of

**Deleted:** 10012001



**CMGT, Inc.®**

*First InTouch™*

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 4

**Deleted:** CMGT, Inc. . . . . ¶
*The Standard For Integrated Comprehensive¶
Absence and Disability Management™*

**Deleted:** October 1, 2001

> CMGT, Inc. (i.e., Convertible preferred stock, convertible debt, warrants, partnership interests and options) granted to a lender, investor, buyer or partner.

> iv) All of the Stock Compensation awarded under this agreement shall be based on percentages of post investment or post merger shares and share equivalents (as detailed in "iii" above) outstanding and the common stock and/or common shares underlying the Warrants (the "Underlying Shares") shall enjoy the usual and customary terms such as tag-along and piggyback rights. Concurrent with becoming a publicly traded company via merger, acquisition, Initial Public Offering (IPO) or any other method, or at least thirty days in advance of a private sale, private placement, re-organization or any other additional fund raising activity that CMGT may choose to commence, CMGT (or its successor) shall file a registration statement with the Securities and Exchange Commission registering all common stock or Underlying Shares of all outstanding Warrants issued to Spehar Capital (or its assignees), and CMGT shall keep such registration statement open and current until all outstanding Warrants have either been exercised or their five year term has expired. CMGT will give Spehar Capital (or its assignees) proper and timely advance notice when any registration statement is to be filed by CMGT. CMGT will use its reasonable best efforts to be flexible as to the timing and manner of Warrant or common stock compensation so as to minimize or delay tax consequences to Spehar Capital (or its assignees), should you so request.

**Formatted:** Bullets and Numbering

> v) The amounts and terms set forth in "i" and "ii", above, notwithstanding, CMGT will not accept any investment funds of less than $1,000,000.00 from any investor Spehar Capital or Gerry Spehar has introduced to CMGT or caused to be introduced to CMGT without compensating Spehar Capital under terms acceptable to Spehar Capital.

**Formatted:** Bullets and Numbering

2) Management Consulting Services;

**Formatted:** Bullets and Numbering

   a) In consideration of certain services rendered by Spehar Capital prior to a successful closing transaction event of a minimum of $1,000,000.00, exclusive of any bridge loan or other debt, subordinated debt or similar interim funding transaction ("Closing"), CMGT will pay Spehar Capital a management Consulting Services Fee of $100,000.00. Such fee shall be paid to Spehar Capital as a monthly consulting fee commencing on the first calendar day of the first calendar month immediately following such Closing transaction date and continuing for successive calendar months, as shown in the "Schedule of Management Consulting Services Fee Payments", below:

**Formatted**
**Formatted**
**Formatted**

| Schedule of Management Consulting Services Fee Payments | | |
| --- | --- | --- |
| **Scheduled Payment** | **Payment Payable On:** | **Amount Of Payment** |
| Payment 1 | 1st Month Following Closing | $ 20,000.00 |
| Payment 2 | 2nd Month Following Closing | $ 15,000.00 |
| Payment 3 | 3rd Month Following Closing | $ 15,000.00 |
| Payment 4 | 4th Month Following Closing | $ 10,000.00 |

**Formatted**
**Formatted**
**Formatted**
**Formatted**
**Formatted**
**Formatted**
**Deleted:** 10012001



*First InTouch™*

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 5

| | | |
|---|---|---|
| Payment 5 | 5th Month Following Closing | $ 10,000.00 |
| Payment 6 | 6th Month Following Closing | $ 10,000.00 |
| Payment 7 | 7th Month Following Closing | $ 10,000.00 |
| Payment 8 | 8th Month Following Closing | $ 10,000.00 |
| | **TOTAL OF ALL PAYMENTS** | **$100,000.00** |

It is understood and agreed to by the parties hereto that such monthly consulting fee payment(s) shall not exceed $100,000 in the aggregate and shall be made in full consideration of:

i) All such services rendered;

ii) CMGT's initial funding requirements that were determined to be $3 million to $3.5 million;

iii) CMGT's funding requirements that were subsequently adjusted to $1 million to $1.5 million;

iv) Such subsequent adjustment in equity capital required by CMGT would have resulted in an overall lesser amount of compensation otherwise anticipated to be paid to Spehar Capital in consideration of such initial funding requirements under the terms of this Agreement, as described in paragraph "1)" under the provision entitled "**COMPENSATION:**", herein, and the parties hereto have agreed to the monthly payments described in "2)a)", above, to fully recognize and compensate Spehar Capital for all such services.

3) No other capital financing or related advisory services or management consulting services and/or compensation related thereto, other than those specifically addressed herein shall be considered under the terms of this Agreement.

**Indemnity/Hold Harmless:**

CMGT agrees to defend, indemnify and hold Spehar Capital, its officers, directors, employees, controlling persons, agents and assigns harmless from any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including interest, penalties and reasonable attorneys' fees and costs, that Spehar Capital may incur as a result of a breach by CMGT of this agreement and/or the performance of services thereunder, except to the extent any such claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies are attributable to the negligence or bad faith of Spehar Capital or its agents. Likewise, Spehar Capital agrees to defend, indemnify and hold CMGT, its officers, directors, employees, controlling persons, agents and assigns harmless from any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including interest, penalties and reasonable attorneys' fees and costs, that CMGT may incur as a result of a breach by Spehar Capital of this agreement and/or



CMGT, Inc.®

*First InTouch*™

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 6

Deleted: CMGT, Inc. . . ¶
*The Standard For Integrated Comprehensive¶*
*Absence and Disability Management*™

Deleted: October 1, 2001

the performance of services thereunder, except to the extent any such claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies are attributable to the negligence or bad faith of CMGT or its agents.

Furthermore, separate and aside from the matters addressed earlier in this agreement, this letter also confirms that CMGT and/or its principals individually agree(s) to be represented by Spehar Capital and/or you as an individual, on an exclusive basis, on all other matters involving the Alaska Native Corporations (ANC's) that may lead to debt and/or equity financing, sale, merger, acquisition, or other business relationship or beneficial transaction with CMGT or its principals. Of course, specifics concerning compensation and other pertinent issues relating to such exclusive representation will be addressed under the terms of a separate definitive agreement(s) to be developed and mutually agreed upon between Spehar Capital and/or you as an individual and CMGT, Inc and/or its principals individually.

Deleted: Authoriszor, Inc,

Deleted: ,

Deleted: Herbert Bailey, Kaplan, Gottbetter & Levenson LLP and GEM

If the above accurately describes our mutual understanding, please indicate Spehar Capital's agreement thereto by signing two (2) original edition copies of this letter, at the space provided below, and returning a fully executed copy to me for our records.

Deleted: . We will then draft a definitive agreement form and provide it to Spehar Capital for its consideration and agreement.

Very truly yours,

Deleted: ¶
Gerry, we look forward to working with Spehar Capital and appreciate your consideration and assistance in raising capital for CMGT.¶

Louis J. Franco, RHU

Deleted:

Read and Agreed To:

**Spehar Capital, LLC**

By: _____
       Gerry Spehar

Title:    President

Date:    _____

Deleted: 10012001

CMGT, Inc. ®

*First InTouch™*

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 7

Deleted: CMGT, Inc. . . ¶
The Standard For Integrated Comprehensive¶
Absence and Disability Management™

Deleted: October 1, 2001

**EXHIBIT A** – The following Exhibit is hereby attached to and is a part of this Agreement as of the date of this Letter Agreement.

**REGISTRATION OF ACCREDITED INDIVIDUAL INVESTOR NAMES AND INVESTMENT FIRMS INTRODUCED BY SPEHAR CAPITAL LLC OR WITH WHOM CMGT HAS APPROVED SPEHAR CAPITAL TO HOLD DISCUSSIONS AND EXCHANGE INFORMATION REGARDING CMGT AS DEFINED HEREIN**

This Registration of Accredited Individual Investor Names and Investment Firms Exhibit (hereinafter referred to as "Registration") is intended to identify all accredited investors/firms and other parties introduced (i) to CMGT by Spehar Capital or (ii) with whom CMGT has approved Spehar Capital to hold discussions and exchange information regarding CMGT as defined herein. Both Spehar Capital and CMGT agree this Registration, as may be amended only by written addendum thereto from time to time, is the only definitive record of all sources so introduced, as reference(s) to such source(s) are made to in this Agreement.

The itemized list of all such accredited investors/firms and other parties is as follows:

| Full Legal Name of Individual Investor and/or Firm[1] | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|
| **1.** Hawk Holdings, LLC/Hawk Technology Group, LLC | Patrick LaVecchia, Senior Managing Director | 300 Tice Blvd. Woodcliff Lake, NJ 07675 201-802-9130 | 05-29-2001 |
| **2.** Authoriszor, Inc | Paul Ayres, Pres. & CEO Andrew Cussons, CFO | 1 Van de Graaff Drive, Ste 502 Burlington, MA 01803-5188 781-359-9650 | 06-18-2001 |
| **3.** The Barton Group | | 5917 Spring Leaf Ct. Elkridge, MD  21075 | 06-18-2001 |
| **4.** Alaska Native Corporations, comprised of Bethel Native Corp. (BNC), Doyon, ,Ltd. and Sealaska Corp. Cook Inlet Corp. , St. George Tanaq Corp., Artic Slope Regional Corp., The Kuskokwim Corp., Council Tree Communications LLC, (collectively "ANC"s"), | *BNC:* Marc Stemp, Pres & CEO  *Doyon, Ltd.:* Dean Rampy, CFO  *Sealaska Corp.:* Chris E. McNeil, Jr. Pres & CEO Bill Strafford, EVP & CFO | *BNC:* Bethel Native Corporation, Box 719 Bethel, Alaska 99559 907-543-2124  *Doyon, Ltd.:* 1 Doyon Place, Ste 300 Fairbanks, Alaska 99701 907-452-4755  *Sealaska Corp.* 18000 International Blvd., Ste 1009 Sea Tac, WA 98188 206-902-4411 | *BNC:* 06-15-2001  *Doyan & Sealaska:* 07-13-2001 |

---

[1] Indicates Investor and/or firm introduced to Spehar Capital by CMGT.

LJF/speharcapitalletteragreement/09272002/chgo/c:d:

Deleted: 10012001



*First InTouch*™

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 8

**Deleted:** CMGT, Inc. . . ¶
*The Standard For Integral Comprehensive¶
Absence and Disability Management*™

**Deleted:** October 1, 2001

| Full Legal Name of Individual Investor and/or Firm[1] | | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|---|
| | | *Cook Inlet Corp.:* | Anchorage, Alaska | 07/13/2001 |
| | | *St. George Tanaq:* Brett Coburn | Alaska 907-272-9886 | 07/13/2001 |
| | | *Artic Slope Regional Corp.:* Conrad Bagne | Alaska 907-349-2369 | 07/13/2001 |
| | | *The Kuskokwim Corp.* Maver Carey | Alaska 907-243-2944 | 07/13/2001 |
| | | *Council Tree Communications LLC* Steve Hillard | Longmount, CO 303-678-1844 | 07/13/2001 |
| 5. | Herbert Bailey as an individual and/or d/b/a Bay Cove Financial and/or Explorer Holdings | Herbert Bailey, Principal  Gregg Webster, Consultant | 502 West King Street Philadelphia, PA 19144 215-849-3048 4385 N. Bacal Loop Beverly Hills, FL 34465 352-746-5655 | 07-17-2001 |
| 6. | Consumers Financial Corp.[1] | R. Frederic Zullinger, Sr. VP & CFO | 1513 Cedar Cliff Drive Camp Hill, PA 17011 717-730-6306 | 09-12-2001 |
| 7. | Kaplan Gottbetter & Levenson LLP  Global Emerging Markets (GEM) | *KGL:* Adam S. Gottbetter, Esq.  *GEM:* Christopher Brown, Director of Global Emerging Markets No. America, Inc. | *KGL:* 630 Third Ave, 5th Floor New York, New York 10017 212-983-6900  *GEM:* 712 5th Avenue, 7th Floor New York, New York 10019 212-582-3400 | *KGL:* 09-24-2001  *GEM:* 09-27-2001 |
| 8. | The Abbey Group, Inc. | Edwin Mendlinger, President | 106 East 65th Street New York, New York 10021-6654 212-956-2419 | 09-21-2001 |
| 9. | Norman Goldberg[1] | *Individual Referral by Michael Newman, Esq., Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | 516-542-4103 | 09-24-2001 |
| 10. | Howard Mann[1] | *Individual Referral by Michael Newman, Esq.,Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017* | 310-477-6911 | 09-24-2001 |

**Formatted**
**Formatted**
**Formatted**
**Formatted**
**Deleted:** 10012001

**CMGT, Inc.®**

*First InTouch™*

Deleted: CMGT, Inc. . . ¶
*The Standard For Integrated Comprehensive Absence and Disability Management™*
Deleted: October 1, 2001

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 9

| Full Legal Name of Individual Investor and/or Firm[1] | | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|---|
| | | *213-892-0999* | | |
| 11. | Joseph Greco [1] | *Individual Referral by Michael Newman, Esq., Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | 714-278-2375 | 09-24-2001 |
| 12. | Leon Pink [1] | *Individual Referral by Michael Newman, Esq., Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | 310-475-6702 | 09-24-2001 |
| 13. | Payden-Rygel [1] | Reiner Braun Scott Weiner *Individual Referral by Michael Newman, Esq., Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | 213-830-4368 | 09-24-2001 |
| 14. | Daniel Cannon [1] | *Individual Referral by Michael Newman, Esq., Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | 310-589-2139 | 09-24-2001 |
| 15. | William (Billie) Chambers [1] | *Individual Referral by Michael Newman, Esq., Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | 011-49-89-5205-9610 (Munich) 011-44-208-995-6700 (London) 011-49-172-983-3717 (cell) | 09-24-2001 |
| 16. | Rodney Loeb, Esq., Et Al. [1] | *Individual Referral by Michael Newman, Esq., Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | 213-892-0999 | 09-24-2001 |
| 17. | Peter Mattingly [1] | *Individual Referral by Michael Newman, Esq., Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 | 09-24-2001 |
| 18. | NXTSAR Ventures, LLC [1] | Daniel Cox, Principal *Referral by Peter Mattingly, who was referred by Michael* | 2211 York Road, Suite 205 Oak Brook, IL 60523 630-371-0282 | 09-27-2001 |



**CMGT, Inc.** ®

*First InTouch™*

Deleted: CMGT, Inc.. . . ¶
*The Standard For Integrated Comprehensive¶
Absence and Disability Management™*

Deleted: October 1, 2001

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 10

| Full Legal Name of Individual Investor and/or Firm[1] | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|
| | *Newman, Esq.,Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | | |
| 19. Brobeck, Phleger & Harrison LLP Et Al. [1] | W. Carl Moore, Jr., Esq., Associate Business & Technology Section  *Referred by Louis J. Franco, CMGT, Inc.* | Brobeck, Phleger & Harrison, LLP 4801 Plaza on the Lake Austin, TX 78746 512-330-4129 | 09-25-2001 [Formatted] |
| 20. Dick (& Barbara) Stewart[1] | *Individual Referral by Michael Newman, Esq.,Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | 7601 Talbrin Way Chapel Hill, NC 25116 919-932-9800 | 09-28-2001 |
| 21. The Equitable Life Assurance Society of the U. S. (an AXA Company) [1] | John Ciriricion , General Counsel – also: Kevin Byrnes, Sr. VP & Treasurer *Referral by Michael Newman, Esq.,Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | 168 Canal Street Manhattan, New York 10013 212-941-8880 212-314-4081 | 09-28-2001 |
| 22. Frank Rabb in association with Highlands Insurance Group | Frank Rabb  Willis King, CEO, Highlands Insurance Group  *Individual Referral by Michael Newman, Esq.,Daar & Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | Frank Rabb, Los Angeles, CA 310-273-9258  Highlands Insurance Group 1000 Lenox Drive Lawrenceville, NJ 08618 609-896-1921 | 10-02-2001 |
| 23. Live Oak Equity Partners [1] | Murali Anantharaman, Managing Partner | 2500 Northwinds Parkway Suite 325 Alpharetta, GA 30004 678-393-9909 | 10-04-01 |
| 24. Smyth, Sanford International [1] | Gustavo Chomat  *Referral by Michael Newman, Esq.& Frank Raab, ,Daar &* | 901 Ponce de Leon Blvd., Suite 504 Coral Cables, FL 33134 305-448-0743 | 10-05-2001 |

Deleted: 10012001



*First InTouch™*

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 11

| Deleted: CMGT, Inc . . . ¶ |
| --- |
| *The Standard For Integrated Comprehensive¶ Absence and Disability Management™* |

| Deleted: October 1, 2001 |
| --- |

| Full Legal Name of Individual Investor and/or Firm[1] | | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
| --- | --- | --- | --- | --- |
| | | *Newman 865 S. Figueroa Street, 23rd Floor Los Angeles, CA 90017 213-892-0999* | | |
| 25. | Argonaut Group [1] | Mark Watson, President &CEO <br><br> Referred by Ron Given | 10101 Reunion Place, Suite 800 San Antonio, TX 78216 210-321-8585 | 10/08/2001 |
| 26. | Terry Neal, Bruce Greene, Joe McDonald & Mary Martin, John Lass, as respective individuals [1] | Terry Neal as an individual <br><br> Bruce Greene as an individual <br><br> Joe McDonald & Mary Martin <br><br> John Lass <br><br> *Referred by Louis J. Franco, CMGT, through David Hottman, President Nevada Pacific Gold, 625 Howe St., Suite 250, Vancouver, BC, Canada V6C 2T6, 604-646-0188* | Terry Neal, 503-647-7730 <br><br> Bruce Green, 847-918-5151 <br><br> Joe McDonald & Mary Martin516-431-0244 <br><br> John Lass206-216-0155 | 10/31/2001 |
| 27. | Bridgestream Partners, LLC, in association with Citadel Associates, Inc. and Tall Mountain, Inc. [1] | *Bridgestream Partners, LLC* William Willard, Managing Member <br><br> Citadel Associates Daniel Barden,President <br><br> *Tall Mountain, Inc.* Pieter Coetzer, President/CEO Hugh O'Donnell, Insurance Imagine Group <br><br> *Referral by Webster Barth, Sr. VP SmartStarters 5400 Carillon Point, 4th Floor Kirkland, WA 98033 425-746-4335* | *Bridgestream Partners, LLC* 1370 Emerald Street San Diego, CA 92109 <br><br> *Citadel Associates* 850 Santa Hidalga Solana Beach, CA 92075 <br><br> *Tall Mountain, Inc.* 390 Bay Street, Suite 2000 Toronto, ON M5H 2Y2 Canada | 10-30-2001 <br><br><br> 11-13-2001 <br><br><br><br> 11-13-2001 |
| 28. | Aon Corporation [1] | Wayne Baliga, President Aon Technical Services, Inc. | Aon Center Chicago, IL 60606 312-701-5000 | 11-13-2001 |

| Formatted |
| --- |
| Formatted |
| Formatted |
| Formatted |
| Formatted |
| Formatted |

| Deleted: 10012001 |
| --- |



CMGT, Inc.®

*First InTouch™*

**Deleted:** CMGT, Inc. . . ¶
*The Standard For Integrated Comprehensive9
Absence and Disability Management™*

**Deleted:** October 1, 2001

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 12

| Full Legal Name of Individual Investor and/or Firm¹ | | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|---|
| | | *Referral by Louis J. Franco, CMGT, Inc.* | | **Formatted** |
| 29. | Grand Junction Economic Partnership | Stephen Ausmus, President & Executive Director | 2828 Walker Field, Suite 302 Grand Junction, CO 970-245-4332 | 11-14-2001 |
| 30. | Wells Fargo Bank West, N.A. | Stephen Irions, Senior Vice President | 2808 North Avenue Grand Junction, CO 81501 970-245-2158 | 11-14-2001 |
| 31. | Alpine Bank | Norm Franke, President | 225 North 5th Street Grand Junction, CO 81501 970-254-2025 | 11-14-2001 |
| 32. | The Business Incubator Center Western Colorado Business Development Corporation | Dean DiDario, Revolving Loan Fund Administrator | 2591 B ¾ Road Grand Junction, CO 81503 970-243-5242 | 11-08-2001 |
| 33. | Venture Associates | James B. Arkebauer, CEO | 4950 East Evans, Suite 105 Denver, CO 80222-5209 303-758-8710 | 11-14-2001 |
| 34. | Tory Brown Venture Capital | Tory Brown, Principal | Denver, CO 303-766-1467 | 11-14-2001 |
| 35. | Misc. Grand Junction, CO Parties Contacted By Gerry Spehar | John Moss | | 12-01-2001 |
| | | Dennis King, President, 1st National Bank of the Rockies | | **Formatted** |
| | | Sam Suplizo Bernie Buescher | | |
| | | Bill Sisson, President, Mesa National Bank | | |
| | | Patricia Dahl, A.G. Edwards | | |
| | | Mike Ferris, Western Slope Auto | | |
| | | Mick Ireland Jamie Gomez, Colorado Housing Finance Authority | | |
| | | Chris Launer, President, Pinnacle Bank | | |
| | | Bill Wraith | | |

**Deleted:** 10012001

LJF/speharcapitalletteragreement\092720Q2/chgo/c:d:



CMGT, Inc.®

*First InTouch™*

Deleted: CMGT, Inc. . . ¶
The Standard For Integrated Comprehensive¶
Absence and Disability Management™

Deleted: October 1, 2001

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 13

| Full Legal Name of Individual Investor and/or Firm[1] | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|
| | Mark McGauley Steven Preiss | | |
| 36. Jim Patterson | James W. Patterson & Associates *Referral by Charles Trautner(CMGT, Inc. shareholder)* | Home: 25 Pine Court Sedona, AZ 86351 928-284-5999 Office: National Bank of Arizona 928-204-1060 | 12-04-2002 |
| 37. Trinity Capital Management, LLC[1] | Richard Mann, Managing Member *Referral by Charles Trautner(CMGT, Inc. shareholder)* | 511 Shellview Circle Cheasapeake, VA 23323 757-675-2813 | 12-17-2001 |
| 38. Colorado Capital Alliance | Marcia Schirmer | http://www.angelcapital.org 303-404-8818 | 12-18-2001 |
| 39. Covington Capital Corp./Gerald Wendel as an individual | Gerald Wendel | Covington Capital Corp. Aspen, CO 81612 | 12-18-2001 |
| 40. Guggenheim Capital | Christopher Birch, Managing Director | New York, New York 202-xxx-xxxx | 01-xx-200[Formatted] |
| 41. International Consolidated Investors Corporation[1] | Richard Bellamy Robert Chernick *Referral by Charles Trautner(CMGT, Inc. shareholder)* | 5080 N. 40th Street, Suite 4660 Phoenix, AZ 85018 Richard Bellamy: 602-735-3033 Robert Chernick: 602-840-2292 x208 | 01-17-2002 |
| 42. Wells Investment Group in association with Citadel Associates, Inc. and Bridgestream Partners, LLC[1] | Daniel Barden, President/CEO Lawrence Wells, President *Referral by William Willard, Managing Member Bridgestream Partners, LLC* 1370 Emerald Street San Diego, CA 92109 858-273-2904 | Larry J. Wells, President/CEO 100 Clock Tower Place, Suite 130, Carmel, CA 93923 831-625-6500 Daniel Barden, President Citadel Associates, Inc. 850 Santa Hildaga Solana Beach, CA 92075 858-755-8881 | 01-30-200[Formatted] |
| 43. Lyric Capital Investment Corporation[1] | Terry Temescu, Managing Partner Mark Bode, Partner | 224 Datura Street, Suite 1211 West Palm Beach, FL 33401 | 02-05-2002 |

Deleted: 10012001

LJF/speharcapitalletteragreement/09272002/chgo/c:d:



**CMGT, Inc.®**

*First InTouch™*

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 14

Deleted: CMGT, Inc. . . ¶
*The Standard For Integrated Comprehensive¶
Absence and Disability Management™*

Deleted: October 1, 2001

| Full Legal Name of Individual Investor and/or Firm[1] | | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|---|
| | | Axel Zdarsky, Partner *Referred by Louis J. Franco, CMGT, Inc.* | 561-835-9599 | Formatted |
| 44. | AMB Capital[1] | Anthony Beyer, Esq. *Referred by Mark Bode, Partner, Lyric Capita investment Corporation* | 301 Clematis Street, Suite 3000 West Palm Beach, FL 33401 561-835-4008 | 02-05-2002 |
| 45. | Barrington Associates[1] | Adam M. Roseman, Head of Technology Investment Banking *Referral by Gil Stenbach, Nat'l Director of Transaction Services Centerprise Advisors 303 West Madison Street Chicago, IL 60606* | 11755 Wilshire Boulevard, Suite 2200, Los Angeles, CA 90025 | 02-14-2002 |
| 46. | Gregory Irwin[1] | Gregory Irwin *Referral by Dennis Russell, President LawAmerica, 16633 Ventura Blvd., Suite 902, Encino, CA 91436 818-783-9606* | westendkid@aol.com | 02-18-2002 |
| 47. | TD Capital[1] | Richard Grinnell *Referral by Dennis Russell, President LawAmerica, 16633 Ventura Blvd., Suite 902, Encino, CA 91436 818-783-9606* | 111 Huntington Avenue, Suite 1400 Boston, MA 02199 Richard.grinnell@tdcapital.com 617 425 0800 | 02-18-2002 |
| 48. | Odin Capital Group, LLC[1] | Thompson H. Rogers, Managing Partner *Referral by Dennis Russell, President LawAmerica, 16633 Ventura Blvd., Suite 902, Encino, CA 91436 818-783-9606* | 1625 Farnam Street, Suite 700, Omaha, Nebraska 68102-2113 402-827-9900 (T. Rogers x 9901) | 02-18-2002 Formatted |
| 49. | Norwest Equity Partners Norwest Venture Partners VII, LLP | Stephen M. Farsht, Associate | 3600 IDS Center 80 S. 8th Street Minneapolis, MN 55402 | 02-27-2002 Formatted Formatted Deleted: 10012001 |



CMGT, Inc.®

*First InTouch*™

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 15

Deleted: CMGT, Inc. . . ¶
*The Standard For Integrated Comprehensive¶*
*Absence and Disability Management*™

Deleted: October 1, 2001

| Full Legal Name of Individual Investor and/or Firm[1] | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|
| | Norwest Equity Partners VII, LLP Itasca LBO Partners VII, LLP | 612-215-1600 | |
| 50. | Validus Partners a United Health Group Company; United Health Group/United Health Capital | *Robert Newkirk, Partner* <br><br> *Referral by Stephen M. Farsht, Associate Norwest Equity Partners 3600 IDS Center 80 S. 8th Street Minneapolis, MN 55402 612-215-1600 through Jamie Rice, United Health Group/United Health Capital* | MN008-E200 9900 Bren Road East Minnetonka, MN 55440-1459 952-936-6800 | 03-06-2002 |
| 51. | Stonehenge Capital Fund Colorado, LLC in association with Rocky Mountain Capital Partners, LLP | *Stonhenge Capital Fund, LLC:* Thomas Adamek, President Eric Danos, Principal Andrew Aye, Principal <br><br> *Rocky Mountain Capital Partners, LLP:* William J. Sullivan, Principal Carolina Barthelson, Analyst | *Stonhenge Capital Fund LLC:* *1125 17th Street, Suite 2269* *Denver, CO 80202* *720-956-0235 (cell: 303-909-4894)* <br><br> *Rocky Mountain Capital Partners, LLP:* *1125 17th Street, Suite 2260* *Denver, CO 80202* *303-297-1701* | 03-07-2002 |
| 52. | Red Rock Capital, LLC | Randolph Garner, Principal | Denver, CO | 03-07-2002 |
| 53. | Sequel Venture Partners | Rhonda Wallen, Senior Associate | 4430 Arapahoe Avenue, Suite 220 Boulder, CO 80303 303-546-0400 | 03-08-2002 |
| 54. | Wilshire Colorado Ventures, LLC in association with Newtek Capital, Inc. and The Stone Pine Companies | *Wilshire Colorado Ventures, LLC and The Stone Pine Companies:* Douglas P. Baird, Marketing VP <br><br> *Newtek Capital, Inc.:* Shamilla Ruder-Amico, VP Acquisitions <br><br> *The Stone Pine Companies:* Paul Bagley, Managing Director | *Wilshire Colorado Ventures, LLC:* 410 17th St., Suite 400 Denver, CO 80202 303-446-5904 <br><br> *Newtek Capital, Inc.:* 100 Quentin Roosevelt Blvd., Suite 408 Garden City, NY 11530 516-390-2253 <br><br> *The Stone Pine Companies:* 1530 16th St., Sugar Bldg., Suite 200, Denver, CO 80202 303-443-5901 | 03-11-2002 |
| 55. | Enhanced Colorado Issuer, LLC | David Orlandella, Principal Andrew Casazza, Director | 1355 South Colorado Boulevard, Suite 902 Denver, CO 80222 303-504-5337 303-299-9777 (D. Orlandella cell) | 03-12-2002 |

Formatted (multiple)

Deleted: 10012001



**CMGT, Inc.** ®

*First InTouch™*

Deleted: CMGT, Inc. . . ¶
*The Standard For Integrated Comprehensive¶
Absence and Disability Management™*

Deleted: October 1, 2001

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 16

| Full Legal Name of Individual Investor and/or Firm [1] | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|
| 56. Wolf Ventures | Tony Shouse, VP of Finance<br><br>Chris Onan, Associate | 1600 Stout Street, Suite 1510<br>Denver, CO 80202<br>303-321-4800 | 03-12-2002 |
| 57. Murphree Colorado CAPCO, LP | James Kenyon | 24 S. Weber Street, Suite 325<br>Colorado Springs, CO 80903<br>719-634-7070 | 03-12-2002 |
| 58. FirstComp Insurance Company [1] | Luke Yeransian, President | 212 South 74th Street, Omaha, Nebraska 68124 | 03-14-2002 |
| 59. Waveland Colorado Ventures, LLC | Ernest Mathis, Principal | 26 W. Dry Creek Circle, Suite 600<br>Littleton, CO 80120<br>303-794-9450 | 04-08-2002 |
| 60. Sandler O'Neill Partners, L.P. [1] | Gregory G. Clapp, Managing Director<br><br>*Referral by John Leatham<br>The Common Fund<br>15 Old Danbury Road<br>Wilton, CT 06849<br>203-563-5196* | 919 Third Avenue, 6th Floor<br>New York, New York 10022<br>212-466-7749<br>212-466-7800 | 04-19-2002 |
| 61. Advantage Capital Partners Corporation | Stephen J. Bordes, Principal | 909 Poydras Street, Suite 2230<br>New Orleans, LA 70112<br>504-522-4850<br>504-400-3933 (S. Bordes cellphone) | 04-23-2002 |
| 62. Alpha Capital Ventures [1] | Andrew Kalnow, Partner | Chicago, IL 60606<br>312-322-9800 | 04-29-2002 |
| 63. Howard Bellowe | Howard Bellowe<br><br>*Referred by Douglas Baird, The Stone Pine Companies, 410 17th St., Suite 400, Denver, CO 80202<br>303-446-5922* | 5400 Colorado Blvd.<br>Greenwood Village, CO 80121<br>303-721-1653 | 04-29-2002 |
| 64. Glen Davis [1] | *Individual Referral by Robert Crandall, EVP, CMGT/Touch Speed Technology, Inc.,<br>4 Wilkinson Rd, Unit 1<br>Brampton, ON L6T 4L2 Canada<br>905-796-5233 x 112* | 510 Maple, Apt. # 613<br>Burlington, ON L7S 1M5 Canada<br>(Home) 905-681-6106<br>(Office) 905-831-2440 x29 | 04-29-2002 |
| 65. Link Resource Partners [1] | Albert Behr<br>Darrell McFeely | 225 Sheppard Avenue West<br>Toronto, ON Canada<br>416-224-5465 | 04-30-2002 |

Deleted: 10012001

The image is the CMGT logo at top right.



**CMGT, Inc.** ®

*First InTouch™*

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 17

**Deleted:** CMGT, Inc. . . ¶
*The Standard For Integrated Comprehensive¶
Absence and Disability Management™*

**Deleted:** October 1, 2001

| Full Legal Name of Individual Investor and/or Firm[1] | | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|---|
| | | *Individual Referral by Glen Davis 510 Maple, Apt. # 613 Burlington, ON L7S 1M5 Canada (Home) 905-681-6106 (Office) 905-831-2440 x29* | Albert Behr x 22 Darrell McFeely x 23 | |
| 66. | MMC Capital [1] | Meryl Hartzband, Senior Partner Linda Ventresca, Associate  *Referral by John Leatham The Common Fund 15 Old DanburyRoad Wilton, CT 06849 203-563-5196* | 20 Horseneck Lane, Greenwich, CT 06830-6327 | 05-03-2002 |
| 67. | Valley Ventures II L.P. [1] | Dr. Terry Winters, Special Limited Partner  *Referral by Louis J. Franco, CMGT, Inc.* | 6720 N. Scottsdale Road, Suite 280 Scottsdale, AZ 85253 480-585-4865 | 05-10-2002 |
| 68. | Innovative Investment Management, LLC | David Spitz Dr. Oded Levy  *Referral by JamesKenyon, Murphree Colorado CAPCO, LP, 24 S. Weber St., Suite 325, Colorado Springs, CO 80903 719-634-7070* | 444 W. Sylvestor Way Highlands Ranch, CO 80129 720-348-0844 | 05-16-2002 |
| 69. | Conning Capital Partners [1] | Gerard Vechio, Partner  *Referral by John Leatham The Common Fund 15 Old DanburyRoad Wilton, CT 06849 203-563-5196* | City Place II 185 Asylum Street Hartford, CT 06103 860-520-1529 | 05-18-2002 |
| 70. | Century Capital Partners [1] | Davis R. Fulkurson, Managing Director  *Referral by John Leatham The Common Fund 15 Old DanburyRoad Wilton, CT 06849 203-563-5196* | One Liberty Square Boston, MA 02109 617-482-3060 | 05-18-2002 |

**Deleted:** 10012001



*First InTouch™*

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 18

**Deleted: CMGT, Inc. . . ¶**
*The Standard For Integrated Comprehensive¶*
*Absence and Disability Management™*
**Deleted: October 1, 2001**

| Full Legal Name of Individual Investor and/or Firm[1] | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|
| 71. Derek Southerland [1] | *Individual Referral by Glen Davis* (Home) 905-681-6106 (Office) 905-831-2440 x29 | 67 Hazelton Avenue Toronto, Ontario  M5R 2E3, Canada | 07-15-2002 |
| 72. International Securities Corp. | Martin Wegard  *Referred by Laurie Zeller, Vox2* | New York, New York 212-986-7811 | 07-16-2002 |
| 73. 1375838 Ontario Ltd., operating as INCUBED (INCUBED) [1] | Stephen J. Hall, President & CEO  *Referral by Gil Stenbach, Nat'l Director of Transaction Services CENTERPRISE ADVISORS 303 West Madison Street Chicago, IL 60606* | 250 Dundas St. W., Suite 504, Toronto, ON, Canada M5T 2Z5 | 07-27-2002 |
| 74. Northern Illinois Angels, LLC [1] | Gorden Reichard, Jr., President & CEO  *Referral by Louis J. Franco, CMGT, Inc.* | 230 W. Monroe Street Chicago, IL 60606 312-223-8393 | 07-31-02 |
| 75. Bathgate Capital Partners, LLC | Richard Huebner, COO & Executive Director of Growth & Development  *Referral by David Spitz, Innovative Investment Management, LLC, 444 W. Sylvestor Way Highlands Ranch, CO 80129 720-348-0844* | 5350 S. Roslyn St., Suite 400 Greenwood Village, CO 80111 303-694-0862 | 08-05-2002 |
| 76. RockMountain Ventures | Joe Edens, Managing Director  *Referred by Bob NewKirk, Validus Partners, MN008-E200 9900 Bren Road East Minnetonka, MN 55440-1459 952-936-6800* | 830 Bonita Avenue Ft. Collins, CO 80526 970-377-3900 | 08-09-2002 |
| 77. Peter H. Pocklington | Peter H. Pocklington  *Referral by Dennis Russell, President LawAmerica, 16633* | C/o Dennis Russel, LawAmerica 818-783-9606 | 09-18-2002 |

**Formatted**

**Deleted: 10012001**



*First InTouch™*

Mr. Gerry Spehar
Letter Agreement Between CMGT and Spehar Capital
September 30, 2002
Page 19

**Deleted:** CMGT, Inc. . . ¶
*The Standard For Integrated Comprehensive¶
Absence and Disability Management™*

**Deleted:** October 1, 2001

| Full Legal Name of Individual Investor and/or Firm[1] | Name/Title of Principal Contact(s) | Mailing Address(es), Telephone, Fax & E-mail | Date of Initial Introduction to CMGT by Spehar Capital |
|---|---|---|---|
| | | *Ventura Blvd., Suite 902, Encino, CA 91436*<br>*818-783-9606* | |
| 78. ARCI, Corporation et al., comprised of Thomas Overturf, Ian Adlington and Dexter Cohen [1] | Thomas Overturf, ARCI<br>Ian Adlington<br>Dexter Cohen<br><br>*Referral by Christopher J. Warden, Ventel, Inc.*<br>*185 Hill Avenue*<br>*Glen Ellyn, IL 60137*<br>*630-790-3042* | T. Overturf:<br>221 East Jay Street<br>Carsen, CA 90745<br>310-835-0508<br><br>I. Adlington:<br>C/o Crown Plaza Hotel"17941 Von Karman Ave.<br>Irvine, CA 92614<br>949-863-1999<br><br>D. Cohen<br>10 Lucerne Road<br>Newport Beach, CA 92660<br>949-640-2025 | T. Overturf:<br>06-25-2002<br><br>I. Adlington:<br>10-01-2002<br><br>D. Cohen<br>10-01-2002 |

**Formatted**

**Deleted:** ¶
REGISTRATION OF ACCREDITED INDIVIDUAL INVESTOR NAMES AND INVESTMENT FIRMS INTRODUCED BY SPEHAR CAPITAL LLC OR WITH WHOM CMGT HAS APPROVED SPEHAR CAPITAL TO HOLD DISCUSSIONS AND EXCHANGE INFORMATION REGARDING CMGT AS DEFINED HEREIN¶
¶
This Registration of Accredited Individual Investor Names and Investment Firms Exhibit (hereinafter referred to as "Registration") is intended to identify all accredited investors/firms and other parties introduced (i) to CMGT by Spehar Capital or (ii) with whom CMGT has approved Spehar Capital to hold discussions and exchange information regarding CMGT as defined herein. Both Spehar Capital and CMGT agree this Registration, as may be amended only by written addendum thereto from time to time, is the only definitive record of all sources so introduced, as reference(s) to such source(s) are made to in this Agreement.¶
¶
The itemized list of all such accredited investors/firms and other parties is as follows:¶
¶
————Page Break————
¶

**Deleted:** 10012001

# EXHIBIT 3

CHARLES W. TRAUTNER
(On behalf of "Newco" referenced below)
13331 North 89th Way
Scottsdale, Arizona 85260

July 31, 2003

CMGT, Inc.
2 S 647 White Birch Lane
Wheaton, Illinois 60187

*Attention:* Louis J. Franco, Chairman, President and CEO

Re:   Proposal by Newco to acquire Assets of Oldco Corporation

Lou:

This letter outlines the proposal by a corporation, which will be formed by the undersigned Charles W. Trautner and others for purposes of engaging in this proposed transaction ("Newco"), to purchase selected assets of CMGT, Inc. ("Oldco") on the principal terms and conditions set forth in this letter.

Notwithstanding your very hard efforts during the past three years, the fact of the matter is that CMGT, Inc. has been unable to secure the equity funding required for its successful operation and can be expected to fail within the very near future. The proposal outlined herein contemplates that Oldco would, in exchange for the sale to Newco of substantially all of Oldco's assets of value, receive shares in Newco that will constitute a minority position (or, if the majority of Oldco's shareholders so elect, a sum certain of cash). Newco's shares will be unregistered and there can be no assurance that Oldco will ever be able to realize any value in connection with such shares. Neither Newco nor any of its investors will have any involvement with the current stakeholders of Oldco. Any claims that the current stakeholders of Oldco have against Oldco, or against one another, will have to be resolved in the ordinary course by such stakeholders among themselves. Following the transaction proposed hereby, the only assets of Oldco available in respect of such claims would be the consideration it receives from Newco.

The proposal outlined herein is fair under the circumstances and, except where otherwise noted, effectively treats all of Oldco's current stakeholders equally. As you know, the undersigned Charles W. Trautner is a substantial shareholder of Oldco and, if the proposed transaction goes forward, his investment in Oldco, as will the investment by all of the other Oldco stakeholders, be limited to the consideration Oldco receives from Newco.

1.   Acquisition. Newco proposes to acquire all of the following assets of Oldco (the Assets): cash, client contracts, accounts receivable, notes receivable, inventories, equipment, trademarks, trade names, service marks, all other intellectual property (including without limitation the Touch Speed software and associated rights), and covenants not to compete. All such assets would be transferred to Newco free and clear of all liens and other encumbrances.

CHDB03 8240176.1 071603 1710C 042                              1

2.   Purchase Price.

(a)   The consideration that will be paid to Oldco will be, at Oldco's option, either

(i)   $500,000 in cash, or

(ii)   shares in Newco constituting 20% of Newco's capital stock at closing.

A cash election must be made by August 15, 2003. In the event Oldco elects to receive Newco stock, then

(A)   Oldco will receive an assurance that Newco's initial capitalization will be at least $2,500,000.

(B)   The Newco shares received by Oldco will constitute a minority stake in Newco, and neither Oldco nor any of its current stakeholders (with the exception of Charles W. Trautner) will have any control whatsoever over Newco.

(C)   A commitment will be secured from Newco's investor group agreeing that Oldco's shares of Newco's stock will be subject to tag along and drag along rights and obligations in the event that Newco's investor group sells their own shares in a block transaction or in the event that Newco engages in an IPO. This means that if Newco's investor group sells their shares in a block transaction they will be required to also cause Oldco's shares in Newco to be sold on the same terms as part of the same transaction, and Oldco (and its assigns) will be required to sell all of its shares in that transaction. This also means that if Newco's investor group sells their shares in a block transaction as part of an IPO, Oldco (and its assigns) will also be required to sell all of its shares as part of the same IPO.

3.   Assumed Liabilities. Newco would assume none of the liabilities of Oldco other than obligations arising after the closing under purchased client contracts.

4.   Certain Conditions Precedent. The proposed transaction will be subject to the following conditions precedent, and only the following conditions precedent (other than definitive documentation), required by Newco:

(a)   Louis J. Franco must enter into an employment agreement with Newco. This employment agreement will provide for cash compensation, stock in Newco, and other benefits as will be negotiated to the satisfaction of both Louis J. Franco and Newco.

(b)   A transition services agreement must be successfully negotiated by Newco with Rob Crandall and the Toronto staff, as well as with Wong & Knowles, so as to assure that the obligations under the purchased client contracts continue to be serviced during the period of time (which is estimated to be about 90 days) that it will take Newco to get its own operations up and running.

(c)   Because of Mayer, Brown, Rowe & Maw's familiarity with Oldco, Newco requires that they document the proposed transaction. Such work will be paid for by

Newco on an hourly basis plus an agreement to also reimburse a certain percentage of legal fees that are currently unpaid, all as agreed to between Mayer, Brown, Rowe & Maw and Newco.

5.    Definitive Agreement.  Upon the acceptance of this letter by Oldco, Newco and Oldco will promptly negotiate, in good faith, the terms of a definitive agreement (the "Definitive Agreement").  The Definitive Agreement will be in a form customary for transactions of this type and will include, in addition to those matters specifically set forth in this letter, customary representations, warranties, indemnities, covenants and agreements of Oldco and Newco, customary conditions of closing (including without limitation the requirement that at least a majority of the shareholders of Oldco shall have approved the transaction), and other customary matters.

6.    Conduct of Business by Oldco.  Pending execution of the Definitive Agreement, Oldco (i) will conduct the business of the Assets in the ordinary course and use its best efforts to maintain the business and assets of the Assets, (ii) will not issue or agree to issue any voting preferred stock, any additional shares of common stock or of any other voting security or any rights to acquire any such additional common stock or voting security, and (iii) will not authorize or consummate any dividends or distributions of assets of the Assets to Oldco's shareholders, any consolidation, merger, sale of any assets of the Assets other than in the ordinary course of business or purchase of all or substantially all of the assets of any entity for the Assets, or any other extraordinary corporate transaction.

7.    No-Shop Agreement.  Other than with the pending prospects listed on Exhibit A hereto, Oldco will not, nor will it permit any of its officers, directors, employees, financial advisers, brokers, stockholders or any person acting on Oldco's behalf, to consider, solicit or negotiate, or cause to be considered, solicited or negotiated on behalf of Oldco or its shareholders, or provide or cause to be provided information to any third party in connection with, any proposal or offer from a third party with respect to the acquisition of the Assets, or all or substantially all of its assets, until the date, if any, that the transactions contemplated by this letter have been terminated or abandoned by the parties in accordance with the terms of this letter.

8.    Brokers.  Oldco has not retained or used, and will not retain or use, the services of any broker or finder which would result in the imposition of a fee upon the Assets or Newco should the transactions contemplated by this letter be consummated.  Newco has not retained or used, and will not retain or use, the services of any broker or finder which would result in the imposition of a fee upon Oldco should the transactions contemplated by this letter be consummated.

9.    Expenses.  Except as otherwise provided herein, each party would bear its own expenses and costs of the transactions contemplated hereby, including, but not limited to, the fees of attorneys and financial advisors.

10.    Confidentiality.  Except for the use of such information and documents in connection with the proposed transactions or as otherwise required by law or regulations, each party agrees to keep confidential any information obtained by it from the other party in connection with its investigations or otherwise in connection with these transactions and, if such

transactions are not consummated, to return to the other party any documents and copies thereof received or obtained by it in connection with the proposed transactions.

11.     Governing Law.   This letter of intent and the Definitive Agreement will be governed by Illinois law.

12.     Binding Effect; Termination.   The parties agree to negotiate in good faith the terms and conditions of the Definitive Agreement until this letter is terminated in accordance with this paragraph. Except for paragraphs 6 through 10 (inclusive), which are intended to be binding, the parties agree that this letter is not intended to be a binding agreement between the parties but merely an expression of their intent with regard to the transactions described herein, and each party covenants never to contend to the contrary. The parties will use their best efforts to consummate the transactions herein contemplated on or prior to September 30, 2003, provided that, in that event a Definitive Agreement with respect to the transactions contemplated herein is not signed on or prior to August 30, 2003, this letter will terminate and (except with respect to paragraphs 6 through 10, inclusive) the parties shall no longer have any rights or obligations with respect to this letter.

13.     Severability.   If any term, provision, covenant or restriction contained in this letter that is intended to be binding and enforceable is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions contained in this letter shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

If you agree to the foregoing, please return a signed copy of this letter to the undersigned no later than 5:00 p.m. (Scottsdale, Arizona time) on August 1, 2003, after which time this letter will expire if not so accepted.

Sincerely yours,

Charles W. Trautner,
(on behalf of the referenced "Newco")

ACCEPTED AND AGREED to
this 1st day of August, 2003:

CMGT, INC.

By:
    Louis J. Franco, President, Chairman, and CEO

CHDB03 8240176.1 071603 1710C 04Z                    4

## EXHIBIT A

1) Mitre & Associates, LLC/Robert Mitre – American & Other Native American Corporations
   - a) Huna Totem Corporation (ANC)
   - b) Bethel Native Corporation (ANC)
   - c) Doyon Ltd. (ANC)
   - d) Chugatch Alaska Corporation (ANC)
   - e) Salt River Pima-Maricopa Indian Community
   - f) Haida Corporation (ANC)
   - g) Native American Finance Officers Association (NAFOA)
   - h) National Congress of American Indians (Wash. DC)
   - i) Pactfic Native Corporation (NM, ND)
   - j) Standing Rock Sioux Tribal Council (ND)
   - k) Spirit Lake Tribal Council (ND)
   - l) Viejas Tribal Council (ND)
   - m) Pueblo Tribes of New Mexico (various NM)
   - n) Mescalero Apache Tribe (NM)
   - o) Woodfords Community Council (CA)
   - p) Viejas Tribal Council (CA)
   - q) Ho-Chunk Nation (WI)

2) Council Tree Communications LLC - working with Madison Dearborn Partners, LLC
   - a) Artic Slope Regional Corporation (ANC)
   - b) Doyan Ltd. (ANC)
   - c) Sealaska Corporation (ANC)

3) Madison Dearborn Partners, LLC - working with Council Tree Communications LLC

3) Fallon Paiute, Duckwater & Ely County Shoshone Tribal Business Council (NV)

4) Warburg Pincus LLC

5) FlexBen, Inc.

6) WorkSteps, Inc./OneComp, Inc. (Peter Gallaher & partners)

7) Richard Eskow (representing various private investors & Silicon Valley VCs)

8) Siemens Information & Communications Networks/Andrea Davis - Various So. CA & NV tribes

9) Generations Partners, LLC

10) Spehar Capital, LLC

# EXHIBIT 4

August 14, 2003

CMGT, Inc.
2 S 647 White Birch Lane
Wheaton, Illinois 60187


Attention: Louis J. Franco, Chairman, President and CEO


Dear Lou:

This Letter of Intent is to set forth our understanding regarding the investment by_____, a
_____ (the "Investor") of $2,500,000 in CMGT, Inc, a Delaware corporation ("CMGT") in
exchange for shares in CMGT constituting 51% of CMGT's capital stock at closing.  A certain portion of
this investment may take the form of existing or to-be-built Call Center facilities that will be acceptable to
CMGT, in function and valuation, for the execution of its Business Plan.  Except with respect to paragraphs
6, 7, 8,and 9, the provisions of this letter are not intended to be legally binding.

1.   This investment decision will be subject to proper due diligence into all aspects of CMGT.  Sole and
     final approval of the investment rests with Investor's Management and Board of Directors.  This due
     diligence will be completed and the investment is contemplated by September 30, 2003.  Unless
     extended by agreement of both parties, this Letter of Intent will terminate without recourse on that
     date.

2.   It is understood that the Investor's 51% ownership interest will confer Native American status on
     CMGT and that CMGT will, therefore, be able to conduct its business as a Native American-owned
     company.  Investor will immediately begin working with CMGT to design and implement an ongoing
     marketing plan that will maximize the effect of CMGT's Native American minority status.

3.   It is understood that CMGT will use the $2,500,000 provided pursuant paragraph 1 only as delineated
     in its Projections and Business Plan, as agreed to by the Investor.

4.   CMGT hereby represents and warrants that (i) to its knowledge, all written information provided to the
     Investor by CMGT does not contain any untrue statement of material fact or omit to state any material
     fact which is necessary in order to make the statements contained therein not misleading in light of the
     circumstances under which they are made, and (ii) to its knowledge, the financial projections contained
     in the Business Plan and other documents have been prepared accurately based on assumptions
     described therein or in its Projections worksheet.

5.   The terms and conditions governing the transaction described herein are to be set forth in a definitive
     agreement (the "Agreement"), which shall be subject to the approval of all of the parties and their
     counsel.  Such terms and conditions shall include among others:

        ▪   Warranties, representations and indemnities including those usually given in transactions of the
            nature herein contemplated, satisfactory to the Investor relating to CMGT's structure,
            organization, business, operations and financial condition;

        ▪   The usual conditions which must be satisfied before parties to transactions of the type
            contemplated are obligated to close, including, but not limited to, obtaining of any required
            consents relating to material contracts, the absence of any litigation or other legal proceeding
            relating to this transaction or CMGT; and

        ▪   Provisions relating to compliance with all applicable securities laws.

6. All the parties agree to use their reasonable best efforts to complete the aforesaid Agreement within 30 days. Investor acknowledges that CMGT is currently a party to another acquisition proposal (the "Competing Bid") which has been generally described to Investor.

7. Upon execution of the Agreement described in paragraph 5 by both parties, the Investors will immediately pay to CMGT the sum of $100,000 as a Bridge Loan, the terms and conditions of which will be negotiated and will include the issuance by CMGT of a certain amount of the outstanding common stock of CMGT.

8. Following execution of the letter, CMGT agrees to assist the Investor and its agents in the conduct of their full and complete due diligence. The Investor agrees to hold all information obtained by virtue of such access in confidence in accordance with the NDA executed between Investor and CMGT.

9. From the date of execution of this letter, CMGT will use its best efforts to operate its business in the manner described in the Business Plan and will use its best efforts to maintain its business as a going concern and maintain its business relationships. CMGT will advise Investor of any material deviation from the aforesaid, whether related to the Competing Bid or otherwise.

If the foregoing accurately describes our understandings and agreements, please sign, date and return the enclosed copy of this letter to me.


Sincerely,


_____, (the "Investor")

By:


_____
Name, Title



Read and Agreed to this 14th day of August, 2003:

CMGT, Inc.

By:


_____
Louis J. Franco, CEO

# EXHIBIT 5



## *CMGT, Inc.*®

**First InTouch™**

LOUIS J. FRANCO, RHU
Chairman, President and Chief Executive Officer

August 15, 2003

TO: ALL CMGT, INC. INVESTORS AND INTERESTED PARTIES

Re: Letter of Intent For "Newco" To Acquire Assets of CMGT, Inc.

Dear Valued Investors and Interested Parties:

I am writing this letter to respectfully request that the shareholders of CMGT, Inc. approve the transaction contemplated by the attached letter of intent, select the stock purchase price option (Section 2(a)(ii)), and authorize me to complete definitive documentation on behalf of CMGT and close the deal (the "Proposed Transaction"). For your convenience, I have also attached a copy of my first letter to you which summarized the Proposed Transaction.

I have attempted to personally discuss the Proposed Transaction with each of you. I apologize if we have not been able to personally communicate. I will also use this letter to address with all of you the questions that some of you have asked me about the Proposed Transaction.

The funding process for CMGT has been excruciating for all of us, and I am very sorry that even by doing my best I have not been able to deliver better results sooner. I believe that none of us can afford to let the process continue any further. My work on behalf of CMGT and you has resulted in close to $40,000 of tax penalties being assessed against me and over $100,000 of my credit card obligations being put in an active collection process by various issuers. In addition to devoting over three years of my life to CMGT, I have personally advanced over $150,000 of my own money keeping CMGT afloat. I have been blessed to have some help from my dear family and friends to somewhat mitigate the financial burden, however, no matter what, after CMGT my family and I are starting over from scratch.

I'm not asking for sympathy. I just want you to know that I have been as devoted to CMGT as you. What I do request from you now is your support for the Proposed Transaction.

It is very important to recognize that the Proposed Transaction will take place at the *corporate* level. It is it a purchase by Newco of CMGT assets from CMGT, not the shareholders of CMGT. The purchase price be paid by Newco directly to CMGT. Although the purchase price is going to be paid by the delivery of Newco stock, there will be no "exchange" of stock between Newco and any of the shareholders of CMGT.

Based on my conversations with various shareholders, it is clear to me that the majority of you have expressed absolutely no interest in selecting the cash option referred to in the letter of intent for the Proposed Transaction, provided I will be managing Newco after the Proposed Transaction. For that reason, I am only asking you to consider whether or not we should proceed with the Proposed Transaction presuming that the purchase price to be paid to CMGT will be in shares of Newco and I become Newco's President and CEO.

CHICAGO CORPORATE OFFICE:   2 S 647 White Birch Lane, Wheaton, IL  60187 • Tel: 630.260.9507 • Fax: 978.389.1060
TORONTO OFFICE:                      4 Wilkinson Rd, Unit 1, Brampton, ON L6T 4M3 • Tel: 905.796.5233 • Fax: 905.796.5237



*CMGT, Inc.*®

*First InTouch™*

Letter To CMGT, Inc. Investors
August 15, 2003
Page 2 of 6

Consummation of the Proposed Transaction will not be the end of the work that must be done to wind up CMGT's affairs. It is only the beginning. Each of our claims in and to CMGT will remain, whatever those interests may be -- equity, debt, contractual, etc. Disagreements that we may have among ourselves as to our respective claims will need to be resolved among ourselves and CMGT after the closing of the Proposed Transaction. We will need to satisfy all claims out of what will become CMGT's only assets of significance, its holding of Newco stock. Be mindful that the very same process will have to be completed even if the Proposed Transaction does not take place. The only difference, in my view, is that if we do not do the Proposed Transaction there is even less of a chance that our respective claims will be satisfied.

I hope to be a part of the process of amicably winding up CMGT's affairs following the closing of the Proposed Transaction. It will be a challenge, but if we all continue to work together I believe we can achieve a result that is at least fair.

Some of you have asked for information about the Newco investor group. I have no such information to share with you except the following. First, the transaction will not close unless we are all shown that Newco's initial capitalization is at least $2.5 million. I believe that is a better commitment than I have been able to obtain for you from any of the hundreds of potential investors I've worked with on your behalf over the last three years and I have no reason to believe anything onerous is contemplated by the Newco group, such as a quick post-transaction sale of our software which is our most significant hard asset. Secondly, I have been able to come to terms with Newco on a five-year employment agreement to act as Newco's President and CEO. I must leave to you to decide whether my own confidence in Newco should influence your own. However, I can assure you that I will be working for the benefit of all holders of Newco stock, including the 20% that will come to CMGT as a result of the Proposed Transaction.

Some of you have asked whether particular terms of the letter of intent for the Proposed Transaction can be further negotiated. For example, it has been asked whether a time limit be put on the "tag along/drag along" provisions. I believe the letter of intent is fair and reasonable under the circumstances, and Newco has given no indication of a willingness for further concessions. We must all also understand that any concession we may be able to obtain will need to be reciprocal, and any such reciprocal change to the "tag along/drag along" provisions could be extremely detrimental to us. I believe this provision is one of our most important protections in the deal, and we should leave it alone.

For purposes of this vote, we will use the capitalization schedule I have attached for your convenience. I will share the results of the voting with you.

Although the Proposed Transaction only requires a majority vote, I would very much appreciate the support of each of you. With that support, I can assure you that we will expeditiously do everything we can to bring the Proposed Transaction to closing and thus be in as good of a position as possible to benefit you and CMGT. Without that support, I can do nothing for you. As you must certainly understand, I will, regretfully, need to move on and try to salvage my own financial situation by other means.

LJF/ltrcmgtinvestors/08152003/chgo/c:d:

*The Standard For Integrated Absence Management™*



*CMGT, Inc.*®

*First InTouch*™

Letter To CMGT, Inc. Investors
August 15, 2003
Page 3 of 6

I remain available at any time for your questions and comments.

Please date and sign the Proxy I have included with this correspondence, retain a copy for your records and return a signed copy to my attention by fax (978-389-1060) with an original signed copy return to me by overnight mail, no later than 5 p.m., Friday, August 22, 2003. Please feel free to use UPS next day air delivery by using CMGT's UPS account number 28AF07on the UPS airbill (you can call them at 1-800-172-5877 to make arrangements for pick up and delivery to me at our corporate address, shown on the bottom of the first page of this letter).

Very truly yours,

Louis J. Franco, RHU

Attachments: (2) 8/7/2003 Shareholder Letter; Proxy Statement

Cc:    Ronald B. Given, Esq., Mayer, Brown, Rowe & Maw, Chicago

LJF/ltrcmgtinvestors/08152003/chgo/c:d:

*The Standard For Integrated Absence Management*™



CMGT, Inc.®
First InTouch™

Letter To CMGT, Inc. Investors
August 15, 2003
Page 4 of 6

CMGT, Inc. - Investor Shareholder List as of 8/14/2003
Confidential Information
8/15/2003

| Name | Date of Investment | Investment Amount | Total Investment | Notes Payable | $ Allocated for Preferred | Number of Preferred Shares | $ Allocated for Common | Number of Common Shares |
|---|---|---|---|---|---|---|---|---|
| Lyric Capital | 2/27/2002 | 20,000 | 20,000 | 20,000 | | | | |
| Lee M. Rask | 10/31/2002 | 50,000 | 50,000 | | 50,000 | 91,743.12 | | |
| Baliga, Wayne J., CPA, Esq. | 3/13/2001 | 100,000 | 190,000 | | 100,000 | 91,743 | | |
| | 5/28/2001 | 20,000 | | | 20,000 | 18,349 | | |
| | 4/4/2002 | 20,000 | | | 20,000 | 18,349 | | |
| | 5/21/2002 | 10,000 | | | 10,000 | 9,174 | | |
| | 7/26/2002 | 10,000 | | | 10,000 | 18,348.62 | | |
| | 9/10/2002 | 10,000 | | | 10,000 | 18,348.62 | | |
| | 2/26/2003 | 20,000 | | | 20,000 | 36,697.25 | | |
| | | 190,000 | | | | | | |
| Carroll, R. Leonard, MD | 2/18/2000 | 35,000 | 56,000 | | 35,000 | 32,110 | | |
| | 3/8/2000 | 15,000 | | | 15,000 | 13,761 | | |
| | 12/19/2000 | 5,000 | | | 5,000 | 4,587 | | |
| | 8/19/2002 | 1,000 | | | 1,000 | 1,834.98 | | |
| | | 56,000 | | | | | | |
| CC-1 Partnership | B/F from '99 | 18,000 | 152,300 | | 18,000 | 218,000 | | |
| | 5/31/2000 | 60,300 | | | 60,300 | | | |
| | 4/17/2000 | 15,000 | | | 15,000 | | | |
| | 5/17/2000 | 18,000 | | | 18,000 | | | |
| | 8/6/2000 | 16,000 | | | 16,000 | | | |
| | 8/18/2000 | 9,000 | | | 9,000 | | | |
| | 8/30/2000 | (2,000) | | | (2,000) | | | |
| | | 152,300 | | | | | | |
| Dorwen, William | 8/30/2000 | 15,000 | 15,000 | | 15,000 | 13,761 | | |
| Hollins/Levine, Jan & Byron, Esq. | 3/16/2000 | 100,667 | 120,667 | | 100,667 | 92,555 | | |
| | 11/6/2000 | 20,000 | | | 20,000 | 36,697.25 | | |
| | | 120,667 | | | | | | |
| Holman, Linda & Ron, PhD | 9/12/2000 | 100,002 | 200,002 | 100,000 | 100,002 | 91,745 | | |
| | 8/1/2000 | 100,000 | | | | | | |
| | | 200,002 | | | | | | |
| Quarles, Rob & Kim, Esq. | 1/2/2001 | 25,000 | 25,000 | | 25,000 | 22,936 | | |
| Reed Egly Partnership | 1/31/2000 | 30,000 | 55,000 | | 30,000 | 27,523 | | |
| | 8/30/2000 | 25,000 | | | 25,000 | 22,936 | | |
| | | 55,000 | | | | | | |
| Regan, Kevin W, MD | 3/15/2001 | 25,000 | 25,000 | | 25,000 | 22,936 | | |
| Ross, John S. | 2/17/2000 | 50,000 | 50,000 | | 50,000 | 45,872 | | |

The Standard For Integrated Absence Management™



**CMGT, Inc.®**

**First InTouch™**

Letter To CMGT, Inc. Investors
August 15, 2003
Page 5 of 6

CMGT, Inc. - Investor Shareholder List as of 8/14/2003
Confidential Information        8/15/2003

| Name | Date of Investment | Investment Amount | Total Investment | Notes Payable | $ Allocated for Preferred | Number of Preferred Shares | $ Allocated for Common | Number of Common Shares |
|---|---|---|---|---|---|---|---|---|
| Richard (Dick) Ross | 7/11/2000 | 23,000 | 101,631 [3] | | | | 23,000 | 100,000 |
| | 8/1/2000 | 15,000 | | | | | 16,000 | |
| | 9/1/2000 | 15,000 | | | | | 15,000 | |
| | 6/5/2000 | 2,000 | | | | | 2,000 | |
| | 9/2/2000 | 3,000 | | | | | 3,000 | |
| | 9/23/2000 | 1,200 | | | | | 1,200 | |
| | 10/10/2000 | 2,500 | | | | | 2,500 | |
| | 4/27/2003 | 7,500 | | | 7,500 | 13,781 | 25 | 0 |
| | 2/29/2000 | 25 | | | | | 5,750 | 0 |
| | 5/1/2000 | 5,750 | | | | | 17,229 | 0 |
| | 10/30/2000 | 17,229 | | | | | 9,427 | 0 |
| | 10/25/2000 | 9,427 | | | | | | |
| | | 101,631 | | | | | | |
| Spaeth, Melvin, Esq. | 6/6/2000 | 10,002 | 10,002 | | 10,002 | 9,178 | | |
| Trautner, Charles W. | 12/29/2000 | 5,000 | 158,000 | | 5,000 | 5,505 | | |
| | 6/14/2001 | 50,000 | | | 50,000 | 45,872 | | |
| | 7/27/2000 | 50,000 | | | 50,000 | 45,872 | | |
| | 8/31/2000 | 50,000 | | | 50,000 | 45,872 | | |
| | 8/23/2002 | 3,000 | | | 2,000 | 3,669.72 | | |
| | | 158,000 | | | | | | |
| Wong, James & Celia, CPA, CFE | 5/1/2001 | 15,000 | 20,000 | | 15,000 | 13,761 | | |
| | 7/26/2002 | 5,000 | | | 5,000 | 9,174.31 | | |
| Catherine Garner | 3/31/02 (00/25/00) | | 50 | | | | 50 | 50,000 |
| **Total Capital Investment - All Shareholders** | | | 1,245,652 | 120,000 | 1,034,471 | 1,143,469 | 94,181 | 150,000 |
| Common Stock | | | (94,181) | | | | | |
| Notes Payable | | | (120,000) | | | | | |
| Accrued Interest converted into Preferred | | | 126,957 | | 126,957 | 116,474 | | |
| Preferred Stock Balance | | | 1,161,428 | | 1,161,428 | 1,259,943 | | |

1. All debt converted to equity (215,000 preferred Series A shares) per agreement between Ross/CC-1 and the company
2. $10,002 investment and $100,000 note payable
3. 100,000 common shares and 100,000 common stock warrants awarded per agreement between Ross and the company.

NOTE: THIS LIST INCLUDES CASH INVESTORS ONLY. THIS LIST DOES NOT INCLUDE CMGT MANAGEMENT TEAM.



*CMGT, Inc.*®

*First InTouch™*

Letter To CMGT, Inc. Investors
August 15, 2003
Page 6 of 6

## CMGT, INC. PROXY / VOTING INSTRUCTION SHEET
## PROXY

*This proxy is solicited in connection with shareholder approval of the transaction described in that certain letter agreement between CMGT, Inc. and Charles W. Trautner (on behalf of "Newco" referenced therein) dated July 31, 2003 (the "Proposed Transaction).*

The undersigned hereby appoints Louis J. Franco, with powers of substitution, as proxy for the undersigned to vote all the capital stock the undersigned may be entitled to vote at the CMGT, Inc. Shareholder Meeting to be held on September 1, 2003 at 2 S 647 White Birch Lane, Wheaton IL 60187 at 12:00 PM CDT, or any adjournment thereof, in the manner indicated below, and upon such other business as may lawfully come before the meeting.  This Proxy will remain if effect until the consummation of the Proposed Transaction or October 17, 2003, whichever first occurs.

1.    Proxy is directed to vote for and otherwise authorize CMGT, Inc. to consummate the Proposed Transaction and to elect as consideration CMGT, Inc.'s receipt of 20% of Newco's capital stock at closing.

2.    Proxy is directed to cause CMGT, Inc. to execute and deliver any and all documentation required to consummate the Proposed Transaction.

3.    Proxy is further authorized from time to time to take such actions and to execute and deliver such certificates, instruments, notices and documents as may be required or as Proxy may deem necessary, advisable or proper in order to consummate the Proposed Transaction, including any extension of the closing date thereof; all such actions to be performed in such manner, and all such certificates, instruments, notices and documents to be executed and delivered in such form, as the Proxy shall approve.

Please sign exactly as printed name appears hereon in the space, below.  Joint owners should each sign.  When signing as attorney, executor, administrator, trustee or guardian, please give full title as such.

PRINTED NAME(S)

SIGNATURE                                                                 DATE

SIGNATURE IF JOINTLY HELD                                     DATE

LJF/ltrcmgtinvestors/08152003/chgo/c:d:

*The Standard For Integrated Absence Management™*

# EXHIBIT 6

# Washoe Tribe of Nevada and California



September 2, 2003

CMGT, Inc.
2 S 647 White Birch Lane
Wheaton, Illinois 60187

Attention: Louis J. Franco, Chairman, President and CEO

Dear Lou:

This Letter of Intent will set forth our understanding regarding certain discussions that the Washoe Tribe of Nevada and California (the "Tribe") and CMGT, Inc, a Delaware corporation ("CMGT") have had. In general, we have discussed an investment of up to $2,500,000 by the Tribe in exchange for a 51% ownership interest in the stock or assets of CMGT. It is contemplated that a certain portion of this investment will take the form of existing or to-be-built Call Center facilities that will be acceptable to CMGT, in function and valuation, for the execution of its Business Plan. Except with respect to paragraphs 6 and 8, the provisions of this letter of intent are not intended to be legally binding.

1. This investment decision will be subject to proper due diligence by the Tribe into all aspects of CMGT. Sole and final approval of the investment decision rests with the Tribe. It is contemplated that due diligence will be completed by September 30, 2003. Unless extended by agreement of both parties, this Letter of Intent will terminate without recourse on that date.

2. It is understood that the Tribe's 51% ownership interest will enable CMGT to conduct its business as a Native American-owned company. The Tribe will work with CMGT to design and implement a marketing plan that will maximize the effect of CMGT's Native American minority status.

3. It is understood that CMGT will use any investment provided pursuant paragraph 1 only as delineated in its Projections and Business Plan, as agreed to by the Tribe.

919 Highway 395 South, Gardnerville, Nevada 89410
(775) 265-4191 • (775) 883-1446 • (530) 694-2339 • FAX (775) 265-6240

CMGT Letter of Intent
Page 2 of 2

4   CMGT hereby represents and warrants that (i) to its knowledge, all written
    information provided to the Tribe by CMGT does not contain any untrue statement of
    material fact or omit to state any material fact which is necessary in order to make the
    statements contained therein not misleading in light of the circumstances under which
    they are made, and (ii) to its knowledge, the financial projections contained in the
    Business Plan and other documents have been prepared accurately based on
    assumptions described therein or in its Projections worksheet.

5.  The terms and conditions governing the transaction described herein are to be set
    forth in a definitive agreement (the "Agreement"), which shall be subject to the
    approval of all of the parties and their counsel.  Such terms and conditions shall
    include among others:

    ▪ Warranties, representations and indemnities including those usually given in
      transactions of the nature herein contemplated, satisfactory to the Tribe relating
      to CMGT's structure, organization, business, operations and financial condition;

    ▪ The usual conditions which must be satisfied before parties to transactions of the
      type contemplated are obligated to close, including, but not limited to, obtaining
      of any required consents relating to material contracts, the absence of any
      litigation or other legal proceeding relating to this transaction or CMGT; and

    ▪ Provisions relating to compliance with all applicable securities laws.

6.  All the parties agree to use their reasonable best efforts to make a decision whether to
    complete the aforesaid Agreement within 30 days.  The Tribe acknowledges that
    CMGT is currently a party to another acquisition proposal (the "Competing Bid")
    which has been generally described to the Tribe.

7.  Following execution of the letter, CMGT agrees to assist the Tribe and its agents in
    the conduct of their full and complete due diligence.  The Tribe agrees to hold all
    information obtained by virtue of such access in confidence in accordance with a non-
    disclosure agreement executed between Tribe and CMGT.

8.  From the date of execution of this letter, CMGT will use its best efforts to operate its
    business in the manner described in the Business Plan and will use its best efforts to
    maintain its business as a going concern and maintain its business relationships.
    CMGT will advise the Tribe of any material deviation from the aforesaid, whether
    related to the Competing Bid or otherwise.

If the foregoing accurately describes our understandings and agreements, please sign,
date and return the enclosed copy of this letter to me.

CMGT Letter of Intent
Page 3 of 3

Sincerely,

WASHOE TRIBE OF NEVADA AND CALIFORNIA

By:

_____
A. Brian Wallace, Chairman

Read and Agreed to this 2nd day of September, 2003:

CMGT, INC.

By:

_____
Louis J. Franco, CEO

# EXHIBIT 7

September 2, 2003

CMGT, Inc.
2 S 647 White Birch Lane
Wheaton, Illinois 60187


Attention: Louis J. Franco, Chairman, President and CEO


Dear Lou:

This Letter of Intent is to set forth our understanding regarding certain discussions that the Washoe Tribe of Nevada and California (the "Tribe") and  CMGT, Inc, a Delaware corporation ("CMGT") have had.  In general we have discussed an investment of up to $2,500,000 in exchange for a 51% ownership interest in the stock or assets of CMGT.  It is contemplated that a certain portion of this investment may take the form of existing or to-be-built Call Center facilities that will be acceptable to CMGT, in function and valuation, for the execution of its Business Plan.  Except with respect to paragraphs 6 and 8, the provisions of this letter are not intended to be legally binding.

1.  This investment decision will be subject to proper due diligence by the Tribe into all aspects of CMGT.
    Sole and final approval of the investment rests with the Tribe.  It is contemplated that due diligence
    will be completed by September 29, 2003.  Unless extended by agreement of both parties, this Letter of                    **Deleted:** 30
    Intent will terminate without recourse on that date.

2.  It is understood that theTribe's 51% ownership interest will enable CMGT to conduct its business as a
    Native American-owned company.  The Tribe will work with CMGT to design and implement an
    ongoing marketing plan that will maximize the effect of CMGT's Native American minority status.

3.  It is understood that CMGT will use any investment provided pursuant paragraph 1 only as delineated
    in its Projections and Business Plan, as agreed to by the Tribe.

4.  CMGT hereby represents and warrants that (i) to its knowledge, all written information provided to the
    Tribe by CMGT does not contain any untrue statement of material fact or omit to state any material
    fact which is necessary in order to make the statements contained therein not misleading in light of the
    circumstances under which they are made, and (ii) to its knowledge, the financial projections contained
    in the Business Plan and other documents have been prepared accurately based on assumptions
    described therein or in its Projections worksheet.

5.  The terms and conditions governing the transaction described herein are to be set forth in a definitive
    agreement (the "Agreement"), which shall be subject to the approval of all of the parties and their
    counsel.  Such terms and conditions shall include among others:

    ▪ Warranties, representations and indemnities including those usually given in transactions of the
      nature herein contemplated, satisfactory to the Tribe relating to CMGT's structure, organization,
      business, operations and financial condition;

    ▪ The usual conditions which must be satisfied before parties to transactions of the type
      contemplated are obligated to close, including, but not limited to, obtaining of any required
      consents relating to material contracts, the absence of any litigation or other legal proceeding
      relating to this transaction or CMGT; and

    ▪ Provisions relating to compliance with all applicable securities laws.

6.  All the parties agree to use their reasonable best efforts to complete the aforesaid Agreement within 30
    days.  The Tribe acknowledges that CMGT (x) is currently a party to another acquisition proposal.                         **Deleted:** (the "Competing Bid")

which has been generally described to the Tribe and that CMGT expects will close by September 30, 2003, and (y) will currently consider any other competing bids until such time as an actual transaction is consummated.  CMGT does not anticipate that any other transaction will close before September 29, 2003.

7.  Following execution of the letter, CMGT agrees to assist the Tribe and its agents in the conduct of their full and complete due diligence.  Although CMGT believes the Tribe will have ample time and opportunity to conduct its due diligence, the Tribe acknowledges that the undersigned Louis J. Franco is the only employee of CMGT that is available to attend to all the various parties currently conducting due diligence.  The Tribe agrees to hold all information obtained by virtue of such access in confidence in accordance with the NDA executed between the Tribe and CMGT.

8.  From the date of execution of this letter, CMGT will use its reasonable best efforts to operate its business in the manner described in the Business Plan and will use its reasonable best efforts to maintain its business as a going concern and maintain its business relationships. During the term of this letter and as long as the Tribe remains active in its pursuit of a transaction, CMGT will advise the Tribe of any material deviation from the aforesaid, including whether any of the referenced competing bids may close prior to September 29, 2003.

| Deleted: |
| --- |
| Deleted: related to the |
| Deleted: C |
| Deleted: B |
| Deleted: or otherwise |

If the foregoing accurately describes our understandings and agreements, please sign, date and return the enclosed copy of this letter to me.

Sincerely,

WASHOE TRIBE OF NEVADA AND CALIFORNIA

By:

_____

A. Brian Wallace, Chairman

Read and Agreed to this 2nd day of  September, 2003:

CMGT, Inc.

By:

_____

Louis J. Franco, CEO

# EXHIBIT 8



**Spehar Capital LLC**



*Professional Capital Services Based On Integrity*

---

**MEMORANDUM TO:** Lou Franco, President, CMGT, Inc.
**FROM:**          Gerry Spehar, Spehar Capital LLC
**DATE:**          August 8, 2003
**RE:**            Chuck Trautner/Newco LOI
**Cc:**            Ron Given, Esq., Mayer Brown Rowe and Maw

---

Dear Lou,

This morning I received your correspondence regarding the July 31, 2003 LOI from Charles W. "Chuck" Trautner outlining "Newco's" offer to acquire assets of CMGT, Inc. With regards to Chuck's LOI and some of its terms, I need to call your attention to certain facts and provisions of Spehar Capital's September 30, 2002 Letter Agreement with CMGT:

1. Chuck Trautner and "Newco" are covered investors under our agreement by virtue of your having "approved Spehar Capital to hold discussions and exchange information regarding CMGT during the term of our Agreement" with Chuck - please refer to page 3, "Compensation, 1)". Exhibit A to our Agreement lists investors covered by the Agreement and contemplates being amended by written addendum from time to time. We have historically updated Exhibit A at irregular intervals. Although we have not recently found time to formally update Exhibit A, in light of Chuck's LOI and some of its terms, this memo will memorialize a few of my/our many approved past discussions and exchanges of information with Chuck and his "investors" regarding his various ideas and efforts to help fund CMGT.

   a) As you know, at your request and as contemplated in our agreement, I have participated directly with Chuck in many discussions and exchanges of CMGT investment information, as well as with Jim Patterson, Harlan Smith, Richard Bellamy, Robert Chernick and others whom Chuck introduced as potential investors and/or co-coordinators of investing groups interested in funding CMGT.

   b) Regarding "Newco", on January 27, 2003 you asked me to participate in a phone conference with you, Ron Given and Chuck to vet and understand Chuck's ideas for restructuring CMGT into an entity he referred to as "Newco". On that call we discussed Chuck's idea of "Newco" doing an asset purchase as a vehicle to afford CMGT a fresh start - shedding some of the baggage and history that he felt were encumbering CMGT's funding efforts. We asked Chuck to clarify the concept and get back to us for CMGT's further consideration when he could provide more specific detail. FYI, subsequent to that call Chuck has called me directly several times and we have discussed CMGT.

---



**Spehar Capital LLC**

*Professional Capital Services Based On Integrity*

Memorandum To: Lou Franco, CMGT, Inc.
August 8, 2003
Page 2 of 2

Lou, pending an update of Exhibit A as contemplated by our agreement, please acknowledge that the above discussions took place, that you "approved Spehar Capital to hold discussions and exchange information regarding CMGT" with Chuck and his investor groups and that both Chuck and the investor groups that he introduced and/or represents should be included in Exhibit A.

As long as we are informally updating Exhibit A, I would also ask that you acknowledge the call we held this past Tuesday, August 5, with David Wilson of FlexBen Corporation and that FlexBen and David should become a part of Exhibit A.

2. I am aware that "asset purchase" agreements are sometimes used to establish a new "purchasing" entity that is not bound by the contracts of the old "selling" entity. This potential was contemplated and addressed in our Agreement in 5) on page 2, which reads:

"In the event that Accepted Capital, as defined herein, is used to fund a successor company to CMGT, all of the terms of this agreement shall apply to such successor company and this Agreement shall be made an obligation of such successor company under the terms of any asset purchase agreement with such successor company."

In light of all the above, Spehar Capital expects to be fully compensated under our Agreement should CMGT consummate a deal with Chuck Trautner's "Newco".

Lou, I look forward to continuing to work with you on all CMGT funding scenarios...please let me know if I can be of help. At this juncture, I would not advise committing to Chuck's proposed Newco investment until you know who the investors are and have much more specific definition as to their intentions and specific long-term commitments to your business, shareholders and management. You need at least that to be able to adequately compare "Newco's" potential to the other CMGT funding alternatives that are just now coming to fruition. Having worked this hard and waited this long, CMGT should take great care to realize the best value for your shareholders.

At this point I see nothing in this LOI that should distract you from continuing to pursue a Native American/minority-status funding - CMGT would carry much more power in its marketplace with that status and/or the backing of the premier VC groups that are either partners in those efforts or otherwise considering investing in CMGT.

Best regards,

Gerry

# EXHIBIT 9

**Robert Carroll**

| | |
|---|---|
| **From:** | Given, Ronald B. [RGiven@mayerbrownrowe.com] |
| **Sent:** | Friday, August 08, 2003 3:58 PM |
| **To:** | Gerry Spehar; Franco, Lou |
| **Subject:** | RE: [Fwd: Newco LOI] |

Gerry:

Although your attachment is to Lou, I would like to address it. As Lou's situation
continued (and continues) to become more desperate, I have kept a separate channel of
communication on behalf of CMGT with Chuck. The LOI is a consequence of those separate
and distinct communications. In the course of formulating the LOI, Chuck and I have
never discussed any of the prior communications to which you refer (and some of which I
also participated in). Lou did not initiate or orchestrate the LOI. On the contrary,
Lou's input prior to yesterday's circulation has primarily been in a fine tuning of the
proposal; for example, making sure that CMGT can continue with your current prospects. As
to the proposed LOI deal itself, your assistance is not required nor requested at this
time. If a role opens for you, either in putting the deal together or post closing, you
will hear directly from Lou or Chuck. You obviously know that Lou and I are big fans of
what you bring to the table.

Lou has his hands full. As to his pending matters with you, as well as to the MOIC
matter, I encourage the both of you to continue your positive work. As to the proposed
LOI transaction, to avoid distractions, I would ask Lou to simply refer any questions you
might have to me.

A good weekend to you both.

Ronald B. Given

Mayer, Brown, Rowe & Maw LLP
190 S. LaSalle Street
Suite 3132
Chicago, IL 60603-3441
Phone:  (312) 701-7382
Fax:     (312) 706-8137
Cell:    (312) 286-5252
Res.:    (312) 431-9952
> Email: <<mailto:rgiven@mayerbrownrowe.com>>
>
>
Assistant to Ronald B. Given:

Evajean T. Bugajski
Phone:  (312) 701-7632
> Email: <<mailto:ebugajski@mayerbrownrowe.com>>
>


I
-----Original Message-----
From: Gerry Spehar [mailto:gspehar1@earthlink.net]
Sent: Friday, August 08, 2003 4:26 PM
To: Franco, Lou
Cc: Given, Ronald B.
Subject: [Fwd: Newco LOI]


Sorry...here's the attachment.


NOTICE: This e-mail message and all attachments transmitted with it are intended solely
for the use of the addressee and may contain legally privileged and confidential

1

information.  If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.  If you have received this message in error, please notify the sender immediately by replying to this message and please delete it from your computer.

# EXHIBIT 10

**Robert Carroll**

| | |
|---|---|
| **From:** | Gerry Spehar [gspehar1@earthlink.net] |
| **Sent:** | Saturday, August 09, 2003 12:39 PM |
| **To:** | Given, Ronald B. |
| **Cc:** | Franco, Lou |
| **Subject:** | Re: [Fwd: Newco LOI] |

Ron,

To be blunt - I hope we know each other well enough by now - your comments miss the point
that matters and make points that are irrelevant to the discussion and confuse the issue.
The important and relevant question is:  Did Chuck Trautner - at any point during the term
of my contract with CMGT - become a legitimate member of Exhibit A of that contract?  The
honest answer is:  Yes, he did.  Once he legitimately became a member of Exhibit A, the
Rubicon was crossed, so to speak, and Spehar Capital became entitled to be paid per its
contract with CMGT.  You, or any one else for that matter, can open or maintain a back
channel at any time to any of the members of Exhibit A, but Spehar Capital is still
entitled to compensation on deals you do - and rightly so.  Were this not the case, what
would prevent anyone from going around my contract with CMGT - via a "separate and
distinct communications" back channel - to any of  Exhibit A's members at any time?

Ron, we all know that Chuck Trautner has been acting in the capacity of "deal doer" for
CMGT since the beginning of my involvement with CMGT.  Lou long ago made the decision to
involve me in CMGT's discussions with Chuck, and has not only continuously solicited my
advice on Chuck's many forays into "deal doing", but has also asked me to directly
participate in discussions with Chuck on many, many occasions - some of which also
involved you.  I have always complied and I gave but a few examples in yesterday's memo.
All parties to those many discussions - Lou, you and Chuck - have solicited my advice at
various times and welcomed my participation on many occasions, and I've contributed much
to our collective understanding that has helped move the ball along.  I don't know what
you and Chuck could possible be talking about that is truly "separate and distinct" from
the all encompassing CMGT territory we've covered in those many discussions.  I don't know
what you could possibly
discuss that is not colored by the advice and information I have continuously provided to
you, Lou and Chuck - at Lou's request.  If you kick the ball across the goal at this
point, Ron, are you truly claiming that everyone else on the team was just standing around
watching while you single-handedly dribbled it all the way up the field through all those
defenders?  That seems a bit much and certainly doesn't fit with the Ron Given I've come
to know and love.

There are many examples of "deal doers" like Chuck listed in Exhibit A -  Jim Patterson,
Richard Bellamy, Robert Chernick, Council Tree all come quickly to mind.  They all have
been acting for other (sometimes anonymous)  investors and, just like Chuck, it is unclear
exactly how they will be compensated and how much - if any - of their own money they are
contributing to the deals we've discussed.  Just like Chuck, some of them work a bit in
the dark and have presented different iterations of investors and deals to CMGT.  Ron, I
would have no way of knowing if any of them have opened or continued a "separate and
distinct communication" with you, but I do know that I would be paid if you consummated a
transaction with them.  I also know that I would feel good about being compensated because
I know how much I've contributed to their/your understanding and consequent ability to do
a deal that makes sense for CMGT.

We have both been trying to help Lou and CMGT over the past years, and no one on this
planet can honestly claim to have applied himself in that regard with more diligence and
integrity than me.  With regards to Exhibit A, Lou and I have always operated on a basis
of trust.  He has involved me in discussions with many parties - FlexBen is a current case
in point - and I have contributed when he asked and trusted him to eventually acknowledge
those parties' inclusion in Exhibit A.  I am trusting both of you will do the right thing
and acknowledge Chuck Trautner's rightful inclusion in that list.

You say you and Lou are fans, Ron.  If you ask yourself why, I believe you'll recognize
that it has a lot to do with integrity.  There are a lot of competent and smart people -
some of them much more accomplished than I - doing what I do.  Why are you and Lou still

working with me?  I believe it has a lot to do with the fact that you know you can trust me to be honest and to do my best to steer you right and to do the right thing myself. I'm asking you to do the same.

Now, to my role as CMGT's financial advisor.  For CMGT's sake, I wish you would have seen fit to involve me as one of CMGT's professional advisors in your discussions with Chuck and in constructing Lou's response to Chuck's LOI and his Letter to Investors and Interested Parties.  We've certainly worked well as a team in the past and CMGT has seen value in my involvement - why not now?  We worked out efficient and amicable ways to keep me involved as a valued advisor when others tried to exclude me, why not now?  Lou has often asked and expected me to ask the hard questions of investors that are needed to focus discussions and clarify nebulous issues - he has specifically asked that of me in our past discussions with Chuck.  This posture and role can be irritating at times, granted - but is often needed and in CMGT's best interest if handled professionally.

FYI, had I been involved in my capacity as advisor to CMGT, I would have suggested a different course of action and counsel to shareholders.  Here are my thoughts, and I'd be interested in hearing your rationale, on several points:

1.  So far, none of the many deals Chuck has thrown our way have panned out.  Given the lack of success in that extensive past history, does it make sense to prohibit CMGT from interacting with new investors when there are still so many unanswered questions about Chuck's "Newco"?  Just a week or so ago Lou received an "out-of-the-blue" call from Warburg Pincus - unless they were already listed in Exhibit A to Chuck's LOI, Lou couldn't field that call today.  He's now in a box with Chuck & friends for a period of time, just when we've been experiencing a surprising spate of unsolicited activity (e.g. FlexBen and Warburg Pincus) - had you asked I would have advised against these limitations.  To date, we haven't permitted anyone else to put us in this box in the LOI stage - why should Chuck Trautner be treated any differently?  Yes, he is a significant shareholder, but he is acting in a "deal doer" capacity in this instance and should be treated in a similar fashion to any other "deal doer" in my opinion.  I see nothing in his LOI or history that warrants special treatment - indeed, there are substantial unanswered questions and gray areas.

2.  Why did Lou counsel CMGT shareholders "I believe this is a deal we should and must do" when there are still so many unanswered questions about it?  In my professional opinion, that statement runs the risk of prematurely encouraging shareholders to take a path which is still encumbered with many major questions.  Keep in mind, we have a credible deal pending with Madison Dearborn that would not only keep CMGT intact, but would also bring extremely valuable ANC minority status - and a decision is imminent.  I would have suggested, at most, a statement like:  "I believe this is a deal we should seriously consider along with other pending transactions".

3.  There may be misplaced/incorrect listings in the LOI's Exhibit A, and some other entities I would have included in that Exhibit A had I been asked to contribute.

Most importantly, Ron, doesn't it make much more sense to engage in a collaborative effort involving all of CMGT's trusted and experienced advisors in these areas (e.g. Spehar Capital) - especially when there is no financial reason to exclude me from these discussions since Chuck's legitimately in Spehar Capital's Exhibit A in any case?

Finally, addressing your last point, in the course of advising Lou on financial and investment matters I will most likely continue to discuss Chuck's LOI directly with Lou. Far from being a distraction, in light of Lou's statement to shareholders it is now one of the primary funding alternatives that I need to assess, compare and generally provide Lou input on in the conduct of my services to CMGT.  CMGT has engaged me specifically to advise on these matters and help Lou with them - especially when his hands are full.  I will, of course, continue to actively pursue all other viable financing alternatives.

Have a good weekend...I'm sure we'll be talking soon.

Gerry


"Given, Ronald B." wrote:

> Gerry:
>
> >
> Although your attachment is to Lou, I would like to address it.  As Lou's situation
continued (and continues) to become more desperate, I have kept a separate channel of
communication on behalf of CMGT with Chuck.  The LOI is a consequence of those separate
and distinct communications.  In the course of formulating the LOI,  Chuck and I have
never discussed any of the prior communications to which you refer (and some of which I
also participated in).  Lou did not initiate or orchestrate the LOI.  On the contrary,
Lou's input prior to yesterday's circulation has primarily been in a fine tuning of the
proposal; for example, making sure that CMGT can continue with your current prospects.  As
to the proposed LOI deal itself, your assistance is not required nor requested at this
time.  If a role opens for you, either in putting the deal together or post closing, you
will hear directly from Lou or Chuck.  You obviously know that Lou and I are big fans of
what you bring to the table.
>
> Lou has his hands full.  As to his pending matters with you, as well as to the MOIC
matter, I encourage the both of you to continue your positive work.  As to the proposed
LOI transaction, to avoid distractions, I would ask Lou to simply refer any questions you
might have to me.
>
> A good weekend to you both.
>
> Ronald B. Given
>
> Mayer, Brown, Rowe & Maw LLP
> 190 S. LaSalle Street
> Suite 3132
> Chicago, IL 60603-3441
> Phone:  (312) 701-7382
> Fax:      (312) 706-8137
> Cell:      (312) 286-5252
> Res.:      (312) 431-9952
> > Email: <<mailto:rgiven@mayerbrownrowe.com>>
> >
> >
> Assistant to Ronald B. Given:
>
> Evajean T. Bugajski
> Phone:  (312) 701-7632
> > Email: <<mailto:ebugajski@mayerbrownrowe.com>>
> >
>
> I
> -----Original Message-----
> From: Gerry Spehar [mailto:gspehar1@earthlink.net]
> Sent: Friday, August 08, 2003 4:26 PM
> To: Franco, Lou
> Cc: Given, Ronald B.
> Subject: [Fwd: Newco LOI]
>
> Sorry...here's the attachment.
>
>
> NOTICE: This e-mail message and all attachments transmitted with it are intended solely
for the use of the addressee and may contain legally privileged and confidential
information.  If the reader of this message is not the intended recipient, or an employee
or agent responsible for delivering this message to the intended recipient, you are hereby
notified that any dissemination, distribution, copying, or other use of this message or
its attachments is strictly prohibited.  If you have received this message in error,
please notify the sender immediately by replying to this message and please delete it from
your computer.

# EXHIBIT 11

# Robert Carroll

| | |
|---|---|
| **From:** | Given, Ronald B. [RGiven@mayerbrownrowe.com] |
| **Sent:** | Saturday, August 09, 2003 3:55 PM |
| **To:** | gspehar1@earthlink.net |
| **Subject:** | Re: [Fwd: Newco LOI] |

Gerry: It is worth again saying, as we have each said, that we appreciate each other's professionalism and hard work on CMGT's behalf. However, you have not suceeded in putting together anything of your own to date and are not part of the LOI transaction. I encourage you to continue your work on the deals that have been carved out for you to continue with. I'm going to try to get the LOI deal done, but I am just as happy to work on one of your prospects.

There is nothing left to be said regarding the LOI, in my view. If you wish to pursue it, you will be in an adversarial position and should deal with us through counsel. You have the right to do that, of course, but if you do I believe all your activities on behalf of CMGT should cease (as well as your MOIC involvement) -- ultimately, that is not my call, however.

-------------------------
Ronald B. Given
Mayer, Brown, Rowe & Maw
190 S. LaSalle Street
Suite 3132
Chicago, IL 60603-3441
Phone: (312) 701-7382
Fax:    (312) 706-8137
Cell:   (312) 286-5252
Res.:   (312) 431-9952
Email: rgiven@mayerbrownrowe.com

Assistant to Ronald B. Given:

Evajean T. Bugajski
Phone: (312) 701-7632
Email: ebugajski@mayerbrownrowe.com

-----Original Message-----
From: Gerry Spehar <gspehar1@earthlink.net>
To: Given, Ronald B. <RGiven@mayerbrownrowe.com>
CC: Franco, Lou <Louman01@aol.com>
Sent: Sat Aug 09 13:38:49 2003
Subject: Re: [Fwd: Newco LOI]

Ron,

To be blunt - I hope we know each other well enough by now - your comments miss the point that matters and make points that are irrelevant to the discussion and confuse the issue. The important and relevant question is: Did Chuck Trautner - at any point during the term of my contract with CMGT - become a legitimate member of Exhibit A of that contract? The honest answer is: Yes, he did. Once he legitimately became a member of Exhibit A, the Rubicon was crossed, so to speak, and Spehar Capital became entitled to be paid per its contract with CMGT. You,

8/23/2006

or any one else for that matter, can open or maintain a back channel at any time to any of the members of Exhibit A, but Spehar Capital is still entitled to compensation on deals you do - and rightly so. Were this not the case, what would prevent anyone from going around my contract with CMGT - via a "separate and distinct communications" back channel - to any of Exhibit A's members at any time?

Ron, we all know that Chuck Trautner has been acting in the capacity of "deal doer" for CMGT since the beginning of my involvement with CMGT. Lou long ago made the decision to involve me in CMGT's discussions with Chuck, and has not only continuously solicited my advice on Chuck's many forays into "deal doing", but has also asked me to directly participate in discussions with Chuck on many, many occasions - some of which also involved you. I have always complied and I gave but a few examples in yesterday's memo. All parties to those many discussions - Lou, you and Chuck - have solicited my advice at various times and welcomed my participation on many occasions, and I've contributed much to our collective understanding that has helped move the ball along. I don't know what you and Chuck could possible be talking about that is truly "separate and distinct" from the all encompassing CMGT territory we've covered in those many discussions. I don't know what you could possibly discuss that is not colored by the advice and information I have continuously provided to you, Lou and Chuck - at Lou's request. If you kick the ball across the goal at this point, Ron, are you truly claiming that everyone else on the team was just standing around watching while you single-handedly dribbled it all the way up the field through all those defenders? That seems a bit much and certainly doesn't fit with the Ron Given I've come to know and love.

There are many examples of "deal doers" like Chuck listed in Exhibit A - Jim Patterson, Richard Bellamy, Robert Chernick, Council Tree all come quickly to mind. They all have been acting for other (sometimes anonymous) investors and, just like Chuck, it is unclear exactly how they will be compensated and how much - if any - of their own money they are contributing to the deals we've discussed. Just like Chuck, some of them work a bit in the dark and have presented different iterations of investors and deals to CMGT. Ron, I would have no way of knowing if any of them have opened or continued a "separate and distinct communication" with you, but I do know that I would be paid if you consummated a transaction with them. I also know that I would feel good about being compensated because I know how much I've contributed to their/your understanding and consequent ability to do a deal that makes sense for CMGT.

We have both been trying to help Lou and CMGT over the past years, and no one on this planet can honestly claim to have applied himself in that regard with more diligence and integrity than me. With regards to Exhibit A, Lou and I have always operated on a basis of trust. He has involved me in discussions with many parties - FlexBen is a current case in point - and I have contributed when he asked and trusted him to eventually acknowledge those parties' inclusion in Exhibit A. I am trusting both of you will do the right thing and acknowledge Chuck Trautner's rightful inclusion in that list.

You say you and Lou are fans, Ron. If you ask yourself why, I believe you'll recognize that it has a lot to do with integrity. There are a lot of competent and smart people - some of them much more accomplished than I - doing what I do. Why are you and Lou still working with me? I believe it has a lot to do with the fact that you know you can trust me to be honest and to do my best to steer you right and to do the right thing myself. I'm asking you to do the same.

Now, to my role as CMGT's financial advisor. For CMGT's sake, I wish you would have seen fit to involve me as one of CMGT's professional advisors in your discussions with Chuck and in constructing Lou's response to Chuck's LOI and his Letter to Investors and Interested Parties. We've certainly worked well as a team in the past and CMGT has seen value in my involvement - why not now? We worked out efficient and amicable ways to keep me involved as a valued advisor when others tried to exclude me, why not now? Lou has often asked and expected me to ask the hard questions of investors that are needed to focus discussions and clarify nebulous issues - he has specifically asked that of me in our past discussions with Chuck. This posture and role can be irritating at times, granted - but is often needed and in CMGT's best interest if handled professionally.

FYI, had I been involved in my capacity as advisor to CMGT, I would have suggested a different course of action and counsel to shareholders. Here are my thoughts, and I'd be interested in hearing your rationale, on several points:

1. So far, none of the many deals Chuck has thrown our way have panned out. Given the lack of success in that extensive past history, does it make sense to prohibit CMGT from interacting with new investors when there are still so many unanswered questions about Chuck's "Newco"? Just a week or so ago Lou received an "out-of-the-blue"

call from Warburg Pincus - unless they were already listed in Exhibit A to Chuck's LOI, Lou couldn't field that call today. He's now in a box with Chuck & friends for a period of time, just when we've been experiencing a surprising spate of unsolicited activity (e.g. FlexBen and Warburg Pincus) - had you asked I would have advised against these limitations. To date, we haven't permitted anyone else to put us in this box in the LOI stage - why should Chuck Trautner be treated any differently? Yes, he is a significant shareholder, but he is acting in a "deal doer" capacity in this instance and should be treated in a similar fashion to any other
"deal doer" in my opinion. I see nothing in his LOI or history that warrants special treatment - indeed, there are substantial unanswered questions and gray areas.

2. Why did Lou counsel CMGT shareholders "I believe this is a deal we should and must do" when there are still so many unanswered questions about it? In my professional opinion, that statement runs the risk of prematurely encouraging shareholders to take a path which is still encumbered with many major questions. Keep in mind, we have a credible deal pending with Madison Dearborn that would not only keep CMGT intact, but would also bring extremely valuable ANC minority status - and a decision is imminent. I would have suggested, at most, a statement like: "I believe this is a deal we should seriously consider along with other pending transactions".

3. There may be misplaced/incorrect listings in the LOI's Exhibit A, and some other entities I would have included in that Exhibit A had I been asked to contribute.

Most importantly, Ron, doesn't it make much more sense to engage in a collaborative effort involving all of CMGT's trusted and experienced advisors in these areas (e.g. Spehar Capital) - especially when there is no financial reason to exclude me from these discussions since Chuck's legitimately in Spehar Capital's Exhibit A in any case?

Finally, addressing your last point, in the course of advising Lou on financial and investment matters I will most likely continue to discuss Chuck's LOI directly with Lou. Far from being a distraction, in light of Lou's statement to shareholders it is now one of the primary funding alternatives that I need to assess, compare and generally provide Lou input on in the conduct of my services to CMGT. CMGT has engaged me specifically to advise on these matters and help Lou with them - especially when his hands are full. I will, of course, continue to actively pursue all other viable financing alternatives.

Have a good weekend...I'm sure we'll be talking soon.

Gerry


"Given, Ronald B." wrote:

> Gerry:
>
> Although your attachment is to Lou, I would like to address it. As Lou's situation continued (and continues) to become more desperate, I have kept a separate channel of communication on behalf of CMGT with Chuck. The LOI is a consequence of those separate and distinct communications. In the course of formulating the LOI, Chuck and I have never discussed any of the prior communications to which you refer (and some of which I also participated in). Lou did not initiate or orchestrate the LOI. On the contrary, Lou's input prior to yesterday's circulation has primarily been in a fine tuning of the proposal; for example, making sure that CMGT can continue with your current prospects. As to the proposed LOI deal itself, your assistance is not required nor requested at this time. If a role opens for you, either in putting the deal together or post closing, you will hear directly from Lou or Chuck. You obviously know that Lou and I are big fans of what you bring to the table.
>
> Lou has his hands full. As to his pending matters with you, as well as to the MOIC matter, I encourage the both of you to continue your positive work. As to the proposed LOI transaction, to avoid distractions, I would ask Lou to simply refer any questions you might have to me.
>
> A good weekend to you both.
>
> Ronald B. Given
>

8/23/2006

> Mayer, Brown, Rowe & Maw LLP
> 190 S. LaSalle Street
> Suite 3132
> Chicago, IL 60603-3441
> Phone: (312) 701-7382
> Fax:    (312) 706-8137
> Cell:   (312) 286-5252
> Res.:   (312) 431-9952
> > Email: <<mailto:rgiven@mayerbrownrowe.com>>
> >
> >
> Assistant to Ronald B. Given:
>
> Evajean T. Bugajski
> Phone: (312) 701-7632
> > Email: <<mailto:ebugajski@mayerbrownrowe.com>>
> >
>
> I
> -----Original Message-----
> From: Gerry Spehar [mailto:gspehar1@earthlink.net]
> Sent: Friday, August 08, 2003 4:26 PM
> To: Franco, Lou
> Cc: Given, Ronald B.
> Subject: [Fwd: Newco LOI]
>
> Sorry...here's the attachment.
>
>
> _____
> NOTICE: This e-mail message and all attachments transmitted with it are intended solely for the use of the
addressee and may contain legally privileged and confidential information.  If the reader of this message is not the
intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are
hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is
strictly prohibited.  If you have received this message in error, please notify the sender immediately by replying to
this message and please delete it from your computer.


_____

NOTICE: This e-mail message and all attachments transmitted with it are intended solely for the
use of the addressee and may contain legally privileged and confidential information. If the
reader of this message is not the intended recipient, or an employee or agent responsible for
delivering this message to the intended recipient, you are hereby notified that any dissemination,
distribution, copying, or other use of this message or its attachments is strictly prohibited. If you
have received this message in error, please notify the sender immediately by replying to this
message and please delete it from your computer.

# EXHIBIT 12

# Robert Carroll

**From:** Given, Ronald B. [RGiven@mayerbrownrowe.com]
**Sent:** Tuesday, August 19, 2003 6:52 PM
**To:** gspehar1@earthlink.net; Louman01@aol.com; lfranco@cmgt.com
**Subject:** Re: Notice to Chuck Trautner per our call

This, of course, is not what we discussed.

I very much regret, Gerry, that from my lawyer's perspective it seems you have always focused so much on yourself and churning words that you have forgotten that your job was to raise money. You have never been in a better position to actually do your job (go out and get someone to beat the LOI for heavens sakes!), but you choose to squander your energy spending all your time on nonsense like this.

I will discuss our conversations with Chuck and repreat to him my view that your claim is without merit and that, in any event, any claim you may have is againt CMGT. I have to say what I believe, whether or not it suits your personal purposes.

And of course, Gerry, Lou and I are not preventing you from directly dealing with Chuck. I realize that is less dramatic than playing this snake in the grass game, but you seem to think you have a relationship with him and your threats might have affect whether or not there is legal substance. I believe from a legal point of view this will set you up for claims against you by the CMGT investors, but you seem intent on causing harm to everyone (including yourself).

Lou and I need to focus on positive work and actually getting things done. From a legal point of view, we simply cannot play your game of throwing E-Mails back and forth. We have talked to you. We have listened to you. We have told you our view. I'm sorry, but we can do no more. I think you need to listen and think a bit more. In any event, you have told us you have counsel. I will henceforth deal only with him or her, as is appropriate.
--------------------------
Ronald B. Given
Mayer, Brown, Rowe & Maw
190 S. LaSalle Street
Suite 3132
Chicago, IL 60603-3441
Phone: (312) 701-7382
Fax:    (312) 706-8137
Cell:   (312) 286-5252
Res.:   (312) 431-9952
Email: rgiven@mayerbrownrowe.com

Assistant to Ronald B. Given:

Evajean T. Bugajski
Phone: (312) 701-7632
Email: ebugajski@mayerbrownrowe.com

-----Original Message-----
From: Gerry Spehar <gspehar1@earthlink.net>
To: Franco, Lou <Louman01@aol.com>; Franco, Lou <lfranco@cmgt.com>; Given, Ronald B.

8/23/2006

<RGiven@mayerbrownrowe.com>
Sent: Tue Aug 19 19:02:52 2003
Subject: Notice to Chuck Trautner per our call

Gentlemen:

This email is to confirm that in the course of our telephone discussion
today you both agreed to notify Chuck Trautner and his investor group of
Spehar Capital's claim to all elements of compensation per its contract
with CMGT should CMGT consummate the transaction contemplated by Chuck's
July 31, 2003 LOI - or any other transaction involving Chuck, for that
matter.

Further, Spehar Capital's contract with CMGT specifies: "In the event
that Accepted Capital, as defined herein, is used to fund a successor
company to CMGT, all of the terms of this agreement shall apply to such
successor company and this Agreement shall be made an obligation of such
successor company under the terms of any asset purchase agreement with
such successor company." Thus, Chuck and his investor group should also
be immediately informed that both the "Newco" contemplated in Chuck's
LOI and "Oldco"/CMGT would be obligated to honor Spehar Capital's
contract with CMGT.

To be perfectly clear:

a) Spehar Capital's contract applies to Chuck and Chuck's LOI
transaction, and

b) Spehar Capital's contract binds both CMGT/"Oldco" and "Newco" in
Chuck's LOI transaction.

Simply put, paragraph 8. of Chuck's LOI should not have been agreed to
by CMGT.

As is your duty per your agreement in today's conversation, please
immediately inform Chuck that Spehar Capital expects to be fully
compensated - by CMGT/"Oldco" and "Newco" - under its Agreement with
CMGT should CMGT consummate its pending deal with Chuck Trautner's
"Newco".

Please copy me on your notice to Chuck.

Best regards,

Gerry Spehar
Spehar Capital, LLC


PS. Ron, in between your many epithets and derogatory comments, you
were extremely dismissive today of my efforts to discuss a settlement
based on honoring Spehar Capital's contract.  You encouraged me to
"bring it on" and told me that you were "not afraid" because whatever I
do would not affect the deal.  In your words:  "This deal will go
forward!"

I'm glad you have such confidence and I look forward to Chuck's or a
better deal getting done and bringing a successful conclusion to our
long and arduous struggle to get CMGT funded.

PPS. Lou, I received a call from a representative of the Washoe Tribe
today and will be fielding more questions tomorrow with a goal of
getting an NDA and LOI shortly.

---

NOTICE: This e-mail message and all attachments transmitted with it are intended solely for the
use of the addressee and may contain legally privileged and confidential information. If the
reader of this message is not the intended recipient, or an employee or agent responsible for
delivering this message to the intended recipient, you are hereby notified that any dissemination,
distribution, copying, or other use of this message or its attachments is strictly prohibited. If you
have received this message in error, please notify the sender immediately by replying to this
message and please delete it from your computer.

# EXHIBIT 13



**CMGT, Inc.®**

**First InTouch™**

LOUIS J. FRANCO, RHU
Chairman, President and Chief Executive Officer

August 26, 2003

TO: ALL CMGT, INC. INVESTORS AND INTERESTED PARTIES

    Re: Letter of Intent For "Newco" To Acquire Assets of CMGT, Inc.

Dear Valued Investors and Interested Parties:

I am very pleased to report that the shareholders of CMGT, Inc. have responded to my August 15 letter with a decisive majority vote in favor of the Newco transaction to acquire assets of CMGT and "FOR" the 20% Newco stock purchase decision contemplated in the Letter of Intent. Thank you very much for your consideration and confidence in your management's recommendation!

As promised, the vote tally is detailed on the attached Schedule.

Regretfully, I must also advise you that I have received two specific objections to the proposed Newco transaction. First, Gerry Spehar/Spehar Capital has claimed that he is entitled to compensation as a result of the Newco transaction under a contract he has with CMGT, Inc. Your management and legal counsel strongly disagree with this contention. Unfortunately, our numerous conversations with Gerry on this topic have not been productive. Secondly, Dick Ross/CC-1 Ltd. Partnership has challenged the validity of the capitalization schedule attached to my August 15th letter and refused to submit his vote. As you know, we believe the capitalization schedule used for this voting is absolutely appropriate and fair to everyone.

The Spehar/Ross/CC-1 claims should not be allowed to delay or in any way hinder the proposed transaction. Even if their claims were deemed to have merit, the appropriate venue for the resolution of those claims will be in the winding up of CMGT, Inc. That is not before us today.

Nonetheless, because of the existence of these claims, Newco will require indemnification and an escrow of the shares to assure indemnification obligations can be satisfied. Also, to protect against any threat to break-up the transaction after it is consummated, Newco will require an independent license to CMGT, Inc.'s software that would survive any break-up of the transaction.

These are commercially reasonable requirements that are within the scope of my own authority and the Letter of Intent, and we could expect the same requirements from any buyer under the circumstances. Although I am disappointed (disappointment that I know you share), I am confident that any claims against the transaction will not succeed and, as a practical matter, the only substantive effect we will be facing is additional documentation complexity and a delay in the winding up of CMGT, Inc. until such time as the escrow is released.

---



*CMGT, Inc.*®

*First InTouch*™

Letter To CMGT, Inc. Investors
August 26, 2003
Page 2 of 3

We have satisfied the notice and voting requirements to consummate the Newco transaction and have provided answers to shareholders' questions in my letters to you. I'm now putting my full efforts into the completion of definitive documentation and meeting our target closing date of September 30th.

I will keep you posted.

Very truly yours,

Louis J. Franco, RHU

Attachment: (1) Shareholder Vote Tally Schedule

Cc:    Ronald B. Given, Esq., Mayer, Brown, Rowe & Maw, Chicago

LJF/ltrcmgtinvestors/08262003/chgo/c:d:

*The Standard For Integrated Absence Management*™



**CMGT, Inc.®**

*First InTouch™*

Letter To CMGT, Inc. Investors, August 26, 2003
Page 3 of 3

## ACTUAL SHAREHOLDER VOTE SUMMARY as of 8/26/2003

### INVESTORS' VOTE TALLY

| CASH INVESTORS | # Shares Held | "FOR" $500K Cash | "FOR" 20% Newco Stock | No Vote |
|---|---|---|---|---|
| Baliga, Wayne | 211,009.49 | 0.00 | 211,009.49 | 0.00 |
| Carroll, Leonard | 52,292.86 | 0.00 | 52,292.86 | 0.00 |
| CC-1 Partnership | 219,000.00 | 0.00 | 0.00 | 219,000.00 |
| Donwen, William | 13,761.00 | 0.00 | 13,761.00 | 0.00 |
| Garner, Catherine | 50,000.00 | 0.00 | 50,000.00 | 0.00 |
| Hollins, Byron & Jan | 129,052.25 | 0.00 | 129,052.25 | 0.00 |
| Holman, Ron & Linda | 91,745.00 | 0.00 | 0.00 | 91,745.00 |
| Quarles, Kim & Rob | 22,936.00 | 0.00 | 22,936.00 | 0.00 |
| Rask, Lee | 91,743.12 | 0.00 | 91,743.12 | 0.00 |
| Reed-Egly Partnership | 50,459.00 | 0.00 | 50,459.00 | 0.00 |
| Regan, Kevin | 22,936.00 | 0.00 | 22,936.00 | 0.00 |
| Ross, John | 45,872.00 | 0.00 | 45,872.00 | 0.00 |
| Ross, Richard | 113,761.00 | 0.00 | 0.00 | 113,761.00 |
| Spaeth, Melvin | 9,176.00 | 0.00 | 0.00 | 9,176.00 |
| Trautner, Charles | 146,790.72 | 0.00 | 146,790.72 | 0.00 |
| Wong, Celia & Jim | 22,935.31 | 0.00 | 22,935.31 | 0.00 |
| **TOTAL SHARES** | **1,293,469.75** | **0.00** | **859,787.75** | **433,682.00** |
| Total Cash Investors # Shares Needed For Majority (51%) | 659,669.57 | | 66% | 34% |

### MANAGEMENT — MANAGEMENTS' VOTE TALLY

| MANAGEMENT | # Shares Held | "FOR" $500K Cash | "FOR" 20% Newco Stock | No Vote |
|---|---|---|---|---|
| Crandall, Rob | 100,000.00 | 0.00 | 100,000.00 | 0.00 |
| DiBenedetto, Debbie | 185,000.00 | 0.00 | 185,000.00 | 0.00 |
| Franco, Lou | 255,000.00 | 0.00 | 255,000.00 | 0.00 |
| Jackson, Craig | 100,000.00 | 0.00 | 0.00 | 100,000.00 |
| Walker, Bill | 190,000.00 | 0.00 | 190,000.00 | 0.00 |
| **TOTAL SHARES** | **830,000.00** | **0.00** | **730,000.00** | **100,000.00** |
| Total Management # Shares Needed For Majority (51%) | 423,300.00 | | 88% | 12% |
| **GRAND TOTAL - ALL SHAREHOLDERS** | **2,123,469.75** | **0.00** | **2,342,724.60** | **533,682.00** |
| Total All Shareholders # Shares Needed For Majority (51%) | 1,082,969.57 | | 75% | 25% |

*The Standard For Integrated Absence Management™*

L:/Filtrong/Investors/082620003chgo/ccd:

# EXHIBIT 14



# CMGT, Inc.

## First InTouch



*TouchSpeed*

**A CMGT, Inc. Company**

TECHNOLOGY, INC.

# CORPORATE DOCUMENTS

*The Standard For Integrated Comprehensive Absence and Disability Management™*

**CMGT, INC.® SUMMARY OF POTENTIAL CORPORATE LIABILITIES**
As of 09-01-2003 - All issues subject to legal opinion of Mayer, Brown, Rowe & Maw (Legal counsel for CMGT, Inc.)

| | Issue(s) | Curative Action(s) | $$ Value | Considerations/Comments |
|---|---|---|---|---|
| 1 | Catherine H. Garner Separation & Consulting Agreement<br>1. Contractual issues<br>2. Past breach of contract & fraudulent actions | • Offered settlement terms of 50,000 shares of common stock (no cash/no other terms) and secure release & waiver of all claims against CMGT | Stock | • CHG has agreed/signed to 50,000 shares & release/waiver of claims against CMGT re: Lyric funding |
| 2 | Richard M. Ross Separation & Consulting Agreement & CC-1 Partnership Agreement | • Offer settlement terms per Agreement letters to R. M. Ross & CC-1 Partnership (preferred stock & common stock warrants + $5,000/mo. for 24 mos. to R. M. Ross; and 219,000 shares preferred stock to CC-1)<br>• Secure release & waiver of all claims against CMGT | Stock + $120,000 (5,000 per mo. for 24 mos.) | • R. M Ross and CC-1 Partnership agreed/signed agreement/waiver of claims against CMGT re: Lyric funding on 10-25-2001 – RMR now claims these agreements are null & void because they pertain only to a previous CMGT funding offer<br>• R.M. Ross agreement = $5,000/mo. for 24 mos. post-funding, plus 2 yr. Warrants to purchase 100,000 shares common stock, plus 100,000 shares preferred stock<br>• CC-1 agreement = 219,000 shares preferred stock |
| 3 | Touch Speed Technology, Inc. Purchase Agreement:<br>1. Stock to Messers. Jackson & Crandall<br>2. CMGT missed $200,000 payment due 8/2000 & $250,000 payment due 7/2001 plus interest & penalties<br>3. Balance of $450,000 Payments to Messers. Jackson & Crandall | • Stock & $$ subj. to financier approval – Management suggests structure a final settlement of all monies owed RCC & CLJ equal to one-time cash payment of $150,000 ($75,000 each), subj. to RCC continued consulting agreement/ no breach actions / RCC & CLJ release & waiver of all claims;<br>• Mitigate stock/$$ terms owed with OPAL report substantiating T/S software not fully functional at time of closing & material breach actions by Craig that damaged Company & mitigated funding efforts<br>• Secure release & waiver of all claims against CMGT | < $450,000 + Stock | • R. Crandall indicated via E-mail that a final settlement of $150,000 to be split between RCC & CLJ is acceptable to them in settlement of all monies owed them<br>• C. Jackson has indicated they will agree to $75,000 each, plus stock, plus balance of $$ owed over time<br>• Messers. Jackson & Crandall have previously demanded immediate issuance of stock & payment of principal, interest, penalties<br>• C. Jackson voluntarily terminated his relationship with CMGT in August 2001 by walking off the job |

**STRICTLY CONFIDENTIAL INFORMATION – DO NOT COPY, DUPLICATE OR DISTRIBUTE**
Page 1 of 3

CMGT-00002

# CMGT, INC.® SUMMARY OF POTENTIAL CORPORATE LIABILITIES

As of 09-01-2003 - All issues subject to legal opinion of Mayer, Brown, Rowe & Maw (Legal counsel for CMGT, Inc.)

| | Issue(s) | Curative Action(s) | $$ Value | Considerations/Comments |
|---|---|---|---|---|
| 4 | • Web Barth/CareManagement.com, Inc. Letter Agreement | • Negotiate settlement comprised of $ paid out over 24 months, post-funding & marketing/sales consulting | Meritless claim | • Letter Agreement made between R. Ross & W. Barth, based on rights to LTC product that never happened |
| | • SEI Agreement/Robert Spaeth<br>1. SEI Agreement superceded by Saviar/SEI Agreement – then terminated when CMGT terminated Saviar/SEI<br>2. RMR promised Robert Spaeth reimbursement of expenses & 50,000 shares CMGT stock – Lyric terms showed 50,000 shares for R. Spaeth | • Grant 50,000 shares, subject to secured release & waiver of all claims against CMGT | Meritless claim | • Saviar/Spaeth Agreement terminated by CMGT for non-performance, misrepresentation & damage to CMGT<br>• R. Spaeth has not agreed to proposed stock redistribution or waiver of claim(s) agreed to by all other CMGT shareholders (4/11/2001 letter)<br>• R. Spaeth represents his father, a CMGT shareholder |
| 5 | • Spehar Capital Agreement/Gerry Spehar<br>1. Claim that CWT Investor Group offer to fund CMGT is included in CMGT/Spehar Capital Agreement | • No legal action initiated<br>• Likelihood of settlement is high if legal action taken against CMGT | Meritless claim | • MBR&M and Management agree there is no basis for a claim<br>• G. Spehar has indicated he will take legal action to enforce his contract based on his previous introductions to/discussions with Chuck Trautner & various investors |
| 6 | • Reimbursement of Management Team Pre-Operating Expenses:<br>1. L. Franco - $180,000<br>2. Craig Jackson - $30,000<br>3. Rob Crandall - $2,500 | • Reimbursements to be made to Mgt. Team promised by CMGT, Inc. | Approx. $210,000 | • Subj. to substantiation/expense reports post-funding |
| 7 | • Zolendek, Strassels, Green & Freed PC<br>1. $30,000 services/consulting fees | • Offer to pay reduced amount due to questionable billings re: consulting services and unprofessional accounting services rendered.<br>• Terminate all contracts & secure release & waiver of all claims against CMGT | Meritless claim | • RMR hired Zolendek and signed agreements without authorization<br>• Zolendek Balance Sheet & Financials produced are questionable/unprofessional work product; Zolendek 'consulting services' unsubstantiated – no work product |
| 8 | • Gammage & Burnham Invoices | • No action required | Meritless claim | • Legal services agreed to by RMR without authorization re: So. African business deals – no work product delivered |

**STRICTLY CONFIDENTIAL INFORMATION – DO NOT COPY, DUPLICATE OR DISTRIBUTE**
Page 2 of 3

CMGT-00003

## CMGT, INC.® SUMMARY OF POTENTIAL CORPORATE LIABILITIES

As of 09-01-2003 - All issues subject to legal opinion of Mayer, Brown, Rowe & Maw (Legal counsel for CMGT, Inc.)

| | Issue(s) | Curative Action(s) | $$ Value | Considerations/Comments |
|---|---|---|---|---|
| | **Substantive Potential Claims/Litigation Issues - *Degree of Risk*** | | | |
| 1 | Saviar/SEI Agreement – *Low* <br> ▪ Total non-performance & serious misrepresentation issues that damaged CMGT. | None required | Meritless claim | **N.B.:** All issues subject to legal opinion of Mayer, Brown, Rowe & Maw (Legal counsel for CMGT, Inc.) |
| 2 | Spehar Capital Agreement – *High* <br> ▪ Claim that CWT Investor Group offer to fund CMGT is included in CMGT/Spehar Capital Agreement | None required | Meritless claim | |
| 3 | CMGT Expired Note(s): <br> ▪ Ron & Linda Holman ($100,000) plus add'l stock- *High if not repaid; Very Low if repaid* <br> ▪ Other shareholders if Holman's are paid – *Very Low* | ▪ Re: Holmans: CWT Investor Group asset purchase-based LOI makes no provision for assumption of any CMGT liabilities <br> ▪ Re: other shareholders – None Required | TBD | |

**STRICTLY CONFIDENTIAL INFORMATION – DO NOT COPY, DUPLICATE OR DISTRIBUTE**
Page 3 of 3

CMGT-00004

# EXHIBIT 15

## Robert Carroll

| | |
|---|---|
| **From:** | Given, Ronald B. [RGiven@mayerbrownrowe.com] |
| **Sent:** | Wednesday, September 17, 2003 11:27 AM |
| **To:** | Louis J. Franco; Wong, James M.; Byron Hollins; Catherine H. Garner; CC-1 Ltd. Partnership ; Deborah V. DiBenedetto; Forest Reed; Gerry Spehar; Kevin W. Regan; Kim Quarles; Lee Rask; Melvin Spaeth; R. Leonard Carroll; Robert C. Crandall; Robert C. Crandall; Robert D. Spaeth; Robert D. Spaeth; Robert D. Spaeth; Ron Holman; Wayne J Baliga; WIlliam J. Donwen; William W. Walker |
| **Subject:** | Purported Spehar TRO |
| **Attachments:** | faxjob.pdf |



faxjob.pdf (65 KB)

```
I attach a fax I received yesterday.  Mayer Brown has not been retained to deal with this
matter, and we do not expect to be.  Lou Franco will be available tomorrow.  Gerry
Spehar's particulars are as follows:

Gerry Spehar
1625 Grandview Avenue
Glendale, CA  91201
Ph. 818-247-5533

His lawyer's info is on the attached.

Ronald B. Given

Mayer, Brown, Rowe & Maw LLP
190 S. LaSalle Street
Suite 3132
Chicago, IL 60603-3441
Phone:   (312) 701-7382
Fax:       (312) 706-8137
Cell:       (312) 286-5252
Res.:      (312) 431-9952
> Email: <<mailto:rgiven@mayerbrownrowe.com>>
>
>
Assistant to Ronald B. Given:

Evajean T. Bugajski
Phone:   (312) 701-7632
> Email: <<mailto:ebugajski@mayerbrownrowe.com>>
>
```

NOTICE: This e-mail message and all attachments transmitted with it are intended solely
for the use of the addressee and may contain legally privileged and confidential
information.  If the reader of this message is not the intended recipient, or an employee
or agent responsible for delivering this message to the intended recipient, you are hereby
notified that any dissemination, distribution, copying, or other use of this message or
its attachments is strictly prohibited.  If you have received this message in error,
please notify the sender immediately by replying to this message and please delete it from
your computer.

Sep-16-03  11:12am    From-                                                    T-348   P.01/05   F-980

## RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL

A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900
FACSIMILE: (213) 895-4921

## FACSIMILE COVER SHEET

**DATE:**  September 16, 2003

**TO:**  Ronald B. Given
Mayer, Brown, Rowe & Maw

**FROM:**  Kenneth A. Franklin

**RE:**  Spehar v. CMGT, Inc.

**TOTAL NUMBER OF PAGES:**  5
(Including Cover Sheet)

**FAX:**  (312) 706-8137
**PHONE:**  (312) 701-7382

**FILE#:**  5945-L1

| MESSAGE: | Please see attached. |
|---|---|

Originals with enclosures will be sent by:

☒  U.S. Mail          ☐  Overnight Courier

☐  Messenger          ☐  E-Mail

☐  Will not be sent

*Please call June Weiss at (213) 895-4900, X-233 if you do not
receive all pages or if message is not legible.*

THIS TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, PLEASE BE AWARE THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, WE WOULD APPRECIATE YOUR CALLING US IMMEDIATELY SO THAT WE MAY ARRANGE FOR THE RETURN OF THE ORIGINAL MESSAGE TO US. THANK YOU.

Sep-16-03  11:12am  From-                                              T-348  P.02/05  F-980



RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION

444 SOUTH FLOWER STREET
SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TEL: (213) 895-4900

JOHN D. CAHILL
JOHN D. PETTKER
HENRY P. PRANOV, JR.
ALLAN E. CERAN
C. STEPHEN DAVIS
CRIS K. O'NEALL
THOMAS CURTISS, JR.
ELIZABETH B. BLAKELY
TIMOTHY G. CEPERLEY
ALFRED KLEIN
KENNETH A. FRANKLIN
WADE E. NORWOOD
ANDREW W. BODEAU
JEAN M. BEASLEY

KARL B. RODI (1908-1982)
DANIEL C. BOND (1942-1977)
PAUL E. SCHWAB (1896-1973)

OF COUNSEL
JOHN P. POLLOCK
ROBERT A. YAHIRO
DAVID K.W. CHANG

TELECOPIERS
(213) 892-4921
(213) 892-4922
(213) 895-4780

OUR FILE NUMBER
3943-L1

September 16, 2003

<u>**VIA FACSIMILE – (312) 706-8137**</u>
<u>**and VIA U.S. MAIL**</u>

Ronald B. Given
Mayer, Brown, Rowe & Maw
190 S. La Salle Street
Chicago, Illinois  60603-3441

    Re:   <u>Spehar Capital, LLC v. CMGT, Inc.</u>

Dear Mr. Given:

    Enclosed please find a copy of the Temporary Restraining Order issued by the Los Angeles Superior Court on Friday.  To expedite this process we attempted to directly serve Louis Franco, but have been advised by our process server that Mr. Franco is avoiding service. As a result, we have served CMGT in Delaware as provided by Delaware law.

    If you would like a copy of the complaint and moving papers, please call me and we will be happy to provide them by Federal Express or facsimile.

    If you have any questions, please do not hesitate to call.

              Very truly yours,

              Kenneth A. Franklin

KAF:bjw

Sep-16-03  11:13am  From-                                    T-348  P.03/05  F-980

1   RODI, POLLOCK, PETTKER, GALBRAITH
    & CAHILL, A Law Corporation
2   ANDREW W. BODEAU (SBN 183600)
    KENNETH A. FRANKLIN (SBN 143809)
3   444 South Flower Street, Suite 1700
    Los Angeles, California 90071-2901
4   Telephone:    (213) 895-4900
    Facsimile:    (213) 895-4921
5
    STEVEN A. KLENDA, LLC
6   STEVEN A. KLENDA, ESQ. (*Pro hac vice* to be filed)
    600 Grant St., Suite 300
7   Denver, Colorado  80203
    Telephone:    (303) 785-7777
8   Facsimile:    (303) 861-1777
9   Attorneys for Plaintiff,
    SPEHAR CAPITAL, LLC, a California limited liability company
10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                 FOR THE COUNTY OF LOS ANGELES

13                (NORTH CENTRAL DISTRICT – BURBANK)

14  SPEHAR CAPITAL, LLC, a California       CASE NO. EC 037602
    limited liability company,
15                                          ORDER TO SHOW CAUSE RE PRELIMINARY
                 Plaintiff,                 INJUNCTION AND TEMPORARY
16                                          RESTRAINING ORDER
    v.
17                                          Date:  10-03-03
    CMGT, INC., a Delaware corporation, and Time:  9:00 a.m.
18  DOES 1 through 100, inclusive          Dept.  NC "A"
19               Defendants.
20

21          Upon reading the verified complaint of plaintiff Spehar Capital, LLC ("Spehar") on file

22  herein, Spehar's *ex parte* application and accompanying memorandum of points and authorities

23  and declarations, and it appearing to the satisfaction of the Court that this is a proper case for the

24  granting of an order to show cause and temporary restraining order, and that unless the temporary

25  restraining order prayed for be granted against defendant CMGT, Inc. ("CMGT"), CMGT will

26  cause great and irreparable injury before the hearing on the order to show cause,

27          IT IS HEREBY ORDERED that CMGT appear in Department ▓ of this Court, located at

28  300 East Olive, Burbank, California, on ___10/3___, 2003, at 9:00 ,m., or as soon

                                            1

1  thereafter as the matter may be heard, then and there to show cause, if any they have, why it, and

2  its officers, agents, servants, employees, representatives, and all persons acting in concert or

3  participating with them, should not be enjoined and restrained during the pendency of this action

4  from engaging in, committing, or performing, directly or indirectly, any and all of the following

5  acts:

6      (a)    proceeding with the asset sale transaction between CMGT and Newco;

7      (b)    consummating, or taking any further steps toward consummating the asset-

8  purchase transactions between CMGT and Newco, or any other transaction by CMGT whose

9  terms do not comply with all terms of the CMGT-Spehar agreement;

10     (c)    selling, transferring, pledging or encumbering any of CMGT's assets or property,

11  other than in the ordinary course of its business; and

12     (d)    licensing any of CMGT's software.

13     IT IS FURTHER ORDERED that pending the hearing and determination on the order to

14  show cause, CMGT, and its officers, agents, servants, employees, representatives, and all persons

15  acting in concert or participating with them, shall be and are hereby restrained and enjoined from

16  engaging in, committing, or performing, directly or indirectly, any and all of the following acts:

17     (a)    proceeding with the asset sale transaction between CMGT and Newco;

18     (b)    consummating, or taking any further steps toward consummating the asset-

19  purchase transactions between CMGT and Newco, or any other transaction by CMGT whose

20  terms do not comply with all terms of the CMGT-Spehar agreement; and

21     (c)    selling, transferring, pledging or encumbering any of CMGT's assets or property,

22  other than in the ordinary course of its business; and

23     (d)    licensing any of CMGT's software.

24  ///

25  ///

26  ///

27  ///

28  ///

2

ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

RICO, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES CALIFORNIA 90071-2901
TELEPHONE (213)955-4900

1       IT IS FURTHER ORDERED that copies of Spehar's *ex parte* application and

2   accompanying memorandum of points and authorities, declarations, and complaint be served upon

3   CMGT not later than ___9/17/___, 2003, by 5:00 p.m ..

4       LET THE ABOVE ORDER ISSUE.

5

6   Dated: September /2, 2003

7                                         _____
                                          Judge, Los Angeles County Superior Court
                                                   Michael S. Mink

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

3

# EXHIBIT 16

**Robert Carroll**

| | |
|---|---|
| **From:** | Given, Ronald B. [RGiven@mayerbrownrowe.com] |
| **Sent:** | Friday, September 19, 2003 10:44 AM |
| **To:** | Louis J. Franco; Wong, James M.; Byron Hollins; Catherine H. Garner; CC-1 Ltd. Partnership; Deborah V. DiBenedetto; Forest Reed; Gerry Spehar; Kevin W. Regan; Kim Quarles; Lee Rask; Melvin Spaeth; R. Leonard Carroll; Robert C. Crandall; Robert C. Crandall; Robert D. Spaeth; Robert D. Spaeth; Robert D. Spaeth; Ron Holman; Wayne J Baliga; WIlliam J. Donwen; William W. Walker |
| **Subject:** | Purported Spehar TRO |

As you know, Gerry Spehar has initiated a purported TRO in Los Angeles relating to the NEWCO transaction. As a consequence of this action by Gerry Spehar, and presuming that it is not immediately withdrawn, (x) Lou Franco has advised me that he must now reluctantly plan to leave his position with CMGT and pursue other opportunities, and (y) representatives of NEWCO have indicated that they intend to terminate the LOI in short order. There is no expectation that Gerry Spehar will do the right thing.

As Lou Franco told you, Gerry Spehar asserted that his contract applied to the NEWCO transaction, an assertion that CMGT, NEWCO and counsel strongly believe has absolutely no substantive basis. Notwithstanding the fact that we believed, and continue to believe, that Gerry Spehar's claim is absolutely spurious, Gerry Spehar knows that he was entitled to assert his claim against CMGT, in the same way that each of you are entitled to assert your claims, after the NEWCO transaction occurred and when CMGT would finally have something of value that is worth anyone's time and effort to argue about, namely shares of NEWCO stock. That would have at least been a fair way for Gerry Spehar to deal with this situation.

It seems obvious that there is no jurisdictional basis for Gary Spehar to bring his lawsuit in Los Angeles when CMGT is a Delaware corporation operating from Illinois. Moreover, injunctions are only appropriate if regular "legal" remedies are inadequate. In this case it is hard to imagine that even Gerry Spehar feels he is entitled to more than the 20% of NEWCO stock that we had hoped to get to CMGT. Injunctive action is also clearly inappropriate if, as seems likely, all Gerry Spehar is really seeking is money. Gerry Spehar seems to want to resolve his claim prior to the claims of any other stakeholders and has found lawyers willing to accommodate him no matter what.

Spurious or not, CMGT has no money to fight this battle. As Lou Franco advised you in his communications regarding the proposed NEWCO transaction, his efforts on your behalf over the years have left him on the verge of financial disaster and he needs to turn to productive pursuits. You are aware that Gerry Spehar chose to try to serve Debbie Franco with notice of his purported TRO last Saturday morning at home. This is simply going too far. Although NEWCO would very much like to do the transaction that it proposed to you, a transaction that you approved in an overwhelming and enthusiastic fashion, no one should expect it or any other third-party to go forward in the face of these despicable tactics.

I know there is concern about CMGT breaching its current client contracts, and questions have arisen whether those clients might seek redress from CMGT shareholders. Lou Franco and I will work on this issue before he leaves.

Many have questioned how it is that an individual who does not seem to have done anything for CMGT can inflict such direct and intentional harm on those whose contributions are beyond dispute. The answer may simply be that CMGT has run out of time and can no longer act on your behalf to protect your interests from Gerry Spehar.

Feel free to contact Lou or me with any questions or comments that you might have regarding the current situation. I have appreciated the opportunity of working with you these last three years. Best regards.

Ronald B. Given

Mayer, Brown, Rowe & Maw LLP
190 S. LaSalle Street
Suite 3132

1

Chicago, IL 60603-3441
Phone:   (312) 701-7382
Fax:        (312) 706-8137
Cell:        (312) 286-5252
Res.:       (312) 431-9952
> Email: <<mailto:rgiven@mayerbrownrowe.com>>
>
>
Assistant to Ronald B. Given:

Evajean T. Bugajski
Phone:  (312) 701-7632
> Email: <<mailto:ebugajski@mayerbrownrowe.com>>
>

NOTICE: This e-mail message and all attachments transmitted with it are intended solely
for the use of the addressee and may contain legally privileged and confidential
information.  If the reader of this message is not the intended recipient, or an employee
or agent responsible for delivering this message to the intended recipient, you are hereby
notified that any dissemination, distribution, copying, or other use of this message or
its attachments is strictly prohibited.  If you have received this message in error,
please notify the sender immediately by replying to this message and please delete it from
your computer.

# EXHIBIT 17

1 | RODI, POLLOCK, PETTKER, GALBRAITH
& CAHILL, A Law Corporation
2 | ANDREW W. BODEAU (SBN 183600)
KENNETH A. FRANKLIN (SBN 143809)
3 | 444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901
4 | Telephone:     (213) 895-4900
Facsimile:     (213) 895-4921
5 |
STEVEN A. KLENDA, LLC
6 | STEVEN A. KLENDA, ESQ. (admitted *pro hac vice*)
600 Grant Street, Suite 300
7 | Denver, Colorado 80203
Telephone:     (303) 514-3179
8 | Facsimile:     (303) 861-1777

9 | Attorneys for Plaintiff,
SPEHAR CAPITAL, LLC, a California limited liability company

10

**FILED**
LOS ANGELES SUPERIOR COURT

**MAR 1 8 2004**

JOHN A. CLARKE, CLERK

Jeff W. Lipp
BY JEFF W. LIPP, DEPUTY

11 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

12 | FOR THE COUNTY OF LOS ANGELES

13 | (NORTH CENTRAL DISTRICT – BURBANK)

14

15 | SPEHAR CAPITAL, LLC, a California limited liability company,

16 | Plaintiff,

17 | v.

18 | CMGT, INC., a Delaware corporation, and DOES 1 through 100, inclusive,

19 | Defendants.

20

21

CASE NO.  EC 037602

**JUDGMENT AND PERMANENT INJUNCTION AGAINST CMGT, INC.**

Dept.:     NC"A"

22 |     This matter came before the Court on the motion of Plaintiff, Spehar Capital, LLC

23 | ("Spehar") for a default judgment against defendant, CMGT, Inc. ("CMGT"). On February 26,

24 | 2004, at 08:30 a.m., the Court held a hearing on Spehar's motion, during which Spehar Capital's

25 | President, Gerry Spehar, testified and presented evidence regarding its damages from CMGT's

26 | breach of Spehar Capital's contract. Having reviewed the pleadings and heard testimony and

27 | received evidence on Spehar's damages, and being sufficiently advised of their premises, the

28 | Court enters the following findings of fact and conclusions of law:

270957_1.doc

1

JUDGMENT AND PERMANENT INJUNCTION AGAINST CMGT, INC.

1.   CMGT was validly served with Spehar's First Amended Complaint on December 8, 2003.

2.   The Court has jurisdiction over CMGT under Cal. Code Civ. P. 410.10, because CMGT has purposefully availed itself of the benefits and burdens of doing business in California and CMGT has sufficient minimum contacts with California to satisfy due process. CMGT has directed a steady and numerous stream of business contacts and communications to California during the past two years, specifically:

   a.   Spehar Capital contracted with CMGT in California.

   b.   CMGT has transacted business in California by providing services to several clients that are located in California and partnering with other California businesses.

   c.   Over the course of the over 2 years preceding this action, CMGT's President, Lou Franco, deliberately directed extensive daily telephone and email communications to Spehar Capital in California, and CMGT's President has traveled to California to meet with CMGT's ' clients, and Spehar Capital.

   d.   CMGT attempted to raise capital from at least one investor, the Washoe tribe, which is located in California.

3.   CMGT has not answered Spehar's First Amended Complaint, entered an appearance or responded in any way to any pleading in this case.

4.   The clerk entered a default against CMGT on January 12, 2004.

5.   Because CMGT has not answered Spehar's First Amended Complaint, all allegations in the First Amended Complaint are deemed to have been confessed. Johnson v. Stanhiser, 72 Cal.App.4th 357, 361 (1999). The Court incorporates these deemed admissions by reference herein as findings of fact.

6.   Spehar has proven damages in the following amounts for the following items for which Spehar's contract with CMGT entitles Spehar to compensation:

| | | |
|---|---|---|
| a. | Legal Expenses | 58,863.00 |
| b. | Cash Success Fee | 150,000.00 |
| c. | Management Consulting Fee | 100,000.00 |

270957_1.doc    2

**JUDGMENT AND PERMANENT INJUNCTION AGAINST CMGT, INC.**

| | | | |
|---|---|---|---|
| 1 | | d. | Stock Compensation | 11,253,627.00 |

| | | | |
|---|---|---|---|
| 2 | | e. | Investment Banking Rights | 5,483,290.00 |

3      Total      17,045,780.00

4      7.    Spehar's damages are: (a) based on either specific dollar amounts that are set forth

5 in its contract with CMGT, or on facts, figures, projections and assumptions that are either the

6 same as, or not materially different from, the facts, figures, projections and assumptions that

7 CMGT presented to and that were relied on by both CMGT and potential investors; and (b)

8 otherwise supported by the evidence that Spehar presented.

9      8.    Spehar Capital's damages are reasonably certain to have been realized but for

10 CMGT's wrongful acts.

11      THEREFORE, the Court:

12      1.    Enters judgment IN FAVOR of Spehar Capital, LLC and AGAINST CMGT, Inc.

13 in the total amount of $17,045,780;

14      2.    Imposes a constructive trust in favor of Spehar Capital, LLC on all assets of any

15 type whatsoever of CMGT and Newco that either CMGT or Newco have transferred: (a) between

16 themselves; (b) to Newco or CMGT shareholders or any other financers of CMGT or Newco

17 (including persons who have loaned or contributed money or other capital to CMGT); or (c) to

18 another person or entity other than in the ordinary course of CMGT's business, as CMGT's

19 business existed and operated at the commencement of this action;

20      3.    Permanently ENJOINS AND RESTRAINS CMGT, Inc. and its officers, agents,

21 servants, employees, representatives, and all persons acting in concert or participating with them,

22 from engaging in, committing, or performing, directly or indirectly, any and all of the following

23 acts:

24      (a) proceeding with the asset sale transaction between CMGT and Newco;

25      (b) proceeding with an asset purchase, business or asset sale, or any other financing

26 arrangement of any type whatsoever between CMGT and any other person or entity without the

27 express written consent of Spehar Capital, LLC;

28

270957_1.doc

3

JUDGMENT AND PERMANENT INJUNCTION AGAINST CMGT, INC.

1    (c) consummating or taking any further steps toward consummating, the asset purchase

2  transaction or any other financing, capital-raising, purchase, sale or other transaction between

3  CMGT and Newco, or any other transaction of any type by CMGT whose terms do not expressly

4  acknowledge, incorporate and comply with all terms of the CMGT-Spehar agreement and this

5  judgment;

6    (d) selling, transferring, pledging or encumbering any of CMGT's assets or property, other

7  than in the ordinary course of ordinary course of CMGT's business, as CMGT's business existed

8  and operated at the commencement of this action; and

9    (e) licensing, selling, disposing of, or otherwise authorizing the use any of CMGT's

10  software by a person or entity other than CMGT, taking any action or acting in any way that

11  would diminish the value to CMGT of CMGT's software.

12    4.    Releases the $25,000 bond that Spehar Capital posted in connection with the

13  preliminary injunction that the Court entered on October 3, 2003. To allow Spehar to domesticate

14  this judgment in any other jurisdiction, the Court's preliminary injunction shall remain in full

15  force and effect until midnight on the 20th day after this judgment enters.

16    ENTERED AND ORDERED this 1st day of March, 2004.

17

18    Hon. David M. Schacter
      Superior Court Judge, Los Angeles County

19

20

21

22

23

24

25

26

27

28

270957_1.doc                                                    4

**JUDGMENT AND PERMANENT INJUNCTION AGAINST CMGT, INC.**

Short Title
## SPEHAR CAPITAL, LLC VS. CMGT, INC.

Case Number
### EC037602



I, JOHN A. CLARKE, Executive Officer/Clerk of the Superior Court of the State of California for the County of Los Angeles do hereby certify and attest that I am the custodian of records of the said Court, and that the foregoing is a full, true and correct copy of the original  Judgment and permanent injunction against CMGT, Inc.///////////////////////////////////

on file or of record in my office, and that I have carefully compared the same with the original.

Executed and Seal of Said Court Affixed at Los Angeles, California.

April 5 , 20 04

EXECUTIVE OFFICER/CLERK OF THE SUPERIOR COURT OF THE STATE OF
CALIFORNIA FOR THE COUNTY OF LOS ANGELES

## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

I, ROBERT A. DUKES , Presiding Judge of the Superior Court of the State of California for the County of Los Angeles do hereby certify that JOHN A. CLARKE is Executive Officer/Clerk of the Superior Court of the State of California for the County of Los Angeles (which is a court of record having by law a seal); that the signature to the foregoing certificate and attestation is the genuine signature of the said JOHN A. CLARKE as such officer, that the seal annexed thereto is the seal of said Superior Court, that said JOHN A. CLARKE as such officer is the legal custodian of the original records or documents described and referred to in the foregoing certificate; is the proper officer having the authority to execute and said certificate and attestation, and such attestation is in due and proper form according to the laws of the State of California.

Executed  at Los Angeles, California.

April 5 , 20 04

PRESIDING JUDGE OF THE SUPERIOR COURT OF THE STATE OF
CALIFORNIA FOR THE COUNTY OF LOS ANGELES

## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES



I, CONNIE B. McCORMACK, Registrar-Recorder/County Clerk of the County of Los Angeles, State of California, the same being a public entity having by law a seal, do hereby certify that  ROBERT A. DUKES , whose name is subscribed to the foregoing certificate of due and proper attestation was, at the time of signing same, Presiding Judge of the Superior Court aforesaid and was duly commissioned, qualified and authorized by law to execute said certificate. And I do further certify that the oath of office, or a true and correct copy thereof, of the judge above named is on file or of record in my office, that I am well acquainted with his handwriting, and verily believe the signature of the said judge to the said certificate to be genuine.

Executed and Seal of Said Registrar-Recorder/County Clerk Affixed at Los Angeles, California

April 5 , 20 04

REGISTRAR-RECORDER/COUNTY CLERK OF THE COUNTY OF LOS ANGELES

CIV 111 08-02

## Exemplification Form