## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DISTRICT

| | | |
|---|---|---|
| DAVID GROCHOCINSKI, not individually, | ) | |
| but solely in his capacity as the Chapter 7 | ) | |
| Trustee for the bankruptcy estate of | ) | |
| CMGT, INC. | ) | |
| Plaintiff, | ) | No. 06 C 5486 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| MAYER BROWN ROWE & MAW LLP, | ) | |
| RONALD B. GIVEN, and CHARLES W. | ) | |
| TRAUTNER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO LAWYER DEFENDANTS' MOTION TO DISMISS

Dockets.Justia.com

## TABLE OF CONTENTS

I.      **INTRODUCTION**…………………………………………………………...1

II.     **FACTS**………………………………………………………………………..2

        A.  **CMGT's History**……………………………………………………2

        B.  **The CMGT and MBRM Engagement Agreement**……………………………..2

        C.  **The CMGT and SC Agreement**………………………………………....3

        D.  **CMGT's Financing Efforts in 2003**………………………………………..3

        E.  **Count I: MBRM/Given's Negligence Regarding CMGT's Dispute With SC *Before* SC Filed Suit Against CMGT**………………………………7

        F.   **Count II: MBRM/Given's Negligence Relating to the SC Lawsuit**…………10

III.    **ARGUMENT**………………………………………………………………..11

        *Davis v. Central Can Co.*, No. 05 C 1563, 2006 WL 2255895
        (N.D. Ill. Aug. 4, 2006)………………………………………………………11

        *Metrick v. Chatz*, 266 Ill. App. 3d 649, 652, 639 N.E.2d 198
        (1st Dist. 1994)………………………………………………........................12

        A.  **Count I: MBRM/Given's Negligent Advice *Before* SC Filed Suit**…………..12

                1.  The Existence of an Attorney Client Relationship Establishing a
                    Duty on the Part of the Attorney………………………………………12

        *Morris v. Margulis*, 307 Ill. App. 3d 1024, 1035, 718 N.E.2d 709
        (5th Dist. 1999), *reversed on other grounds*, 197 Ill.2d 28 (2001)………………....13

        *Keef v. Widuch*, 321 Ill App. 3d 571, 747 N.E.2d 992
        (1st Dist. 2001)……………………………………………………………13

                2.  A Breach of that Duty………………………………………………15

        *Metrick*, 266 Ill. App. 3d at 653-54……………………………………………15

        *Davis*, 2006 WL 2255895 at * 1………………………………………………...16

                3.  MBRM/Given's Breaches Proximately Caused CMGT's Injury………..18

i

*Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248, 255,
794 N.E.2d 1016 (2nd Dist. 2003)……………………………………………………..18

*Governmental Interinsurance Exchange v. Judge*, 221 Ill.2d 195, 210
850 N.E.2d 183 (2006)……………………………………………………………....18

    B. **Count II: MBRM/Given's Negligent Advice After SC Filed Suit**…………..21

        1. The Existence of an Attorney Client Relationship Establishing a
           Duty on the Part of the Attorney……………………………………21

*Morris*, 307 Ill. App. 3d at 1035……………………………………………………21

*Keef*, 321 Ill. App. 3d at 586………………………………………………………..21

        2. A Breach of that Duty………………………………………………..21

*Dial 800 v. Fesbinder*, 118 Cal. App. 4th 32, 52
(2nd Dist. 2004)……………………………………………………………………...21

*Metrick*, 266 Ill. App. 3d at 653-54………………………………………………...22

*Dep't of Fish and Game v. Anderson-Cottonwood Irrigation Dist.*,
8 Cal. App. 4th 1554, 1564 (3rd Dist. 1992)………………………………………...22

*Greenly v. Cooper*, 77 Cal. App. 3d 382, 385 (4th Dist. 1978)…………………….22

*Davis*, 2006 WL 2255895 at * 1…………………………………………………….22

        3. MBRM/Given's Breaches Proximately Caused CMGT's Injury……...23

*Gruse v. Belline*, 138 Ill. App. 3d 689, 698,
486 N.E.2d 398, (2nd Dist. 1985)…………………………………………………...23

*Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*,
215 Ill.2d 294, 307-10, 837 N.E.2d 99 (2005)……………………………………...23

*Davis*, 2006 WL 2255895 at * 1…………………………………………………….25

    C. **Counts I and II: This Case is Not a Fraud on the Judicial System**………….25

IV.    **CONCLUSION**………………………………………………………………..26

## I.     **INTRODUCTION**

Before addressing the merits of defendants' motion to dismiss, it is important to point out what is not germane to that motion.  Defendants' unprofessional, procedurally improper and unwarranted attack on Gerry Spehar (a non-party) and David Grochocinski (the trustee in bankruptcy) are not relevant to defendants' motion to dismiss.  These unwarranted personal attacks demonstrate the futility of defendants' arguments.  They should be stricken and, at the appropriate time, sanctions should be assessed.

This case arises out of, *inter alia*, the negligent legal advice and representation.  CMGT alleges two independent and distinct causes of action for legal malpractice that defendants Mayer Brown Rowe & Maw LLP ("MBRM") and Ronald B. Given ("Given") provided CMGT Inc., ("CMGT").  Count I is based on MBRM/Given providing CMGT with negligent legal advice concerning a dispute that arose between CMGT and Spehar Capital, LLC ("SC"), with whom CMGT had contracted for financing services.  Count I relates solely to MBRM/Given's negligent advice *before* SC filed a lawsuit against CMGT.  The injury alleged in Count I is CMGT's lost value resulting from its inability to obtain financing.  Count II is based on the negligent advice that MBRM/Given gave CMGT *after* SC sued CMGT.  The injury alleged in Count II is the $17 million default judgment that SC was awarded.

In their motion to dismiss, MBRM and Given intentionally and deceptively mix the allegations of Counts I and II together to make baseless arguments.  Defendants' arguments do not provide a basis to dismiss this case.  Defendants' motion to dismiss should be denied because CMGT has pled two sufficient and meritorious claims for legal malpractice.

## II.    FACTS

### A.  CMGT's History

At all times relevant to this case, CMGT's business plan was focused on providing clients with employee absence and disability management services. (¶ 14.)[1]  CMGT's chief executive officer and president was Louis Franco ("Franco"). (¶ 17.)  Through Franco's long-standing friendship with Given, MBRM was hired to be CMGT's legal counsel. (¶ 13.)  Franco relied heavily on Given's advice. (¶ 13.)

During its first years, CMGT developed its business plan and secured several valuable strategic "partnerships." (¶¶ 14-20.) Nevertheless, CMGT required approximately $2,000,000 in additional financing to fully exploit its very promising potential. (¶ 20.) CMGT conservatively projected that it would achieve more than $10 million per year of net profits and $24,000,000 in working capital within four years of receiving the approximately $2,000,000 in financing. (*Id.*)

### B.  The CMGT and MBRM Engagement Agreement

CMGT and MBRM memorialized an agreement on or about January 31, 2000 for MBRM to render legal services to CMGT (the "Engagement Agreement"). (¶ 21.) MBRM agreed to provide CMGT with legal services relating to CMGT's "initial capitalization, formative acquisition activities, and other related general corporate activities." (Comp. at Ex. 1.) MBRM charged CMGT by the hour. (¶ 22.)  However, MBRM agreed to defer payment until CMGT received an initial capitalization of at least $1,000,000. (*Id.*)  The Engagement Agreement provided that: (a) MBRM would be bill at 125% of its regular hourly rates, and (b) MBRM could terminate the engagement either if the balance of unpaid fees exceeded $50,000, or if CMGT was not capitalized by May 1, 2000. (*Id.*) MBRM also agreed to not seek payment for its unpaid

---

[1]     All citations are to CMGT's complaint and are designated as "(¶ __)".  Citations to the complaint's exhibits are designated as "(Comp. at Ex __)".  A copy of CMGT's complaint is attached hereto and incorporated herein as Exhibit 1.

fees if CMGT did not receive additional financing. (*Id.*)  Given performed or supervised all of MBRM's work for CMGT. (¶ 23.)

### C.  The CMGT and SC Agreement

In or around June 2001, CMGT retained SC to help obtain financing. (¶ 24.) CMGT's agreement with SC was memorialized in writing on October 1, 2001. (*Id.*) CMGT and SC revised their October 1, 2001 agreement on or about September 30, 2002 ("SC Agreement"). (¶ 25.)  Under the terms of the SC Agreement, SC was to (a) facilitate introductions, (b) provide advisory services relating to potential financing transactions, and (c) perform certain "management consultant services." (¶ 26.)  CMGT agreed to pay SC a "success fee" upon the successful closing of a funding or a transaction. (*Id.*) The success fee was to be payable in cash, and was equal to 6% of the accepted capital. (*Id.*) The SC Agreement also provided for a $100,000 management consulting fee, stock compensation and investment banking rights upon CMGT's acceptance of a term sheet, or other commitment. (*Id.*)

A chart was attached to the SC Agreement ("Exhibit A") that identified the third parties that CMGT introduced to SC, or that SC was authorized to solicit. (¶ 27.)  SC was entitled to be paid if CMGT entered into a financing deal with anyone listed on Exhibit A. (*Id.*) SC and CMGT, as part of their regular course of dealing, "orally" added people to the list without updating Exhibit A. (*Id.*)

### D.  CMGT's Financing Efforts in 2003

Between June 2001 and January 2003, CMGT discussed financing with several companies, individuals and/or venture capitalists. (¶ 32.) One of the companies SC contacted CMGT was Sealaska Corporation ("Sealaska"). (¶ 33.)  On or about February 5, 2003, Sealaska signed a letter of intent to purchase 51% of CMGT for $2,000,000. (*Id.*) Sealaska was a

3

particularly attractive investor for CMGT because of Sealaska's minority status and its

significant strategic relationships, which would have greatly increased CMGT's client base. (*Id.*)

 Over the next month, CMGT and Sealaska engaged in extensive negotiations over a term

sheet. (¶ 37.) No agreement was reached.  The primary impasse was Sealaska's unwillingness to

pay CMGT more than $950,000 for a 51% ownership interest in CMGT. (*Id.*)  Sealaska's

proposed term sheet was bad for MBRM because it subordinated and reduced its accrued fees.

(*Id.*) Although CMGT and Sealaska were on the brink of closing a deal, they ultimately were

unable to reach mutually agreeable terms. (*Id.*)

 While CMGT was negotiating with Sealaska, CMGT was also discussing potential deals

with other prospective investors. (¶ 38.) One of those prospective investors was a group headed

by defendant Charles Trautner ("Trautner"). (*Id.*)  Franco introduced Trautner to SC and insisted

that Trautner work through SC. (¶ 39.)  Although SC worked with Trautner at Franco's

insistence, Trautner was never formally added to Exhibit A. (*Id.*)

 On January 27, 2003, a conference call took place between Trautner, Franco, Given and

SC's owner, Gerry Spehar ("Spehar"), regarding Trautner's proposal to fund CMGT via an asset

purchase deal ("Newco.") (¶ 40.)  Franco instructed Spehar to vigorously question Trautner

about his proposal, which Spehar did. (*Id.*) Trautner's proposal did not provide for payment of

CMGT's investor notes or other liabilities, and would have left CMGT's shareholders with only

20% equity. (*Id.*) Consequently, Franco rejected Trautner's proposal as an unacceptable

"sweetheart" deal for Trautner and his investors. (*Id.*) In or around May 2003, Given and

Trautner revived Trautner's proposal. The terms of the revived proposal were the same as Franco

had rejected in January. (¶ 41.) Given and Trautner did not tell Franco that they were reviving

the Newco discussions. (*Id.*)

4

Given's discussions with Trautner quickly led to Given drafting a letter of intent. (¶ 41.) As set forth in the letter of intent, Trautner's investor group agreed to purchase all of CMGT's assets by either (a) paying CMGT $500,000 in cash, or (b) giving CMGT 20% of the shares of Newco. (*Id*.) Under the Given-drafted Newco letter of intent, if CMGT opted to accept 20% of the shares of Newco, Trautner and his investors were required to provide Newco's shareholders with an assurance that Newco's initial capitalization would be at least $2,500,000. (*Id*.) The Given-drafted Newco letter of intent also stated that Newco would not assume any of CMGT's liabilities, other than those associated with client contracts, but that MBRM's accrued fees would be paid at closing. (¶ 42.) The Given-drafted Newco letter of intent also favored Franco because it required Newco to enter into an employment agreement with him before closing. (*Id*.) The targeted closing date was September 30, 2003. (*Id*.) On or about July 31, 2003, Trautner signed the letter of intent. (*Id*.)

Given pressured Franco to agree to the Newco letter of intent. Had SC been advised of the terms of the Give-drafted Newco term sheet, SC could have obtained a better proposal from Sealaska, the Washoe, or other potential investors, and CMGT would likely have been able to close a deal that was *better* than the Newco deal for CMGT. (¶ 43.)  Given pressured Franco to accept the Given-drafted Newco letter of intent because it ensured that MBRM's accrued fees would be paid. (*Id*.) On or about August 1, 2003, Franco signed the Newco letter of intent. (*Id*.) However, the letter of intent still needed to be approved by CMGT's shareholders before it could be effective. (¶ 44.)

SC learned about the Given-drafted Newco letter of intent on August 7, 2003. (¶ 44.) That same day, Franco sent CMGT's shareholders a letter notifying them about the Newco deal. (*Id*.) At this time, SC was in discussions with the Washoe Tribe about a financing deal. (*Id*.)  The

Washoe Tribe deal would have been extremely beneficial to CMGT because CMGT would have gained minority status and financing, and would have retained more than twice the ownership it would have had in the Newco deal. (*Id.*) In addition, the Washoe deal would have mooted the SC Dispute.  On August 14, 2003, Given and Franco pre-approved a letter of intent with the Washoe. (*Id.*) Nevertheless, the next day Franco sent CMGT's shareholders a Given-drafted letter soliciting proxies for the Newco deal. (*Id.*) This solicitation letter misrepresented that there were no other financing alternatives. (*Id.*)  Specifically, the Given-drafted solicitation letter failed to tell CMGT's shareholders about the potential deal with the Washoe. (*Id.*)

On or about August 29, 2003, the Washoe committed to sign a letter of intent by September 2, 2003, which they did. (¶ 45.) This letter of intent mirrored the letter of intent that Given and Franco pre-approved on August 14, 2003. (*Id.*) In its September 2 letter of intent, the Washoe requested a due diligence period through September 30, 2003. (*Id.*) Although not reflected in the pre-approved letter of intent, Franco gave the Washoe until October 15, 2003 to complete their due diligence. (*Id.*)

On September 3, 2003, however, Given inexplicably modified the September 2 letter of intent to reduce the Washoe's requested due diligence time to September 29, 2003, and to state that the Washoe understood that: (a) CMGT expected to close the Trautner proposal by September 30, 2003, (b) CMGT would consider other competing bids until the transaction was consummated, (c) CMGT did not anticipate closing any other transactions before September 29, 2003, (d) Franco was the only CMGT employee available to assist the various parties conducting due diligence, and (e) CMGT would advise the Washoe if another competing bid was going to close prior to September 29, 2003. (¶ 46, Comp. Ex. 7.) Given did not offer any explanation for

the modifications.  Franco, in reliance on Given's advice, agreed to the changes Given made.

(*Id.*)  The Washoe rejected the Given-modified letter of intent. (*Id.*)

### E.  Count I: MBRM/Given's Negligence Regarding CMGT'S Dispute With SC *Before* SC Filed Suit Against CMGT

After learning about the Given-drafted Newco letter of intent, Spehar immediately sent

Franco and Given a letter stating that the revived Trautner proposal was within the scope of the

SC Agreement. (¶ 47.) Spehar also asked Franco to confirm that, consistent with their regular

course of dealing, the revived Trautner deal was considered part of Exhibit A. (*Id.*)

On or about August 8, 2003, Given responded to Spehar. (¶ 48.) Given stated that he had

kept a "separate" channel of communication open with Trautner and that the revived Trautner

proposal was the result of those communications. (*Id.*) Given also stated that Franco had not

initiated or orchestrated the Given-drafted Newco letter of intent. (*Id.*) With respect to SC's

assertion that the revived Trautner proposal fell within the scope of  the SC Agreement, Given

said that he and Trautner had not discussed any of the prior communications to which Spehar had

been a party, and that Spehar's assistance was neither required nor requested. (*Id.*) Finally, Given

said that he would be asking Franco to refer Spehar's questions regarding the revived Trautner

proposal to him (Given).[2] (¶ 49.) In other words, Given took control of the SC Dispute.

On or about August 9, 2003, Spehar replied to Given and explained why he believed the

revived Trautner proposal was within the scope of the SC Agreement. (¶ 50.) Given responded to

Spehar that same day, telling Spehar that, "there is nothing left to be said regarding the LOI…if

you wish to pursue it, you will be in an adversarial position and should deal with us through

counsel…" (*Id.*) Given made no effort whatsoever to settle the dispute over the scope of the SC

---

[2]     The dispute between SC and CMGT *before* SC filed suit shall hereinafter be referred to as the "SC Dispute."

Agreement, and thus, Given negligently increased the likelihood that the unresolved SC Dispute would result in litigation that could harm CMGT's financing efforts. (¶ 51.)

Despite Given's adversarial responses, SC attempted to amicably resolve the SC Dispute so that CMGT would obtain financing (and SC could obtain its fee). (¶ 52.) In pursuit of a settlement, SC (through Spehar) engaged in a telephone call with Given on August 19, 2003. (*Id*.)  During this call Given hurled obscenities, racial slurs and threats at Spehar, and steadfastly refused to negotiate any settlement of the SC Dispute. (*Id*.) Also during this call, Given encouraged Spehar to "bring it on" because Given was "not afraid" and that Spehar could not affect the revived Trautner proposal anyway. (Comp. at Ex. 12.)  After the call, Spehar sent Given and Franco a series of emails that again tried to resolve the dispute. (¶ 53.) Given responded to these emails with an email stating that "from a legal point of view, we simply cannot play your game of throwing E-Mails back and forth.  We have talked to you.  We have listened to you.  We have told you our view.  I'm sorry, but we can do no more.  I think you need to listen and think a bit more… ." (¶ 53.)

Given's hard-line responses to Spehar's settlement attempts negligently exposed CMGT to a dispute that put CMGT's existence at risk. (¶ 54.) Given continued to provide CMGT with negligent advice regarding the SC Dispute through August 2003. (¶ 55.) For example, on or about August 26, 2003, Franco sent a Given-prepared letter to all of CMGT's shareholders regarding the revived Trautner proposal. (*Id*.) This letter states, in part, that:

> Gerry Spehar/Spehar Capital has claimed that he is entitled to compensation as a result of the Newco transaction under a contract he has with CMGT, Inc.  *Your management **and legal counsel** strongly disagree with this contention*. Unfortunately, our numerous conversations with Gerry on this topic have not been productive…even if their claims were deemed to have merit, the appropriate venue for the resolution of those claims will be in the winding up of CMGT, Inc. That is not before us today…*I am confident that any claims against the transaction will not succeed and, as a practical matter, the only substantive effect*

> *we will be facing is additional documentation complexity and a delay in the*
> *winding up of CMGT, Inc. until such time as the escrow is released…*

(¶ 55.)

Significantly, Given did not advise CMGT that if it did not settle with SC before the SC

Dispute turned into litigation, CMGT would likely lose all possible financing deals with

minority investors (such as the Washoe), and would likely lose even the less

advantageous revived Trautner proposal. (¶ 69.)

On or about September 1, 2003, Franco prepared an internal risk assessment document

regarding the SC dispute, which rated the degree of risk of SC filing suit as "high," and said that

there was "*no curative action required.*" (¶ 57.)  Franco called SC's claim "meritless" and stated

that "All legal issues subject to opinion of Mayer Brown Rowe & Maw (legal counsel for

CMGT, Inc.)." (*Id.*) Franco's statement that all legal issues were subject to the opinion of

MBRM meant that Franco's evaluation of the SC Dispute was based on opinions expressed by

MBRM. (*Id.*) In other words, Given had told Franco that CMGT did not have to resolve the SC

Dispute because even if SC filed suit, it would not prevent CMGT from closing the revived

Trautner proposal.

CMGT raises two claims in Count I of its complaint.  The first claim alleges that

MBRM/Given negligently pushed CMGT to accept the revived Trautner proposal without

advising CMGT of the consequences of not offering similar terms to other potential investors

(e.g., the Washoe Tribe), which could result in a better deal than the revived Trautner proposal.

(¶¶ 66-71.) MBRM pushed the revived Trautner proposal because that deal, unlike other deals,

ensured that MBRM's fees would be paid. (*Id.*) MBRM did not disclose to CMGT that this was

its reason for pushing the revived Trautner proposal. (*Id.*) CMGT's second claim alleges that

MBRM/Given gave CMGT negligent advice regarding the SC Dispute, which backed SC into a

corner, caused SC to file its suit and destroyed all financing opportunities, thereby destroying

CMGT. (*Id.*) Count I seeks to recover the lost value of CMGT. (¶ 70.)

### F.    Count II: MBRM/Given's Negligence Relating to the SC Lawsuit

Because of Given's negligent advice and handling of the SC Dispute, in September 2003

SC filed suit against CMGT in California ("SC Lawsuit"). (¶ 58.) Initially, SC requested

injunctive relief to stop the revived Trautner proposal. (*Id.*) Given negligently advised CMGT

not to appear and defend the SC Lawsuit based on Given's assessment that California did not

have jurisdiction, and that if CMGT appeared it would submit itself to California's jurisdiction.

(*Id.*)

On September 12, 2003, the California court held a hearing on SC's request for a

temporary restraining order ("TRO"). (¶ 59.) No one appeared on behalf of CMGT, and the court

awarded SC a TRO preventing the revived Trautner proposal from closing. (*Id.*) CMGT failed to

appear and defend at the TRO hearing because of the negligent advice provided by Given. (*Id.*)

CMGT should have specially appeared to challenge personal jurisdiction.  Even if the court ruled

against CMGT, it is unlikely that the court would have granted a TRO, especially without

requiring SC to post a multimillion dollar bond.  After the TRO hearing, the court scheduled a

preliminary injunction hearing for October 3, 2003. (¶ 60.)

On September 17, 2003, Given sent a copy of the TRO order and an email to CMGT's

shareholders. (*Id.*)  Even though Given had advised CMGT how to handle the SC Dispute and

Given's advice had been directly responsible for the SC Lawsuit, Given asserted that MBRM

had not been retained to deal with the SC Lawsuit, and that he did not believe MBRM would be

retained to defend the suit. (*Id.*) Moreover, even though Given stated that MBRM was not going

to defend CMGT in the SC Lawsuit, Given nevertheless continued to advise CMGT about the

10

suit. (*Id.*) For example, in a September 19, 2003 email to CMGT's shareholders, Given advised that:

> …Gerry Spehar has initiated a purported TRO in Los Angeles…we believed, and continue to believe, that Gerry Spehar's claim is absolutely spurious…It seems obvious that there is no jurisdictional basis for Gary Spehar to bring his lawsuit in Los Angeles when CMGT is a Delaware corporation operating from Illinois. Moreover, injunctions are only appropriate if regular "legal" remedies are inadequate…Injunctive action is also clearly inappropriate if, as seems likely, all Gerry Spehar is really seeking is money…

(¶ 60; Comp. Ex. 16.)

On or about October 2, 2003 Given notified CMGT's shareholders that because of the SC Lawsuit, the Trautner group had terminated the letter of intent.[3] (¶ 61.) No one from CMGT appeared at the October 3, 2003 preliminary injunction hearing, and the court entered a preliminary injunction. (¶ 62.) CMGT did not appear and defend at the preliminary injunction hearing because of the negligent advice provided by Given. (¶ 62.) On December 1, 2003, SC served CMGT with an amended complaint seeking damages. (¶ 63.) On February 26, 2004, SC obtained a default judgment for $17 million. (*Id.*) On information and belief, CMGT did not appear and defend SC's amended lawsuit because of the negligent advice provided by Given. (*Id.*) As previously explained, Count II seeks to recover the damages occasioned by the $17 million default judgment.

## III.   **ARGUMENT**

"The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Davis v. Central Can Co.*, No. 05 C 1563, 2006 WL 2255895 at * 1 (N.D. Ill. Aug. 4, 2006). "Federal notice pleading requires only that the plaintiff 'set out in her complaint a short and plain statement of the claim that will provide the defendant with fair notice of the

---

[3]     As previously explained, this was a totally foreseeable consequence of MBRM/Given's negligent advise regarding the SC Dispute before SC filed suit, and it guaranteed the destruction of CMGT's business (which is the subject of Count I).

claim.'" *Id.* "When ruling on a motion to dismiss, the court must accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Id.* In addition, "[t]he court must construe the pleadings liberally, and mere vagueness or lack of detail alone will not constitute sufficient grounds to dismiss a complaint." *Id.* "A claim should be dismissed only where it appears beyond doubt that plaintiff can prove no set of facts that would entitle her to relief." *Id.*

To plead a good and sufficient cause of action against an attorney for legal malpractice, a plaintiff must allege facts, which establish (1) an attorney/client relationship, (2) a duty owed by the defendant to the plaintiff arising out of that relationship, (3) a breach of that duty on the part of the defendant, (4) a proximate causal relationship between the defendant's breach of duty and the damages sustained by the plaintiff, and (5) damages. *Metrick v. Chatz*, 266 Ill. App. 3d 649, 652 (1st Dist. 1994). As explained below, CMGT has pled two independent and meritorious counts for legal malpractice against MBRM.

### A. Count I: MBRM/Given's Negligent Advice *Before* SC filed Suit

#### 1. The Existence of an Attorney-Client Relationship Establishing a Duty on the Part of the Attorney

The revived Trautner proposal was an "initial capitalization" activity as that term is used in the CMGT/MBRM Engagement Agreement. Additionally, because the SC Dispute was a potential barrier to closing the revived Trautner proposal, it was directly related to CMGT's initial capitalization activity. Thus, MBRM/Given's advice regarding the SC Dispute was expressly within the scope of their contractual duties per the Engagement Agreement. Similarly, MBRM/Given's advice concerning the revived Trautner proposal was also within the scope of the Engagement Agreement because that advice was directly related to an initial capitalization event.

12

Moreover, even if MBRM/Given's services concerning the SC Dispute and the revived Trautner proposal were not expressly within the scope of the Engagement Agreement (which they were), those services were nevertheless within the scope of MBRM/Given's duties because MBRM/Given voluntarily gave advice to CMGT relating to both issues.  In that regard, Given immediately and voluntarily took charge of the SC Dispute on behalf of CMGT.  In addition, Given initiated and orchestrated the revived Trautner proposal and then advised CMGT to accept that proposal.  Because an attorney-client relationship does not need to be explicit or expressed and is not dependent on the execution of a contract or even the consent of the attorney, it is irrelevant that the SC Dispute and the revived Trautner proposal were never specifically added to the Engagement Agreement. *Morris v. Margulis*, 307 Ill. App. 3d 1024, 1035 (5th Dist. 1999), *reversed on other grounds*, 197 Ill. 2d 28 (2001).  Rather, the relevant inquiry is whether Franco believed that Given was acting as CMGT's lawyer when Given provided advice about the SC Dispute and the revived Trautner proposal. *Id*.  As alleged in CMGT's complaint, Franco clearly believed that Given was acting as CMGT's legal counsel when Given provided advice about the SC Dispute and the revived Trautner proposal. (*See e.g.*, ¶¶ 41-46, 48, 49, 55, 57, 69.)  Thus, MBRM/Given had a duty to provide non-negligent legal advice with respect to the SC Dispute and the revived Trautner proposal.

MBRM/Given argue that their duty regarding the SC Dispute was limited by the terms of the Engagement Agreement. (Mot. pg. 11.)  In support of this argument, MBRM/Given place undue reliance on the rule that an attorney may limit the objectives of the representation. MBRM/Given cite *Keef v. Widuch*, 321 Ill. App. 3d 571 (1st Dist. 2001) for this rule.  In *Keef*, the issue was whether the defendant-attorney had an obligation to give his client advice that was outside the scope of the written engagement agreement. The issue was *not* whether the

defendant-attorney could be liable for advice that he voluntarily provided. MBRM/Given have not cited any cases stating that an attorney is immune from liability for negligently providing legal services because those services, which were voluntarily provided, were outside the scope of a written engagement agreement.  The law in Illinois is to the contrary. *Morris*, 307 Ill. App. 3d at 1033, 1035  ("[t]he attorney-client relationship places fiduciary duties upon the attorney which are not limited by the specific terms of the contract of engagement…[i]f the client consults the attorney for the evident purpose of securing legal advice, an attorney-client relationship will probably be found, regardless of the attorney's intent").

MBRM/Given also misleadingly argue that they had no duty to advise CMGT to settle the "Spehar *Suit*" -- *i.e.*, the SC Lawsuit. (Mot. pp. 11-16).  This argument is misleading because CMGT does *not* allege that MBRM/Given negligently failed to advise CMGT to settle the SC Lawsuit. Rather, CMGT alleges in Count I that MBRM/Given negligently failed to advise CMGT to settle the SC Dispute so that CMGT's very existence would not be put at risk by litigation that, for all practical purposes, could prevent CMGT from obtaining financing.[4]

With respect to the revived Trautner proposal, MBRM/Given argue that they had no duty to advise CMGT to offer similar terms to other potential investors because that was a business (rather than legal) issue. (Mot. at pg. 17.)  This argument ignores the nature of CMGT's claim in Count I.  The gist of Count I is that MBRM, on its own initiative, negotiated terms on behalf of CMGT with Newco that were significantly less favorable to CMGT than the terms previously offered to other potential investors, and that MBRM nevertheless encouraged CMGT to accept the revived Trautner proposal because it ensured that MBRM would get paid.  Given's significant role in the revived Trautner proposal included providing CMGT with a mixture of

---

[4]      The only relevance of the SC Lawsuit to Count I is that when the suit was filed, it had the foreseeable consequence of killing any chance of CMGT acquiring the financing it needed to survive.

business-legal advice.  Once Given began providing advice concerning the revived Trautner proposal, he incurred a duty to provide full, fair and competent advice, regardless of whether the advice is classified as "business" or "legal." *Morris*, 307 Ill. App. 3d at 1037.  This duty stems from CMGT's belief that it was consulting with its legal counsel when Given provided advice concerning the revived Trautner proposal. *Id*. at 1035. Furthermore, Given had a duty to warn CMGT that it could lose the revived Trautner proposal if it did not settle the SC Dispute. *Metrick*, 266 Ill. App. 3d at 653-54 ("It is the duty of every attorney to inform a client of the available options for alternative legal solutions, as well as to explain the foreseeable risks and benefits of each…"). As explained below, MBRM/Given breached these duties.

### 2.  <u>A Breach of that Duty</u>

MBRM/Given breached their duty to CMGT by failing to advise CMGT that a substantial risk of not settling with SC before the SC Dispute turned into litigation was that litigation with SC could prevent CMGT from obtaining the financing it needed. *Metrick*, 266 Ill. App. 3d at 653-54. MBRM/Given further breached their duty by negligently opining that the SC Dispute would not stop the Newco deal from closing.  MBRM/Given's advice was negligent because it needlessly exposed CMGT to litigation at a time when litigation, *meritorious or not*, could destroy CMGT.

MBRM/Given argue that CMGT's allegation that MBRM/Given negligently failed to try to settle the SC Dispute is contradicted by the complaint's exhibits. (Mot at pp. 15-16.)  In support of this argument, MBRM/Given rely on Franco's August 26, 2003 letter to CMGT's shareholders regarding the revived Trautner proposal.  In that letter, Franco states that, "…our numerous conversations with Gerry on this topic [the SC Dispute] have not been productive…" In its motion, MBRM/Given improperly draw an inference in their favor that this statement --

which makes no reference to any attempts at settlement -- means that the conversations with Spehar included attempts by Given/CMGT to settle the dispute and that the conversations were not productive as a result of Spehar's unwillingness to settle. This inference is improper because all reasonable inferences must be drawn in favor of the non-movant. *Davis*, 2006 WL 2255895 at * 1. Moreover, MBRM/Given's improper inference is contradicted by other exhibits to the complaint that plainly demonstrate that it was Given -- not Spehar -- that was unwilling to settle the SC Dispute. (*See e.g.*, Comp. Exhibits 9-12.)[5]

MBRM/Given also rely on a September 19, 2003 email from Given to CMGT's shareholders for their argument that CMGT tried to settle with SC. (Mot. at pg. 16.) MBRM/Given disingenuously argue that Given's September 19 email proves that CMGT offered to settle the SC "case" by giving SC the opportunity to share in the proceeds from the revived Trautner proposal. Given's September 19 email does not support this argument. Indeed, nothing in the complaint, including its exhibits, supports MBRM/Given's baseless assertion that CMGT offered to settle the SC Dispute by offering SC a chance to share in the Newco proceeds because no such offer was ever made.

MBRM/Given also argue that exhibits to the complaint demonstrate that they advised CMGT that the SC *Lawsuit* prevented CMGT from obtaining the financing it needed. (Mot. pg. 16) This argument is an example of MBRM/Given deceptively blending Counts I and II. CMGT does not allege, in either Count I or Count II, that MBRM/Given failed to disclose that the SC Lawsuit prevented CMGT from obtaining financing. Rather, CMGT alleges in Count I that

---

[5]     In support of its argument, MBRM/Given rely on exhibits that purportedly show that MBRM/Given and CMGT agreed that the "Spehar Suit" was meritless. (Mot. pg. 15). This argument is both misleading and wrong. First, Count I relates to the Spehar Dispute, not the Spehar Lawsuit. In addition, MBRM/Given's and CMGT's view about the merits of the SC Dispute is not relevant to CMGT's claim. CMGT's claim is that MBRM/Given should have told CMGT that a significant risk of not settling with SC, regardless of the dispute's merit, would be that CMGT might not get the funding it needed. Finally, CMGT's opinion about the merit of the SC Dispute and the SC Lawsuit was based on MBRM/Given's advice. The exhibits relied on by MBRM/Given simply reflect the fact that Franco relied on MBRM/Given's legal advice.

MBRM/Given negligently failed to advise CMGT that one significant risk associated with not settling the *pre-lawsuit* SC Dispute was that CMGT might not get the financing it needed. As explained above, this distinction is important because the benefit of settling with SC before SC filed suit was to avoid the risk of losing financing opportunities.[6]

As explained in the "duty" section above, MBRM/Given also breached their duty to CMGT by pressuring CMGT to accept the revived Trautner proposal (*See* pp. 13-15 *supra*). MBRM/Given argue that this claim is contradicted by the exhibits to the complaint. According to MBRM/Given, an August 15, 2003 letter from Franco to CMGT's shareholders demonstrates that the Newco deal was approved by CMGT's shareholders because of Franco's support for the deal (as opposed to Given's advice). (Mot pg. 18.) MBRM/Given's argument ignores two key facts. First, Franco's August 15 letter was prepared by Given. (¶ 44.) Second, Given encouraged Franco to accept the Newco deal and Franco relied heavily on Given's advice. (¶¶ 13, 43.) Thus, the August 15 letter was really Given advising CMGT's shareholders to approve the deal.

MBRM/Given also argue that CMGT's claim regarding MBRM/Given's conflict of interest in the revived Trautner proposal is contradicted by the Engagement Agreement because the Engagement Agreement discloses that MBRM's fee could be paid out of financing. (Mot. pp. 19-20.) This argument is misleading because it falsely presumes that every potential deal ensured that MBRM's fee would be paid. But not every potential deal ensured that MBRM would get paid. For example, the failed Sealaska deal subordinated and reduced MBRM's accrued fee. (¶ 37.) CMGT's claim is that MBRM/Given had a duty to disclose the fact that it

---

[6]    MBRM/Given also argue that the exhibits to the complaint prove that CMGT knew that "the Spehar Suit would impede financing." (Mot. pg. 14). In support of this argument, MBRM/Given rely on emails that Given sent to CMGT's shareholders after SC obtained its TRO. (*Id.*) MBRM/Given apparently intend to defend this case by setting up and knocking down claims that have not been made. To reiterate, CMGT's claim in Count I is, in part, that MBRM/Given did not warn CMGT about the risk of not settling with SC *before* SC filed suit. CMGT's claim is not that MBRM/Given failed to disclose that SC had obtained a TRO that would impede financing.

favored the revived Trautner proposal because, unlike other potential deals, it ensured that

MBRM's accrued fees would be paid at closing.

Finally, MBRM/Given argue that CMGT fails to allege a conflict of interest because

CMGT does not allege that MBRM/Given represented the Trautner investor group.

MBRM/Given are wrong.  CMGT does allege that MBRM/Given favored the revived Trautner

proposal because they represented the Trautner investor group. (¶ 69(g).) On a motion to dismiss,

this allegation must be accepted as true.  *Davis*, 2006 WL 2255895 at * 1.

### 3.  <u>MBRM/Given's Breaches Proximately Caused CMGT's Injury</u>

As a result of MBRM/Given's breaches (as described above), CMGT suffered damages.

Those damages include CMGT's failure to obtain financing from Sealaska, the Washoe, Newco,

and/or other potential sources of funding, its eventual bankruptcy and the loss of its substantial

value.  Defendants do not challenge that the complaint states a claim for damages in Count I.

Instead, defendants argue that MBRM/Given's negligence did not proximately cause CMGT's

injuries.

Proximate cause encompasses both cause in fact and legal cause.  *Suwanski v. Village of*

*Lombard*, 342 Ill. App. 3d 248, 255 (2nd Dist. 2003).  Generally, the issue of proximate cause in

a legal malpractice case is a question of fact for a jury to determine based on its consideration of

all of the evidence. *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 210

(2006). In this regard, the Illinois Supreme Court has explained that,

> [i]ssues that could cause reasonable persons to reach different results should never
> be determined as questions of law. The debatable qualities of issues such as
> proximate cause, the fact that fair-minded persons might reach different
> conclusions, emphasize the appropriateness of leaving such issues to a fact-
> finding body, *i.e.*, the jury. *Id.*

The key inquiry into cause in fact is whether a defendant's conduct was a substantial factor in bringing about the injury. *Suwanski*, 342 Ill. App 3d at 255. Where reasonable minds could differ as to whether a defendant's conduct was a substantial factor in bringing about a plaintiff's injury, there is a question for the jury to decide. *Id.* None of MBRM/Given's arguments regarding proximate cause focus on CMGT's allegation that MBRM/Given negligently failed to advise CMGT to settle with SC *before* SC filed suit. Instead, MBRM/Given focus all of their proximate cause arguments on what happened/could have happened *after* SC sued CMGT.[7] As a result of MBRM/Given's negligent advice regarding the SC Dispute, SC sued CMGT and prevented the revived Trautner proposal from closing. Thus, MBRM/Given's negligence was a substantial factor in CMGT's failure to obtain financing.

MBRM/Given's negligence with respect to the revived Trautner proposal was also a substantial factor in CMGT's failure to obtain other potential financing. If Given had advised CMGT to offer terms similar to the Newco terms to other investors, such as Sealaska, and/or if Given had not modified the Washoe letter of intent, CMGT would have had more funding options available and it likely would have received funding from a source other than Newco. Thus, MBRM/Given's negligent and self-interested advice was a substantial factor in CMGT's failure to obtain financing.

With respect to the revived Trautner proposal, MBRM/Given argue that CMGT cannot establish proximate cause because CMGT does not allege that other financing options were available. (Mot. pg. 18.) This argument is just wrong. CMGT alleges that the Washoe had committed to a letter of intent and were set to go forward with an acceptable due diligence period

---

[7]      MBRM/Given do argue in one conclusive statement that CMGT could have pursued settlement with SC at any time. (Mot. pg. 14). This conclusive argument ignores the allegation that CMGT did not settle with SC on MBRM/Given's advice. (¶¶ 57, 69(e).) MBRM/Given also argue that no settlement was possible because CMGT had no assets. This argument ignores that there were many settlement structures available. For example, CMGT and SC could have worked out a settlement in which SC would be paid after the Newco transaction closed.

until Given killed the deal by modifying the letter of intent he and CMGT had previously approved.  MBRM/Given also argue that their conflicted interest in the revived Trautner proposal is irrelevant because the Newco deal was never consummated.  (Mot. pg. 19.) MBRM/Given's conflict is relevant because, but for the conflict, MBRM/Given would not have killed the Washoe deal and CMGT would have offered better terms to Sealaska.

Legal cause presents a question of foreseeability. *Suwanski*, 342 Ill. App 3d at 255. A tortious act is a legal/proximate cause of an injury if the injury is of the type that a reasonable person would foresee as a likely result of his conduct.  *Id*.  Here, it was reasonably foreseeable that (a) if CMGT did not settle the SC Dispute, SC would sue CMGT and CMGT would lose all potential financing, (b) if CMGT followed Given's advice to modify the Washoe letter of intent, the Washoe would walk away, and (c) if Given advised Franco to accept the Newco deal without offering similar terms to other investors, Franco would listen to Given's advice and CMGT would lose other valuable (and better) financing opportunities.  Thus, MBRM/Given's negligence was also a legal cause of CMGT's injury.

MBRM/Given argue that they could not have been the proximate cause of CMGT's injuries because CMGT's trustee in bankruptcy (the "Trustee") did not move to vacate the default judgment that was entered against CMGT in the SC Lawsuit.  (Mot. pg. 9.)  This argument is another example of MBRM/Given deceptively blending Counts I and II.  The injuries alleged in Count I are CMGT's inability to obtain financing and the loss of its substantial value.  These injuries were inflicted well before and are independent of the default judgment in the SC Lawsuit (which is Count II).  Thus, even if the Trustee had been able to vacate the default judgment, this would not have extinguished or diminished CMGT's damages in Count I.

Moreover, as explained in the proximate cause section for Count II *infra*, MBRM/Given's attempt to place blame on the Trustee fails for other reasons as well.

### B.   Count II: MBRM/Given's Negligent Advice *After* SC Filed Suit

#### 1.   The Existence of an Attorney-Client Relationship Establishing a Duty on the Part of the Attorney

After SC filed its lawsuit, Given negligently advised CMGT not to appear and defend the SC Lawsuit because he apparently believed that if CMGT filed an appearance, it would submit itself to California's jurisdiction. CMGT consulted with Given as a lawyer and relied on Given's legal advice in deciding not to appear and defend at the TRO and preliminary injunction hearings.  Thus, MBRM/Given owed CMGT a duty to provide competent legal advice regarding the SC Lawsuit.  *Morris*, 307 Ill. App. 3d at 1035.  MBRM/Given argue that they did not owe CMGT any duties with respect to the legal advice they provided because the SC Lawsuit was not added to the Engagement Agreement. (Mot. pg. 11.)  As explained above, Illinois law does not support MBRM/Given's argument. (*See* pg. 14 *supra*).  This is particularly true where, as here, MBRM/Given did not disclose to CMGT that the advice they were providing was outside the scope of the engagement and should not be relied upon until *after* CMGT had already relied on the advice to its detriment. *Keef*, 321 Ill. App. 3d at 586 (lawyer may limit objectives of the representation if client consents after disclosure).[8]

#### 2.   Breach of that Duty

MBRM/Given breached their duty to CMGT by negligently advising CMGT not to appear and defend the SC lawsuit because doing so would submit CMGT to California jurisdiction.  MBRM/Given should have told CMGT that it could appear for the limited purpose of contesting jurisdiction. *Dial 800 v. Fesbinder*, 118 Cal. App. 4th 32, 52 (2nd Dist. 2004) ("[i]f

---

[8]     By the time that MBRM/Given told CMGT that MBRM/Given was not going to represent CMGT in the SC Lawsuit, SC had already obtained a TRO and the Newco deal was already dead.

the defendant confines its participation in the action to objecting to lack of jurisdiction over the person, there is no general appearance.")  MBRM/Given further breached their duty by failing to advise CMGT that if it did not appear and defend the SC Lawsuit, SC would likely obtain the injunctive relief that it was seeking. *Metrick*, 266 Ill. App. 3d at 653-54.  Further still, MBRM/Given breached their duty by failing to advise CMGT that it could defeat SC's complaint for injunctive relief by arguing that adequate legal remedies were available and/or by requesting that SC be required to post a multimillion dollar injunction bond. *See e.g.*, *Dep't of Fish and Game v. Anderson-Cottonwood Irrigation Dist.*, 8 Cal. App. 4th 1554, 1564 (3rd Dist. 1992) ("[a] party seeking injunctive relief must show the absence of an adequate remedy at law") and *Greenly v. Cooper*, 77 Cal. App. 3d 382, 385 (4th Dist. 1978) ("… a bond is generally required for a preliminary injunction…").   Finally, MBRM/Given breached their duty by inviting litigation with SC by telling SC to "bring it on," without warning CMGT that if SC filed suit, MBRM/Given would not represent CMGT in the lawsuit.

MBRM/Given do not challenge that these allegations are breaches of MBRM/Given's duty.  Instead, MBRM/Given challenge whether the above described advice/breaches were ever given. This argument violates the rules for a motion to dismiss.  *Davis*, 2006 WL 2255895 at * 1 ("…on a motion to dismiss, the court must accept all factual allegations as true..").   In support of their argument, MBRM/Given rely on an email that Given sent to CMGT's shareholders on September 19, 2003, *i.e.*, after the TRO was entered, in which Given states that: (a) CMGT is not subject to California's jurisdiction, (b) injunctions are only appropriate if regular legal remedies are inadequate, and (c) CMGT has no money to fight this battle. (Mot. pg. 15; *see also*, Comp. Ex. 16.) According to MBRM/Given, this email contradicts CMGT's allegation that the reason why CMGT did not appear and defend the SC Lawsuit was because of Given's negligent advice.

MBRM/Given's argument is wrong.  First, Given's September 19 email does not contradict CMGT's allegations.  There is no statement in any exhibit to CMGT's complaint by a CMGT officer or shareholder that the reason why CMGT did not defend the SC Lawsuit was because CMGT did not have the money to do so.  Moreover, this email was sent *after* the TRO was entered but Given's advice about not defending the SC Lawsuit came *before* the TRO hearing.  As a result of that negligent advice, a TRO blocking the revived Trautner proposal was entered.

Finally, Given's September 19, 2003 email does not contradict the allegation that MBRM/Given breached their duty by failing to warn CMGT about the risks of not appearing and defending.  Even if CMGT did not have the money to fight, once MBRM/Given started giving CMGT advice they had a duty to advise CMGT about all of its legal options and the possible risks of each option. *Metrick* 266 Ill. App. 3d at 653-54.

### 3.  <u>MBRM/Given's Breaches Proximately Caused CMGT's Injury</u>

Unlike Count I, MBRM/Given challenge both the damages and proximate cause alleged in Count II.  The damages suffered by CMGT as a result of the negligence alleged in Count II was the entry of SC's $17 million default judgment.  *Gruse v. Belline*, 138 Ill. App. 3d 689, 698 (2nd Dist. 1985) ("…[a]n unpaid judgment against the [legal malpractice] plaintiff shown to have resulted from his attorney's unauthorized act was evidence of actual damage even though it remained unpaid at the time of trial."); *see also*, *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 307-10 (refusing to hold that the existence of an unsatisfied judgment is insufficient to withstand a challenge to the damages element of a legal malpractice claim).  Finally, regardless of whether the $17 million is itself damages, CMGT is entitled to collect the difference between its lost value (as a result of MBRM/Given's negligence) and the $17 million judgment that was entered.

CMGT's injuries were proximately caused by MBRM/Given's negligence. MBRM/Given's negligent advice was a substantial factor in SC obtaining its default judgment because that advice caused CMGT to fail to appear and defend at both the TRO hearing and the preliminary injunction hearing.  If CMGT had received proper advice, it would have defended SC's complaint for injunctive relief and the SC Lawsuit would have been dismissed because CMGT was not subject to California's jurisdiction. (¶ 64.) Further, since SC had an adequate remedy at law, and since SC could not have posted a large bond the TRO would have been denied if SC had appeared and defended. (¶ 64.)  If SC's complaint for injunctive relief had been dismissed or if the TRO had been denied for any of these reasons, the litigation would not have stopped the funding of one or more funding opportunities. (¶¶ 64-65.) MBRM/Given were also the legal cause of CMGT's injury because it was reasonably foreseeable that if CMGT did not appear and defend the SC Lawsuit, then SC would get the relief it was seeking.

MBRM/Given argue that CMGT cannot establish proximate cause because it could have obtained an attorney and defended itself at anytime. (Mot. at pp. 12, 13, 15) This argument ignores the fact that CMGT was relying on MBRM/Given's legal advice when it made its decision not to defend the SC Lawsuit.  MBRM/Given also argue that CMGT has alleged and must prove that SC's claim was meritless. MBRM/Given are wrong.  CMGT does not allege that SC's claim was meritless.  Rather, CMGT alleges that if MBRM/Given had advised CMGT to contest jurisdiction and/or defend against SC's right to *injunctive* relief, SC never would have gotten to the point of filing a complaint for damages and obtaining a default judgment. (¶¶ 64-65.)

Finally, MBRM/Given argue that the trustee proximately caused CMGT to suffer the $17 million default judgment because he failed to file a motion to vacate. (Mot. pg. 9.) This argument

24

is improper on a motion to dismiss because it is premised on facts outside of the four-corners of the complaint. *Davis*, 2006 WL 2255895 at * 1.  For example, it would be relevant to this argument to know what information the Trustee had available to him and/or what cooperation the Trustee was getting from CMGT agents prior to the passing of the deadline to vacate the default judgment.  If the Trustee was misinformed or lacked the information necessary to make the decision to move to vacate the default judgment, then his failure to do so was not an intervening cause that broke the causal chain of liability.  Because these facts are outside the pleadings, MBRM/Given's argument should not even be considered.[9]

### C.  Counts I and II: This Case is Not A Fraud on the Judicial System

MBRM/Given's argument that, as a sanction, this case should be dismissed as a "fraud on the judicial system" is based on deliberate mischaracterizations of CMGT's complaint and is probably a sanctionable argument itself.  First and foremost, as explained above, CMGT has two meritorious claims of legal malpractice against MBRM/Given.  That fact by itself is enough to defeat MBRM/Given's wild accusation that this case is a fraud.

Next, MBRM/Given's argument is premised on nothing more than their own unsupported (and unsupportable) conclusion that Spehar fraudulently obtained a "bogus" default judgment in California so that he could cause CMGT to go into bankruptcy, which then allowed him to cause the filing of this lawsuit.  MBRM/Given fail to present any evidence that SC's default judgment was "bogus" or obtained through the use of misrepresentations to the California court. To the contrary, SC obtained its default judgment because MBRM/Given negligently advised CMGT

---

[9]     The cases cited by MBRM/Given in support of their argument involve a situation where a plaintiff's former attorney acts negligently, the plaintiff then hires a new attorney and the new attorney has the opportunity to cure the first attorney's negligence.  In those cases, the new attorney was hired by the plaintiff to represent the client in the same matter that the first (negligent) attorney had represented the plaintiff.  Thus, the new attorney was fully informed and had the cooperation of the plaintiff.  Here, on the other hand, the Trustee was appointed to be CMGT's trustee for the purpose of maximizing the distribution from the estate to the creditors.  At this point in the case, it would be total speculation to state that the Trustee had all of the information and cooperation he needed to make the decision to move to vacate SC's default judgment before the time allowed to do so had passed.

not to appear and defend the SC Lawsuit.  MBRM/Given also fail to present any evidence that the Trustee acted fraudulently or in bad faith.  Significantly, it was the Trustee's decision to file this case – not Spehar's.  Indeed, the case cited by MBRM/Given in support of their argument, *REP MCR Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984 (7th Cir. 2005), involved allegedly fraudulent conduct by a litigant, not a third party.  In addition, the court in *Lynch* imposed the sanction of dismissal only after conducting a full evidentiary hearing and concluding that a litigant had engaged in document forgery.  Here, MBRM/Given have failed to present any evidence to support their farfetched fraud allegations.

Finally, MBRM/Given's argument that this case is a fraud by Spehar disingenuously ignores the entire premise of Count I.  As explained above, Count I is not based on SC's default judgment.  Rather, Count I is based on MBRM/Given's negligent legal services concerning the SC Dispute.  The injury alleged in Count I is the substantial value that CMGT lost -- not the $17 million judgment.  Thus, MBRM/Given's argument that this case is a fraudulent attempt to obtain a $17 million windfall based on SC's "bogus" default judgment is both misleading and wrong.  Consequently, MBRM/Given's motion for the sanction of dismissal with prejudice should be denied.

## IV.    CONCLUSION

Wherefore, for all of the foregoing reasons, CMGT respectfully requests that the court deny MBRM and Given's motion to dismiss.

Dated: January 5, 2007                          Respectfully submitted,
                                                PLAINTIFF

                                        BY:     _____//s// Edward T. Joyce_____
                                                Plaintiff's attorneys

Edward T. Joyce
EDWARD T. JOYCE & ASSOC., P.C. - Atty No. 32513
11 South LaSalle Street, Ste., 1600
Chicago, Illinois 60603

## CERTIFICATE OF SERVICE

The undersigned attorney, certifies that on January 5, 2007, he caused this document to be served upon

Stephen Novack
Mitchell L. Marinello
Steven J. Ciszewski
Novack and Macey LLP
100 N. Riverside Plaza
Chicago, IL 60606

by electronically delivering a copy through the Court's CM/ECF filing system.

  /s/ Robert D. Carroll