## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| DAVID GROCHOCINSKI, not individually but solely in his capacity as the Chapter 7 Trustee for the bankruptcy estate of CMGT, INC., ) ) ) ) | |
| Plaintiff, ) | No. 06 C 5486 |
| v. ) | Judge Virginia M. Kendall |
| MAYER BROWN ROWE & MAW LLP, RONALD B. GIVEN and CHARLES W. TRAUTNER, ) ) ) ) | |
| Defendants. ) | |

## LAWYER DEFENDANTS' REPLY IN
## SUPPORT OF THEIR MOTION TO DISMISS

Stephen Novack
Mitchell L. Marinello
Steven J. Ciszewski
Novack and Macey LLP
100 N. Riverside Plaza
Chicago, IL 60606
(312) 419-6900

Dockets.Justia.com

## ARGUMENT

In their opening memorandum (the "Opening Memorandum" or "Op. Mem. at ___"), the Lawyer Defendants argued that the Complaint should be dismissed because it: (1) is a fraud on the judicial system; and (2) fails to state a claim for legal malpractice. CMGT's lengthy response (the "Response" or "Resp. at ___") does not defeat either of these arguments.

## I.    THE COMPLAINT SHOULD BE DISMISSED AS A FRAUD ON THE COURT

### A.    The Fraud

This lawsuit is a brazen attempt to use the judicial system to parlay a meritless claim into a multi-million dollar windfall. The attempted fraud consists of three central acts. <u>First</u>, Spehar <u>asserted</u> and then <u>filed</u> a meritless claim against CMGT, its client, in California state court (the "Spehar Lawsuit") and obtained a $17 million default judgment thereon (the "Default Judgment"). <u>Second</u>, Spehar used the Default Judgment to give itself creditor status and filed a single-creditor involuntary bankruptcy petition against CMGT in the Northern District of Illinois. <u>Third</u>, Spehar cooked up a deal with CMGT's bankruptcy trustee (the "Trustee") whereby: (1) the Trustee would sue CMGT's attorneys for not preventing Spehar from filing its meritless lawsuit and getting the Default Judgment; and (2) Spehar would fund the litigation and receive the lion's share of any recovery. In short, Spehar seeks to benefit from its own wrongdoing, and the Trustee is willing to go along for a piece of the action.

The Response does nothing to contest the elements of this attempted fraud, nor could it. All these actions are well-established in public records, of which the Court may take judicial notice.

The Response claims that the Lawyer Defendants have submitted no evidence that the Default Judgment was "bogus." Yet, no evidence is necessary, because the Complaint admits that the Spehar Lawsuit was meritless (Compl., ¶¶ 64 and 77) -- as it must be to have any chance of

stating a valid malpractice claim. The transcript in the California court also shows that the $17 million figure had no basis, and this is confirmed by common sense. Indeed, how could Spehar possibly be entitled to a $17 million fee for a deal that it <u>prevented</u> <u>from</u> <u>happening</u>? And, how could Spehar's alleged contract right to a fee of only 6% of the financing that it allegedly secured for CMGT (<u>Id.</u>, ¶26) equate to $17 million when: (1) the Newco Deal (or the "Trautner Proposal," as the Trustee calls it) involved no money, but only a 20% stock interest in a company that had yet to be formed (<u>Id.</u>, ¶40 and Ex. 13); and (2) CMGT never got any other financing and went out of business? As the California transcript shows, the Default Judgment is based on nothing more than Spehar's self-serving speculation. (Op. Mem. at Ex. B).

The Response does <u>not</u> address these points, and it therefore concedes them. And the few arguments it does offer lack any merit. <u>First</u>, the Response attempts to distinguish <u>REP MCR Realty, L.L.C. v. Lynch</u>, 363 F. Supp. 2d 984, 988 (N.D. Ill. 2005), <u>aff'd</u> 200 Fed. Appx. 592 (7th Cir. 2006), because there was an <u>evidentiary</u> <u>hearing</u> in that case. But, here, there is no need for an evidentiary hearing, because the facts of this fraud are in the public record for all to see. As such, there are no credibility determinations to be made, and the Response does not identify even one disputed issue of fact that requires an evidentiary proceeding. In contrast, the <u>REP</u> court had to decide whether or not three documents were fabrications and, if they were, who created them.

<u>Second</u>, the Response argues that <u>REP</u> involved the misconduct of a party, not a "non-party" like Spehar, whom the Response says is "not relevant." Yet, Spehar caused and is funding this case -- and stands to gain the lion's share of any recovery from it. So, in any meaningful sense, Spehar is a real party in interest -- if not, <u>the</u> real party in interest. Moreover, the Trustee knows full well how this case arose and that for him to win he must prove that Spehar's claim and suit were

meritless. The Trustee has knowingly cast his lot with Spehar, the party who destroyed CMGT, and he is attacking without basis the lawyers who helped CMGT for three years without being paid for their services. The Trustee <u>does</u> deserve special consideration -- just <u>not</u> the kind he has in mind.

**B.    Count I Does Not Make This Case Any Less Of A Fraud**

The Response says that any problems with Count II are irrelevant to Count I, suggesting that Count I is insulated from the Lawyer Defendants' fraud-on-the-Court argument. Not so. Count I is also a fraud. All that Count I does is move the starting point of the fraud from Spehar's <u>obtaining</u> the meritless Default Judgment to Spehar's earlier out-of-court <u>assertion</u> of the meritless claim on which the Judgment was based. In effect, Count I says that <u>Spehar</u> demanded that CMGT settle its meritless claim and that the Lawyer Defendants' alleged failure to advise CMGT to give in to this extortion exposes them to millions of dollars of damages -- primarily for <u>Spehar's</u> benefit. Spehar's actions were wrong from the beginning, and it should not profit from them.

**C.    The Court's Authority To Remedy The Fraud**

The Court is not required to permit this fraudulent suit to continue, and it should use its inherent power and authority to dismiss the case with prejudice. As already explained (Op. Mem. at 7), it is well within this Court's authority to dismiss this case as a sanction for fraudulent or bad faith conduct.

**II.    FRAUD OR NOT, COUNT I FAILS TO STATE A CLAIM**

The Response accuses the Opening Memorandum of "mixing" Counts I and II. It did not. Nevertheless, the Lawyer Defendants here take the Response head on as to Count I, showing that it fails to state a valid claim. The Response (at 9-10) says that Count I raises "two claims," <u>i.e.</u>, that

3

the Lawyer Defendants: (A) "negligently pushed" CMGT to accept the Trautner Proposal; and (B) negligently advised CMGT not to settle the Spehar Dispute. Each fails.

### A.    The "Negligent Pushing" Claim

The Response (at 9) accuses the Lawyer Defendants of "negligently pushing" Franco to accept the Trautner Proposal when they supposedly had a duty to tell him to continue to search for better financing arrangements. In other words, the Trustee alleges that the Lawyer Defendants committed legal malpractice because they encouraged Franco to accept the Trautner Proposal and failed to tell him that he might be able to get a better deal from someone else. Such a claim is patently absurd.

### 1.    No Duty

As stated in the Opening Memorandum, whether one can obtain better financial terms in the marketplace involves business judgment, not legal issues. CMGT was responsible for evaluating its own financial prospects and deciding what to do, not the Lawyer Defendants. Simply stated, lawyers are not obligated to make business decisions for their clients, and the Lawyer Defendants had no duty to tell CMGT whether to accept the Trautner Proposal or keep looking for a better offer. The Response has no meaningful answer to these obvious points. Accordingly, for the reasons set forth at pages 17-18 of the Opening Memorandum, the "negligent pushing" claim fails for lack of duty.

### 2.    No Causation

Even assuming, arguendo: (a) that the Lawyer Defendants had a duty to advise CMGT whether to accept the Trautner Proposal; (b) that the Lawyer Defendants recommended accepting that Proposal; and (c) that such advice was incorrect -- the claim still fails for lack of causation. That

is because CMGT (through Franco and the shareholders) made the ultimate business decision to accept the Proposal and did so with full knowledge of the facts. For example, they knew: (a) the terms of the Trautner Proposal; (b) the terms previously offered to (but rejected by) Sealaska and the Washoe; and (c) that the Lawyer Defendants stood to receive a portion of their fees if the Trautner Proposal was accepted and closed. Franco was a full-grown adult, and there is no suggestion that he was mentally disabled or incompetent. He came to his own decision to recommend the Trautner Proposal to CMGT's shareholders, and did so by letter. In that letter, after explaining that CMGT was in dire financial straits, Franco expressly told CMGT's shareholders:

> I believe that [the Troutner Proposal] is a better commitment than I have been able to obtain for you from any of the hundreds of potential investors I've worked with on your behalf over the last three years.

(Compl., Ex. 5, page 2, ¶3; emphasis added.) Thus, Franco recommended that CMGT's shareholders (also competent adults) approve the Trautner Proposal, and they overwhelmingly did so. (Id., Exs. 5 and 13.) CMGT cannot blame the Lawyer Defendants for the business decision that it (through Franco and the shareholders) made. Stated another way, the Lawyer Defendants did not cause CMGT to accept the Proposal. Rather, with full knowledge of the relevant facts, CMGT made its own business decision.

Incredibly, the Trustee argues that neither Franco's letter nor the shareholders vote matters, because the Lawyer Defendants drafted the letter for Franco and so it was "really Given advising CMGT's shareholders to approve the deal." (Resp. at 17). This is absurd. Lawyers draft letters, memos, contracts and other documents for their clients all the time. That does not make those documents the lawyers' documents nor make the lawyers parties thereto.

5

Moreover, the Response's theory (at 5) that, if CMGT had not accepted the Trautner Proposal and instead had continued to work with Spehar, then CMGT could have gotten a better financing package is pure speculation. To start with, the Trustee admits that Spehar <u>did</u> learn of the Trautner Proposal just six days after Franco signed it and <u>before</u> it was approved by CMGT's shareholders. (Resp. at 5; Compl., ¶44.)  Nevertheless, Spehar did not come up with any better financing proposals. This should not be surprising, because it is undisputed that: (a) despite more than two years of trying, Spehar had not been able to find <u>any</u> financing for CMGT (Compl., ¶¶24, 32-44 and 63); (b) after three years of trying, neither had Franco (<u>Id.</u>, Ex. 5); (c) Sealaska had walked away from a "potential" deal (<u>Id.</u>, ¶37); (d) the Washoe had declined to sign a letter of intent (<u>Id.</u>, ¶46); and (e) CMGT was about to go under (<u>Id.</u>, Ex. 5 at 1).

In all events, although CMGT was prevented from closing the Newco Deal, CMGT remained free to accept other financing -- and had Spehar's blessing to do so. (<u>Id.</u>, ¶63.) Nothing the Lawyer Defendants did or failed to do prevented CMGT from seeking or accepting such other financing. Thus, no matter how the issue is cut, the Lawyer Defendants caused no damages.

The Response cites <u>Governmental Interinsurance Exchange v. Judge</u>, 850 N.E.2d 183 (Ill. 2006), and <u>Suwanski v. Village of Lombard</u>, 794 N.E.2d 1016 (Ill. App. Ct. 2003), for the proposition that the proximate cause issue should be resolved by the jury. These cases, however, hold only that when facts can lead to <u>different</u> inferences, the proximate cause issue is for the jury. As the Trustee's own case says, "where the facts are undisputed and reasonable people would not differ as to the inferences drawn from the facts, proximate cause may be determined as a matter of law." <u>Suwanski</u>, 794 N.E.2d at 1022.  The pertinent facts here are not in dispute and the only

6

reasonable inference from those facts is that the Lawyer Defendants were not the proximate cause of any loss.

### 3.     **Impermissibly Speculative**

The facts and law reveal another fatal defect in the "negligent pushing" claim -- it is too speculative to stand. Even assuming that the Lawyer Defendants had and breached a duty not to "push" the Trautner Proposal, the Trustee could not recover on this claim unless the Court: (a) finds that CMGT could and would have been able to obtain some other financing; (b) determines which particular financing would have been obtained -- including with whom and on what terms; and (c) for damages, determines whether CMGT would have been profitable with such financing and, if so, to what extent. Yet, each of these findings and determinations would be pure speculation, as discussed in further detail below.

### 4.     **No Recoverable Damages**

Damages are not presumed in a malpractice claim; instead, they must be proved. Eastman v. Messner, 721 N.E.2d 1154, 1158 (Ill. 1999). Damages also cannot be speculative. Midland Hotel Corp. v. Reuben H. Donnelley Corp., 515 N.E.2d 61, 66 (Ill. 1987) (reversing award of speculative lost profits). The classic type of damages that are too speculative to be legally recoverable is "lost profits" of a business that never got started and has no operating history. Id.; Drs. Selke & Conlon, Ltd. v. Twin Oaks Realty, Inc., 491 N.E.2d 912, 917 (Ill. App. Ct. 1986). That is the situation here -- in spades.

The alleged damages are the lost "value" or "profits" that CMGT would have enjoyed if it had obtaining financing other than the Newco Deal. But that implicates two layers of impermissible speculation. First, that CMGT could have obtained other financing and, if so, which financing and

7

on what terms. <u>Second</u>, if all that were figured out, what value or profit CMGT -- a start-up company -- would have then enjoyed. In analyzing these matters, the Court would have to take into account that CMGT was a start-up that had radically changed its business plan and had been a financial failure to date. Indeed, CMGT was not only near financial collapse (Compl., Ex. 5), but its only assets were a telephone call "center" and some software it had purchased from another company (<u>Id.</u>, ¶¶11-15). Any such damages would be too speculative to award. <u>Midland Hotel</u>, 515 N.E.2d at 66; <u>Drs. Selke & Conlon</u>, 491 N.E.2d at 917.

*   *   *

No discussion of the so-called "negligent pushing" claim would be complete without setting forth the very "legal advice" that the Trustee says the Lawyer Defendants were obligated to give. In effect, here is what the Trustee says Given should have told Franco:

> I know CMGT has been losing money and is out of cash. I know that you are not being paid any salary and are near personal bankruptcy. I also know that you believe the Trautner Proposal to be the <u>only</u> and <u>best</u> thing available to CMGT. (Compl., Ex. 5.)

> Still, I want to advise you that you should reject the Trautner Proposal because, if you continued to look, you might be able to get better financing than Trautner is offering. I don't know how or where you might get better financing or how you are going to survive in the meantime, but I have two ideas for you. You could approach the Sealaska or Washoe Indian tribes who recently rejected the financing proposals that you made to them. Or you could continue to hold on and hope that Spehar, who has not found any financing for CMGT in the more than two years that he supposedly has been working on it, finally comes up with something.

No lawyer could possibly be obligated to give such "advice."

8

B.    **The "Failure To Settle" Claim**

1.    **No Breach**

The Response (at 15) states that the Lawyer Defendants:

> breached their duty to CMGT by failing to advise CMGT that a
> substantial risk of not settling with [Spehar] before the [Spehar]
> Dispute turned into litigation was that litigation with [Spehar] could
> prevent CMGT from obtaining the financing it needed.

Even assuming the Lawyer Defendants owed CMGT a duty with respect to settling the

Spehar Dispute (they did not, see the "No Duty" Section below), it simply would not be reasonable

(or foreseeable) for the Lawyer Defendants (or anyone else) to assume that a broker whose claim to

a fee from a proposed deal was challenged by his client would sue to prevent that very deal from

closing.    Talk about "killing the golden goose."    Rather, the only logical (and foreseeable)

assumption would be that any such suit would allow the deal to close and afterward would seek to

recover the alleged fee from the proceeds of the financing.    No one could reasonably have foreseen

that, if Spehar's claims were not settled, Spehar would shoot itself in the foot -- and kill CMGT in

the process.

Alternatively, even if the Lawyer Defendants could somehow be found to be incorrect in their

belief, their mistaken judgment would not be actionable.    See Goldstein v. Lustig, 507 N.E.2d 164,

168-69 (Ill. App. Ct. 1987) (attorneys not liable for errors of judgment).

Either way, as a matter of law, the Lawyer Defendants did not breach any duty to CMGT.

2.    **No Causation/Speculation**

Assuming arguendo both duty and breach, the claim would still fail for lack of causation and

because it is too speculative.    The Spehar Lawsuit did not prohibit CMGT from getting financing.

It prohibited CMGT only from closing the Newco Deal.    (Compl., Ex. 15.)    Yet, according to the

9

Complaint, this proposed deal was a "sweetheart deal" (¶40) and other, better financing was available to CMGT (¶43). In light of these allegations, what is the Trustee complaining about? The Lawyer Defendants did not cause CMGT any damages if, as the Complaint alleges, the end result was that CMGT was prevented from making a bad deal.

Moreover, as stated in the Opening Memorandum, the idea that a lawyer's failure to advise a client to settle caused damages is, at best, speculative, because it presumes that the client would have followed the lawyer's advice and that a settlement could have been reached. Here, such speculation is rampant. Indeed, this "claim" is impermissibly speculative at each and every one of its many layers.

First, to find in the Trustee's favor, the Court would have to find that if CMGT were advised to settle, it would have taken that advice and attempted to settle Spehar's claim even though that claim was meritless. Second, the Court would then have to find that the parties could and would have reached a settlement -- including the sub-findings that Spehar (who admittedly was pursuing a meritless claim) would have been reasonable in its settlement demands and that CMGT could have financially met the terms of any such settlement -- even though it had no money and was near financial exhaustion (Compl., Ex. 5). Third, the Court would have to find that if such a settlement had been reached, then CMGT could and would have obtained financing -- even though CMGT had not been able to find financing for three years. (Id.) Fourth, if all those things had happened, the Court would then have to find which particular financing would have been obtained -- including, with whom and on what terms. Fifth, to decide "damages," the Court would then have to determine whether, if it had received financing, CMGT would have been profitable and, if so, to what extent. (This damage element is discussed in more detail in Section 3 below.)

This speculation -- and lack of causation -- defeat the "failure to settle" claim, without more.

### 3.    No Recoverage Damages

As just explained in Section II.A.4 above, damages are not presumed in a malpractice case. Eastman, 721 N.E.2d at 1158. Moreover, they cannot be speculative. Midland Hotel, 515 N.E.2d at 66.

Here, although the Trustee sometimes refers to Count I's damages as CMGT's lost opportunity to get financing, the actual facts make his claim much more specific. At the time the Spehar Dispute arose, CMGT already had accepted the Newco Deal, and the Dispute concerned only whether Spehar was entitled to a fee therefor. (Compl., Ex. 13 and ¶¶47-50.) Even if we ignore the fact that Spehar's claims were without merit and that CMGT had no money to settle them anyway (Id., Ex. 5) -- and even if we assume that CMGT would have taken the Lawyer Defendants' advice to settle the Spehar Dispute and that Spehar would have been reasonable in its settlement demands so that a settlement could and would have occurred -- then all that CMGT lost was the 20% interest in Newco that it had agreed to accept in return for all of its assets. (Id., Ex. 13.)

Yet, Newco was a new, start-up company that had not even been formed at the time CMGT accepted the Newco Deal. (Id., Ex. 3.) It had no operating history, including no sales or profits, and it is therefore impossible to say how it would have performed in the marketplace or even if it would have survived. In this regard, it is worth remembering that CMGT acquired its software program and call center from another failed company (Id., ¶¶11-15) and that CMGT itself was on the brink of failure when it accepted the Newco Deal (Id., Ex. 5). There is no knowing whether Newco would have met the same fate as its predecessors. Thus, under the law, any claim for Newco's lost "profits"

11

or "value" would be too speculative to recover. <u>Midland Hotel</u>, 515 N.E.2d at 66; <u>Drs. Selke &</u> <u>Conlon</u>, 491 N.E.2d at 917.

### 4.   <u>No Duty</u>

As explained in the Opening Memorandum (at 11) and as the Engagement Letter states, the Lawyer Defendants were hired to represent CMGT in its "initial capitalization" and other corporate matters, not in litigation. Accordingly, they had no duty to advise CMGT whether or not to settle the Spehar Dispute. Nevertheless, the Response cites <u>Morris v. Margulis</u>, 307 Ill. App. 3d 1024 (Ill. App. Ct. 1999), for the proposition that the Engagement Letter does not matter. According to the Response, the scope of the attorney-client relationship is defined by what Franco <u>believed</u>. (Resp. at 13-14.) But, <u>Morris</u> -- and the case upon which it relied, <u>Herbes v. Graham</u>, 180 Ill. App. 3d 692 (Ill. App. Ct. 1989) -- do not apply here. In both <u>Morris</u> and <u>Herbes</u>, there was <u>no</u> written agreement defining the scope of the attorney-client relationship. As a result, those courts were forced to analyze the beliefs of the prospective client to define the attorney-client relationship. In contrast, the Complaint here alleges and attaches the Engagement Letter, which specifically sets forth and limits the scope of the Defendants' engagement and expressly states that the scope of the engagement can be enlarged only in writing. The Complaint never alleges that the Lawyer Defendants consented to represent CMGT in connection with the Spehar Dispute or any other litigation matters. The Complaint also never alleges that the Engagement Letter was amended to enlarge the scope of representation. Thus, the Engagement Letter controls.

In all events, even if CMGT's belief as to the scope of representation could somehow trump the unambiguous terms of the Engagement Letter, the exhibits defeat any allegation that Franco or CMGT actually believed that the Lawyer Defendants were representing it in the Spehar Dispute.

That is because Given, in a written communication to CMGT and its shareholders, specifically stated that, "Mayer Brown has <u>not</u> been retained to deal with [the Spehar Dispute], and we do not expect to be." (Compl., Ex. 15.)  Neither Franco nor anyone else at CMGT ever disputed this statement. CMGT knew all along that the Defendants were not representing it in connection with the Spehar Dispute.

## III.   <u>FRAUD OR NOT, COUNT II ALSO FAILS TO STATE A VALID CLAIM</u>

The gravamen of this claim is the allegation -- "on information and belief" -- that the Lawyer Defendants told CMGT not to appear in California to contest personal jurisdiction because to do so would submit it to personal jurisdiction in California.  (Compl., ¶58; Resp. at 10, 24.)  In other words, Given allegedly told his client that personal jurisdiction can never be challenged, for to assert the personal jurisdiction defense is to submit to personal jurisdiction and, thus, give up that very defense.  The notion that a corporate lawyer would be giving litigation advice or that <u>any</u> lawyer, let alone Given, would tell a client something so internally inconsistent, illogical and wrong is so inherently unbelievable that it cannot properly be based on any <u>reasonable</u> "information and belief." Thus, this Court should not accept this allegation as true -- even on a Rule 12(b)(6) motion.[1]  Yet, even if this allegation is taken as true, it cannot support a malpractice claim, for the following reasons.

### A.   <u>No Damages</u>

Count II seeks recovery of $17 million -- the amount of the Default Judgment.  As set forth in the Opening Memorandum (at 9-10), this claim cannot possibly satisfy the damages element of

---

[1]   The Complaint is <u>unverified</u>.  Thus, the fact that the Trustee nevertheless felt it necessary to qualify this particular allegation as being "on information and belief" makes the allegation even more suspect.

an attorney malpractice claim because of the combination of two undisputed, inescapable and dispositive facts: (1) CMGT did not pay any portion of the Default Judgment; and (2) it will never be obligated to do so, because it is bankrupt. In support, the Opening Memorandum relied, inter alia, upon Sterling Radio Stations, Inc. v. Weinstine, 765 N.E.2d 56, 62 (Ill. App. Ct. 2002). The Response relies on another Illinois Appellate Court case -- Gruse v. Belline, 486 N.E.2d 398 (Ill. App. Ct. 1985). Because of this -- and because there is no Illinois Supreme Court authority directly on point -- we first discuss the analysis that this Court uses to determine Illinois law under such circumstances. Then, we will show why that analysis defeats Count II.

As a federal court exercising diversity jurisdiction, this Court is bound by the holdings of the Illinois Supreme Court. Republic Tobacco Co. v. North Atlantic Trading Co., Inc., 381 F.3d 717, 731 (7th Cir. 2004). If the Illinois Supreme Court has not addressed an issue, this Court must predict how it would rule if it were deciding the case. Adams v. Catrambone, 359 F.3d 858, 862 (7th Cir. 2004). In so doing, the authority of the Illinois Appellate Court is persuasive, and should be followed unless there is a compelling reason to believe that it is incorrect and that the Illinois Supreme Court would reach a different conclusion. Id.; Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002). Finally, if there is a conflict in the authority of the Illinois Appellate Court, this Court "must assume the perspective" of the Illinois Supreme Court and predict how it would rule under the circumstances. Id. at 637. Applying these rules of analysis, this Court should find that the unpaid Default Judgment does not satisfy the actual damages element of an attorney malpractice claim.

First of all, Sterling Radio is the definitive Illinois case on this point. Indeed, it is the only case -- at either the Supreme Court or Appellate Court level -- that deals with a legal malpractice

14

plaintiff that did not and never will pay the judgment at issue. In <u>Sterling Radio</u>, the malpractice

plaintiff's judgment was paid by someone else, pursuant to which the <u>entire</u> judgment was fully

satisfied. 765 N.E.2d at 59. As a result, not only did he not pay any part of the judgment, but he

never could be obligated to do so. Under those circumstances, the Illinois Appellate Court (First

District) reasoned that: (1) the plaintiff's damages were "zero"; and (2) if he received anything on

his malpractice claim he "would be in a better position by bringing the legal malpractice claim than

if he had won the underlying action." <u>Id.</u> at 62.

Here, the same reasoning applies. CMGT did not pay any portion of the Default Judgment

<u>and</u>, because of its bankruptcy, never will be obligated to do so. So, CMGT "would be in a better

position" than if it had not suffered the Default Judgment. <u>Sterling Radio</u> is on point, and the

Trustee knows it. The Response does not even attempt to distinguish that case or show that it does

not apply. Instead, the Response relies on <u>Gruse</u>, a much older Illinois Appellate Court (Second

District) case. <u>Gruse</u>, however, arose in a significantly different factual setting. There, two

judgments had been entered against the client as a result of the lawyer's malpractice. 486 N.E.2d

at 691. Although the judgments had not been paid, the client (an individual) had not filed

bankruptcy and was still liable for them. Indeed, the judgment would continue to impact the client

negatively (and his ability to get credit) until it was paid. <u>Id.</u> at 692-95.

<u>Gruse</u> also did not purport to set any kind of universal rule that an unpaid judgment <u>always</u>

satisfies the damage element of a legal malpractice case. On the contrary, <u>Gruse</u> said <u>only</u> that an

unpaid judgment can do so "absent any evidence to the contrary." <u>Id.</u> at 698. Since there was <u>no</u>

evidence in <u>Gruse</u> that the client would never pay the judgment, the court found for the client. But,

15

here, there is evidence -- indeed, uncontradicted evidence -- that CMGT will never be obligated to pay the Default Judgment.

For all of these reasons, <u>Sterling Radio</u> is the only Illinois case on point on this issue. And this Court should follow it because, as will now be shown, there is no compelling reason to believe that it is incorrect and that the Illinois Supreme Court would reach a different conclusion. In fact, <u>Sterling Radio</u> is perfectly consistent with Illinois Supreme Court damage principles applicable to legal malpractice cases. Indeed, two of the very principles on which the <u>Sterling Radio</u> decision was based were announced by the Illinois Supreme Court:

> The plaintiff must affirmatively prove that he suffered actual damages as a result of the attorney's malpractice, and a plaintiff who obtains recovery in a malpractice suit can be in no better position by bringing suit against the attorney than if the underlying action [was handled properly].

<u>Eastman</u>, 721 N.E.2d at 1158 (internal quotation marks and citations omitted). <u>Sterling Radio</u> correctly and logically applied these principles in holding that a malpractice plaintiff who did not pay -- and <u>never</u> would pay -- the judgment could not recover the amount thereof from his lawyer. Otherwise, he would receive a windfall.

Finally, the Response's half-hearted citation (with a "*see also*" signal) to <u>Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.</u>, 837 N.E.2d 99 (Ill. 2005), goes nowhere. (Resp. at 23.) Notwithstanding the Response's parenthetical description, the Supreme Court did not "refus[e] to hold" that an unpaid judgment is "insufficient" on damages any more than it "refused to hold" that such a judgment was "sufficient" for damages. The fact is that the Supreme Court made <u>no</u> ruling on this issue -- one way or another. 837 N.E.2d at 109. It simply decided the case on <u>other</u> grounds. <u>Id.</u> (holding that malpractice claim failed for lack of causation). If anything,

16

<u>Landau's</u> analysis supports and is consistent with <u>Sterling Radio</u>. Specifically, the <u>Landau</u> Court repeated that a malpractice plaintiff must prove <u>actual</u> damages, which occurs only if the client has sustained a <u>monetary</u> loss:

> For purposes of a legal malpractice action, a client is not considered to be injured unless and until he has suffered a loss for which he may seek monetary damages.
>
> *    *    *
>
> In a legal malpractice action, actual damages are never presumed. Such damages must be affirmatively established by the aggrieved client. Unless the client can demonstrate that he has sustained a <u>monetary loss</u> as the result of some negligent act on the lawyer's part, his cause of action cannot succeed.

<u>Id.</u> at 107 (emphasis added) (citations omitted).

### B.    <u>No Duty/Contradicted By Exhibits</u>

The Trustee cannot escape the principle that the exhibits to his Complaint trump his contrary allegations. The exhibits show that the Lawyer Defendants were not representing CMGT in litigation matters (Compl., Ex. 1.) and that, as soon as Given found out about the TRO, he reminded CMGT and its shareholders that his firm "has not been retained to deal with this matter, and does not expect to be" (<u>Id.</u>, Ex. 15). This refutes any contrary allegation the Trustee may make that the Lawyer Defendants were representing CMGT as to the Spehar Lawsuit or had a duty to provide any advice relating to that litigation.

### C.    <u>No Breach/Contradicted by Exhibits</u>

Two days after telling CMGT and its shareholders that they had not been retained to represent CMGT in the Spehar Lawsuit, the Lawyer Defendants told CMGT and its shareholders that they believed that the Spehar Lawsuit was "absolutely spurious" but that CMGT had "no money" to defend itself and would not be able to protect the shareholders' interests. (<u>Id.</u>, ¶60 and Ex. 16). By

17

using the words "absolutely spurious", the Lawyer Defendants clearly were saying that the Spehar
Lawsuit lacked merit and, therefore, could be successfully defended.   The problem they identified
was that CMGT had no money to hire a lawyer and could no longer protect the shareholders'
interests in CMGT from Spehar. (Id., Ex. 16.) These facts from the Complaint's own exhibits show
that the reason CMGT did not defend itself is because it was out of money, not because its lawyers
allegedly made the illogical statement that it could ignore a lawsuit without consequence.

### D.    No Causation

The Trustee acknowledges that CMGT did not have the money to fight the Spehar Lawsuit
but says that this did not matter, because:

> Even if CMGT did not have the money to fight, once MBRM/Given
> started giving CMGT advice, they had a duty to advise CMGT about
> all of its legal options and the possible risks of each option. Metrick,
> 266 Ill. App. 3d at 653-54.

(Resp. at 23.) The Trustee is wrong.

First, as stated above, there is no indication that the Lawyer Defendants "started" giving
CMGT advice about how to handle the Spehar Lawsuit.  To the contrary, they simply said the suit
was "spurious" -- if anything, this should have encouraged CMGT to defend itself.

Second, the Metrick case does not say that a lawyer must explain options to a client that the
client does not have.  Yet, aside from mounting a defense, what options were there other than to
settle, which Franco unsuccessfully tried to do (Compl., Ex. 13) and which CMGT had no money
to do (Id., Ex. 5), or to cease operations, which CMGT ultimately did? The Trustee points to nothing
else.

Furthermore, by the time the TRO was entered prohibiting CMGT from closing the Newco
Deal, CMGT had been clearly advised: (1) that CMGT had not hired the Lawyer Defendants to

represent CMGT in the Spehar Lawsuit (<u>Id.</u>, Ex. 15); (2) that ignoring the Spehar Lawsuit had resulted in a loss in that the TRO was entered (<u>Id.</u>); (3) that more legal proceedings, including a preliminary injunction hearing, were coming up (<u>Id.</u>); and (4) that CMGT needed money to hire an attorney if it was going to mount a defense, even as against a meritless claim (<u>Id.</u>, Ex. 16). In those circumstances, CMGT and its shareholders had a decision to make: raise money and hire counsel or give up. They chose to give up. This decision cuts off any possible claim that the Lawyer Defendants' alleged malpractice, whether it occurred <u>before</u> or <u>after</u> the Spehar Lawsuit, proximately caused any loss. The reason for this is not only simple, but in the Complaint itself: the Spehar Lawsuit was meritless, and CMGT would have won the case at any time if it had just defended itself. (<u>Id.</u>, ¶¶64-65). In fact, if CMGT had defended itself, it would have won the preliminary injunction hearing and would have closed the Newco Deal. (<u>Id.</u>)

## IV.    <u>ANY LOSS AS TO COUNT II WAS PROXIMATELY CAUSED BY THE TRUSTEE</u>

As shown in the Opening Brief, the Trustee had sixty days <u>after</u> he was appointed to vacate the Default Judgment. Thus, if CMGT has any loss resulting from the Default Judgment, the Trustee is responsible for it. He could have moved to vacate the Default Judgment, but he negligently or intentionally failed to do so.

The Trustee does not say that this argument is wrong. He says only that it is premature:

> For example, it would be relevant to this argument to know what information the Trustee had available to him and/or what cooperation the Trustee was getting from CMGT agents prior to the passing of the deadline to vacate the default judgment. If the Trustee was misinformed or lacked the information necessary to make the decision to move to vacate the default judgment, then his failure to do so was not an intervening cause that broke the causal chain of liability.

(Resp. at 25.) The Trustee's argument is wrong.

19

The $17 million Default Judgment was by far CMGT's largest debt. Any trustee should have known to focus his attention on the Default Judgment -- CMGT's only significant liability and a gargantuan one at that -- at the earliest possible time. In addition, any trustee should know that default judgments are relatively easy to vacate and that the time for doing so is often short.

The amount of the Default Judgment, in and of itself, is extremely high. Any trustee with even a casual knowledge of the facts should have immediately asked himself these questions:

> How could a financial advisor, who according to its written contract is entitled to a finder's fee equal to about 6% of the capital CMGT accepted (Compl., ¶26), possibly be entitled to a $17 million dollar fee when it failed to find any financing for CMGT for more than two years (id., ¶¶24, 32-44 and 63), when it prevented CMGT from accepting the Newco Deal by getting a TRO in California (id., ¶59), and when CMGT got no other financing and instead went out of business (id., ¶65)?

> Come to think of it, even if CMGT had accepted the Newco Deal, CMGT would have received no money or line of credit, but only 20% of the stock in a new company that had not yet been formed and that was going to have a capitalization of only $2,500,000. (Id., Exs. 5 and 13.) How does 6% of the 20% of the stock that CMGT was to receive in a risky start-up company turn into $17 million?

The pleadings of the Spehar Lawsuit were served on CMGT and, in any event, were available public records, and the hearing at which the $17 million Default Judgment was entered was transcribed, including Spehar's frivolous testimony (Op. Mem. at Ex. B). Even in a cursory investigation, the Trustee should have reviewed these documents. If he had, he would have realized that the $17 million Default Judgment had no basis, and that the California trial judge stated on the record that he expected it to be vacated. (Id. at 5, lines 3-5.)

So precisely what "information" and "cooperation from CMGT's agents" did the Trustee need in order to figure out that he should move to vacate the Default Judgment? None is identified

in the Response, and there is none.  All the Trustee had to do was to put CMGT's interests first and get rid of the Default Judgment against CMGT.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed, and the Lawyer Defendants should be granted such other and further relief as is appropriate.

Respectfully submitted,

MAYER BROWN ROWE & MAW LLP AND
RONALD GIVEN

_____/s/ Stephen Novack_____
One Of Their Attorneys

21

## CERTIFICATE OF SERVICE

Stephen Novack, an attorney, hereby certifies that he caused a true and correct copy of the foregoing Reply in Support of the Lawyer Defendants' Motion to Dismiss to be served through the ECF system upon the following:

> Edward T. Joyce
> Arthur W. Aufmann
> Robert D. Carroll
> Edward T. Joyce & Assoc., P.C.
> 11 S. LaSalle St.
> Chicago, IL 60603

on this 7th day of February, 2007.

_____ /s/ Stephen Novack _____