IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID GROCHOCINSKI, not individually, )
but solely in his capacity as the Chapter 7 )
Trustee for the bankruptcy estate of CMGT, )
INC., ) Case No. 06 C 5486
 )
     Plaintiff, ) Judge Virginia M. Kendall
  v. )
 )
MAYER BROWN ROWE & MAW LLP, )
RONALD B. GIVEN and CHARLES W. )
TRAUTNER, )
 )
     Defendants. )

## MEMORANDUM OPINION AND ORDER

David Grochocinski ("Grochocinski"), in his capacity as Chapter 7 Trustee for the bankruptcy estate of CMGT, Inc. ("CMGT") sued Mayer Brown Rowe & Maw LLP ("Mayer Brown") and Ronald B. Given ("Given"), an attorney at Mayer Brown, (collectively the "Defendants"),[1] for legal malpractice. Defendants moved for summary judgment, claiming that the suit was brought improperly, and, if successful, would conclude in an absurd result and a fraud on the judicial system. The Court finds that to protect the integrity of the judicial system, judicial estoppel must be applied here. The Court grants summary judgment for the Defendants.

## STATEMENT OF FACTS

---

[1] The Complaint included allegations against Charles W. Trautner, but Grochocinski has voluntarily dismissed him from this suit.

CMGT is a Delaware corporation that became the subject of an involuntary bankruptcy filing on August 24, 2004. (Pl. 56.1 Resp. ¶ 1.)[2] Lou Franco ("Franco") was CMGT's President, Chairman and CEO and exercised day-to-day management of CMGT from November 1, 2000 until CMGT ceased operations. (Pl. 56.1 Resp. ¶ 9.) On January 31, 2000, CMGT hired Mayer Brown, a limited liability partnership engaged in the practice of law, to provide legal services "in connection with [CMGT's] initial capitalization, formative acquisition activities, and other general corporate activities" pursuant to a written engagement letter. (Pl. 56.1 Resp. ¶ 10.) According to the engagement letter, the scope of engagement could be expanded only by mutual agreement of the parties and was required to be in writing. (Pl. 56.1 Resp. ¶ 12.) The scope of engagement was never expanded in writing to include litigation. (*Id.*) Pursuant to the engagement letter, Mayer Brown agreed to defer payment of its fees until the closing of CMGT's initial capitalization of at least $1 million, provided that CMGT pay 125% of Mayer Brown's hourly rate. (Pl. 56.1 Resp. ¶ 11.) Mayer Brown had the right to unilaterally terminate the engagement if the attorneys' fee balance exceeded $50,000 or CMGT did not obtain capitalization by May 1, 2000. (*Id.*) If CMGT never found capitalization, it would not be required to pay attorneys' fees but would be required to pay Mayer Brown's out-of-pocket expenses. (*Id.*)

---

[2] Throughout this Opinion, the Court refers to Grochocinski's Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts as "Pl. 56.1 Resp. ¶ ___" and Defendants' Reply to Grochocinski's Local Rule 56.1 Statement of Additional Facts as "Def. 56.1 Resp. ¶ ___".

In accordance with the Local Rules, the Court did not consider statements of fact supported by unauthenticated documents, hearsay, or other evidence that is inadmissible under the Federal Rules of Evidence; and does not consider statements of fact supported only by general citations to lengthy documents with no indication of where in the document support for the proposed statement of fact may be found. See *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005) (court may disregard statements and responses that do not properly cite to the record); *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial").

In June of 2001, CMGT retained Spehar Capital ("SC"), a venture capital consulting firm operating as a California limited liability corporation, to assist in securing $2 million in financing to fund CMGT's initial operations. (Pl. 56.1 Resp. ¶¶ 13, 15.) Robert Gerard Spehar, known as Gerry Spehar ("Spehar"), was the sole owner, officer, and employee of SC. (Pl. 56.1 Resp. ¶ 14.) CMGT's agreement with SC was set forth in a written agreement (the "Agreement"). (Pl. 56.1 Resp. ¶ 16.) Under the Agreement, SC was to receive a fee of 6% of the amount of any financing transaction if a transaction closed and the party supplying the financing was listed on Exhibit A to the agreement. Exhibit A comprised those parties SC introduced to CMGT or the parties with whom SC was permitted to hold discussions. (Pl. 56.1 Resp. ¶ 17.) If the transaction closing was for one million or more in financing, SC was entitled to additional compensation such as stock, investment banking rights, and a $100,000 management fee. (*Id*.)

## The "Trautner Deal"

Three years after entering into the engagement letter with Mayer Brown and having not secured any financing, CMGT was in desperate financial condition. (Pl. 56.1 Resp. ¶¶ 18-19.) In May of 2003, however, Charles W. Trautner ("Trautner"), a shareholder in CMGT, proposed a deal to finance CMGT (the "Trautner Deal"), the terms of which he set forth in a letter of intent. (Pl. 56.1 Resp. ¶ 26; Def. 56.1 Reply ¶ 6.) Pursuant to the letter of intent, a new, yet-to-be-formed corporation called Newco would acquire CMGT's assets in exchange for either 20% of Newco's stock or $500,000 in cash. (Pl. 56.1 Resp. ¶ 27; Def. 56.1 Reply ¶ 4.) According to the letter of intent, Newco would not acquire CMGT's liabilities. (Pl. 56.1 Resp. ¶ 29.) Additionally, Newco would negotiate with Mayer Brown to reimburse it for a certain percentage of their unpaid legal fees. (Pl. 56.1 Resp. ¶ 30.)

Franco sent a letter to CMGT's shareholders recommending that they approve the Trautner Deal and stating that he believed it was the only viable option for CMGT's survival. (Pl. 56.1 Resp. ¶ 31; Def. 56.1 Reply ¶ 9.) At the same time, however, he continued to pursue a second financing option—an investment from the Washoe Tribe, brought to his attention by Spehar. (Pl. 56.1 Resp. ¶ 22.) In August of 2003, all CMGT shareholders who voted approved the Trautner Deal and chose to accept 20% of Newco's stock as compensation. (Pl. 56.1 Resp. ¶ 32.)

### SC Files a Lawsuit Against CMGT

Trautner was not listed on Exhibit A of the SC Agreement. (Pl. 56.1 Resp. ¶ 33.) Nonetheless, when Spehar learned of the Trautner Deal, he sent a letter to Franco setting out his basis for believing his company played a role in CMGT's involvement with Trautner and arguing that Trautner should be added to Exhibit A of the Agreement. (Pl. 56.1 Resp. ¶ 35.) CMGT disagreed with SC's right to compensation for the deal. (Pl. 56.1 Resp. ¶ 36.)

Disgruntled with CMGT's refusal to pay him, SC sued CMGT in California state court (the "California lawsuit") on September 9, 2003. (Pl. 56.1 Resp. ¶ 38.) SC sought specific performance of its contract with CMGT and specifically sought to block the Trautner Deal. (*Id*.) SC obtained an *ex parte* temporary restraining order ("TRO") on September 12, 2003 that, among other things, prohibited CMGT from closing the Trautner Deal or taking further steps toward consummating any other transactions "whose terms do not comply with all terms of the [Agreement]." (Pl. 56.1 Resp. ¶ 39.; R. 138, Compl., Ex. 15.) Spehar sent Given a copy of the TRO documents on September 16, 2003. (Pl. 56.1 Resp. ¶ 40; Def. 56.1 Reply ¶ 53.) Thereafter, Given sent an email to Franco and CMGT's shareholders attaching the TRO documentation, notifying them that SC had obtained the TRO prohibiting CMGT from closing the Trautner Deal, and stating that Mayer Brown had not been

and did not expect to be retained to assist CMGT in the California lawsuit. (Pl. 56.1 Resp. ¶ 41; Def. 56.1 Reply ¶ 54.) The TRO documents attached to the email specifically stated that the California court would hold a preliminary injunction hearing on October 3, 2003. (Pl. 56.1 Resp. ¶ 42.) CMGT did not appear at the preliminary injunction hearing and the court converted the TRO into a preliminary injunction. (Pl. 56.1 Resp. ¶ 43.) The next day, Spehar informed CMGT via email that the court had issued the preliminary injunction. (Pl. 56.1 Resp. ¶ 44.)

In late November or early December of 2003, SC served CMGT by mail an amended complaint in the California lawsuit, this time also seeking money damages for CMGT's alleged breach of contract. (Pl. 56.1 Resp. ¶ 45.; Pl. Appx. to 56.1 Statement, Ex. 85.) CMGT did not answer the amended complaint and the California court found it in default. (*Id.*) The California court held a prove-up hearing on the default on February 26, 2004. (Pl. 56.1 Resp. ¶ 46.) At that hearing, Spehar argued that CMGT's acceptance of the Trautner Deal triggered certain provisions in his agreement with CMGT. (Def. Appx. to 56.1 Statement, Ex. F.) Despite the fact that Trautner was not listed on Exhibit A of the Agreement, Spehar testified that he was entitled to compensation for securing the $2.5 million infusion of capital. (*Id.*) Specifically, Spehar testified that he should have received: (1) a $100,000 management consulting fee; (2) a $150,000 finder's fee, which represented 6% of the $2.5 million[3]; (3) $5,863 in legal expenses; (4) $11,253,627, which represented 6% of CMGT as common stock; and (5) $5,400,000 in investment banking rights. (*Id.*)

Spehar's estimation of the stock compensation and investment banking rights was based on a possible future initial public offering three years after the date of his testimony, (*id.*), despite the fact that Spehar knew at the time that CMGT "was in desperate financial condition." (Pl. 56.1 Resp.

___

[3]Spehar claimed he was entitled to the finders fee even though the California TRO blocked the Trautner Deal. (Pl. 56.1 Resp. ¶ 39.)

¶ 19.)  When the court asked Spehar whether CMGT was in existence, Spehar answered, "Yes, it is."  (Def. Appx. to 56.1 Statement, Ex. F.)  To further bolster his claims to the court, Spehar described the business of CMGT as follows:

> [CMGT] own[s] a business called absence management.  And just to give you a perspective on what companies, how they value this service, 51% of human resources directors in the United States . . . have a call center operation.
> . . . . [CMGT has] a piece of proprietary software that integrates, CMGT has a proprietary piece of software they wrote which allows for the call center to, over the internet, integrate all of the employees and all of the disability carrier's databases on that company with a call center.  So that whenever anybody calls in that's sick, that the funnel.  That's the tip of the funnel from which all information flows out to all of those people.

(*Id.*)  After telling the judge that the "current valuation of my 6% would be $11,253,627," the California judge asked Spehar, "What's it worth now?"  Spehar replied, "That's it—$11 million."  (*Id.*)

Spehar knew at the time of the hearing that he had blocked the one possible infusion of capital to keep CMGT alive by obtaining the TRO that stopped the deal.  He also knew that CMGT could not obtain any other infusion of capital to save the entity because his proposed TRO which was entered by the California judge prevented CMGT from consummating "any other transaction by CMGT whose terms do not comply with all terms of the CMGT-Spehar agreement."  (Compl., Ex. 15)  He further knew that CMGT was prevented from licensing the "valuable" software pursuant to the same TRO.  (*Id.*)

The judge recognized that some of the damages were speculative.  (*See* Def. Appx. to 56.1 Statement, Ex. F. ("But that one is pretty hard because nothing has happened on that yet.  You could have it in your judgment that you had the right to the fee, if it ever occurs, but this may never

occur.").)  The judge stated that if a default judgment was issued, CMGT would come in and set it aside, and the case would start over again.  (Pl. 56.1 Resp. ¶ 49.)  Nevertheless, based on the misrepresentations Spehar made at the hearing, the judge entered the $17 million default judgment against CMGT.[4]  (Pl. 56.1 Resp. ¶ 48.)  Among other things, the California court also permanently enjoined CMGT from completing the Trautner Deal or any other deal "without the express written consent of Spehar Capital, LLC."  (Compl., Ex. 17.)

## CMGT Enters Bankruptcy

The California judgment permanently blocked the Trautner Deal and CMGT never secured financing.  (*Id.*)  Rather than being a lucrative call center coordinating America's HR directors as Spehar held it out to be, CMGT was forced to cease operations.  CMGT did not pay any portion of the California default judgment.  (Pl. 56.1 Resp. ¶ 50.)  On August 25, 2004, Spehar filed a single creditor involuntary bankruptcy petition against CMGT in the United States Bankruptcy Court for the Northern District of Illinois (the "bankruptcy court").  (Pl. 56.1 Resp. ¶ 51.)  Spehar admits that the bankruptcy action was filed for the express purpose of collecting the $17 million default judgment from Mayer Brown through a legal malpractice action.  (Pl. 56.1 Resp. ¶ 52.)  On September 15, 2004, the bankruptcy court entered an order of relief under Chapter 7 of the Bankruptcy Code.  (Pl. 56.1 Resp. ¶ 53.)

---

[4]There are some discrepancies between Spehar's testimony at the California default prove-up hearing and the California court's judgment.  Spehar testified that he was entitled to $5,438,290 in investment banking fees.  (Def. Appx. to 56.1 Statement, Ex. F.)   The California court's judgment order includes $5,483,290 in investment banking fees. (Compl., Ex. 17.)  Spehar's attorney also stated that Spehar was entitled to $5,863 in legal fees, (Def. Appx. to 56.1 Statement, Ex. F.), but the California court included $58,863 in legal fees in the judgment.  (Compl., Ex. 17.)

The bankruptcy court appointed a bankruptcy trustee, David Grochocinski, and within days of the appointment, Spehar, through counsel Mr. Todhunter,[5] ("Todhunter") approached Grochocinski about filing a legal malpractice action against Defendants. (Pl. 56.1 Resp. ¶ 54; Def. Appx. to Rule 56.1 Statement, Ex. J at 368:16-20.) Spehar informed Grochocinski that such an action would be based on Defendants' failure to appear and defend CMGT in the California lawsuit. (Pl. 56.1 Resp. ¶ 54.) Spehar told Grochocinski that he wanted him to collect on the legal malpractice claim so SC, in turn, could collect the default judgment. (Pl. 56.1 Resp. ¶ 55.) Additionally, Spehar agreed to loan the estate $17,500 for bankruptcy administration costs, which included costs for bringing the claims against Defendants, and agreed to split the costs of the present action with Grochocinski's attorneys. (Pl. 56.1 Resp. ¶ 56.) Spehar also located an attorney who would work on a contingency fee to bring the malpractice action. (Pl. 56.1 Resp. ¶ 57.)

### Grochocinski Fails to Attempt to Vacate the Default Judgment

Grochocinski recognized that it was in the interest of the estate to get rid of the default judgment so the other creditors could share whatever assets CMGT may have held. (Pl. 56.1 Resp. ¶¶ 59-60.) Nevertheless, Grochocinski did not file a motion to vacate the judgment. (Pl. 56.1 Resp. ¶ 65.) He did not examine caselaw, hornbooks or treatises on California law related to determine if he could vacate the default judgment; talk to a California attorney about whether he could vacate the default judgment; consult anyone from CMGT or Defendants regarding the default judgment; or review or try to obtain a transcript of the default judgment hearing. (Pl. 56.1 Resp. ¶¶ 61-64.)

---

[5]Grochocinski and Todhunter went to law school together. Grochocinski originally stated in his deposition that he and Todhunter "were friends," but upon further questioning, qualified his response and described his relationship to Spehar's attorney as "law school acquaintances." (Def. Appx. to Rule 56.1 Statement, Ex. J at 10:5-15.)

Grochocinski did, however, spend one-half hour reviewing the California Code of Civil Procedure Section 473, which addresses default judgments. (Pl. 56.1 Resp. ¶ 66.)

Grochocinski swore in an affidavit submitted to the bankruptcy court that there were several reasons why he did not attempt to vacate the default judgment. (Pl. 56.1 Resp. ¶ 67.) First, he believed it was not economically feasible to retain an attorney in California because the estate had no assets. (*Id*.) Second, he thought such a motion would be futile because the time to file such a motion had run. (*Id*.) Third, he believed that pursuant to the California Code of Civil Procedure Section 473(b), a default judgment in California may be vacated upon application supported by an attorney's sworn affidavit attesting that the judgment was entered as a result of the attorneys's mistake, inadvertence, surprise or neglect. (*Id*.) Grochocinski stated that the last issue would need to be resolved as a part of the proposed malpractice litigation because the Defendants were unlikely to admit to negligence. (*Id*.) In his December 16, 2004 response to a letter from CMGT shareholder Kim Quarles, Grochocinski stated that "It is likely that the time period to vacate the [default judgment] has now expired." (Pl. 56.1 Resp. ¶ 68.)

### Grochocinski's Pre-Filing Factual Investigation

Before filing this malpractice action, Grochocinski did not consult any of the relevant parties except Spehar in spite of the efforts of many individuals who attempted to contact him to provide him with information in conflict with the information Spehar had provided him. (Pl. 56.1 Resp. ¶¶ 98-106.) Neither Grochocinski nor his legal counsel discussed this malpractice case with Franco or any other CMGT officers, employees, or shareholders. (Pl. 56.1 Resp. ¶¶ 98-101; 104.) They also did not consult Trautner or anyone at Mayer Brown. (Pl. 56.1 Resp. ¶¶ 102-03.)

As a result, Grochocinski had no knowledge regarding the decisions CMGT made with respect to the California lawsuit. (Pl. 56.1 Resp. ¶¶ 82-92.) He did not know if CMGT's shareholders were interested in settling with SC or if such a settlement was possible before the closing of the Trautner Deal. (Pl. 56.1 Resp. ¶¶ 82; 85.) He did not know if SC would have settled for anything less than its full demands, or if CMGT had any assets whatsoever with which to pay a settlement. (Pl. 56.1 Resp. ¶¶ 83-84.) Grochocinski did not know if CMGT had any financial resources to use in defending itself against the California suit. (Pl. 56.1 Resp. ¶¶ 86.) Nor did he know why CMGT did not defend itself against SC's amended complaint and did not to appear for the default judgment prove-up hearing. (Pl. 56.1 Resp. ¶¶ 89-90; 92.)

At his deposition, Grochocinski could not identify the factual basis for the following allegations: 1) SC and CMGT regularly agreed to oral modifications of the Agreement; 2) Given revived the Trautner Deal on terms identical to those that Franco had previously rejected; 3) CMGT's business took a downturn between January and May of 2003; 4) Given pressured Franco to agree to the Trautner Deal; 5) Defendants failed to advise Franco that a better financing deal was available from other potential investors; 6) CMGT and a company called Sealaska were close to a deal and had even signed a letter of intent; 7) Defendants had a conflict of interest because both SC and CMGT were their clients; 8) Defendants' legal fees would be paid if the Trautner Deal closed; and 9) Defendants advised CMGT not to appear or defend against the preliminary injunction in the California lawsuit. (Pl. 56.1 Resp. ¶¶ 69-74; 79-80; 88.)

Grochocinski alleges in the Complaint that other financing options were available to CMGT at the time of the Trautner Deal. (Compl. ¶¶ 33; 37-38; 44.) Grochocinski specifically alleges that Sealaska signed a letter of intent to provide $2 million in financing to CMGT, but he admits that

he has never seen the letter of intent.  (Pl. 56.1 Resp. ¶¶ 75.)  Further, he did not contact anyone at Sealaska to discuss their dealings with CMGT.  (Pl. 56.1 Resp. ¶ 105.)  Indeed, Grochocinski was unaware of any potential financing for CMGT as of September 29, 2003 other than the Trautner Deal and a possible deal with the Washoe Tribe.  (Pl. 56.1 Resp. ¶ 77.)  He never asked to see the supposed letter of intent from the Washoe Tribe and he did not speak to anyone from the Washoe Tribe.  (Pl. 56.1 Resp. ¶¶ 78; 106.)

Spehar encouraged Grochocinski to file the lawsuit without investigation.  (Pl. 56.1 Resp. ¶ 141.)  Specifically, in a July 28, 2006 email, he told Grochocinski that "it is simply too late now to get all of this properly done by the filing deadline . . . let alone investigate, depose and file before the filing deadline."  (*Id*.)  Spehar stated that Joyce [Grochocinski's attorney] "should become more comfortable" after he conducted a "proper investigation."  (*Id*.)

### CMGT's Attempts to Contact Grochocinski

Before Grochocinski filed the Complaint in this case, CMGT's officers and shareholders contacted Grochocinski to give him their opinions about CMGT's situation and Spehar's conduct.  (Pl. 56.1 Resp. ¶¶ 127-31.)  Shareholder Dr. R. Leonard Carroll wrote a letter stating that he thought CMGT was finally going to be capitalized by the Trautner Deal "until Gerry Spehar stopped the capitalization and now the company is bankrupt."  (Pl. 56.1 Resp. ¶ 127.)   Similarly, James M. Wong, CMGT's accountant and a major shareholder, wrote that Spehar "initiated a lawsuit against CMGT without merit or sustaining damages, rendered CMGT unacceptable as an investment to any potential investor and caused its demise."  (Pl. 56.1 Resp. ¶ 128.)  Wong further stated that Spehar "knew that CMGT was never funded and did not have the financial resources to defend itself."  (*Id*.)  Yet another shareholder, William Donwen, wrote a letter stating that "having followed this company

for several years, it is my firm opinion that Gerry Spehar and his various activities was responsible for the failure of CMGT." (Pl. 56.1 Resp. ¶ 129.) Kim Quarles, a CMGT shareholder and an attorney, wrote that "because of Spehar's egregious conduct, CMGT was left unfunded and without the financial means to battle [Spehar's] spurious allegations." (Pl. 56.1 Resp. ¶ 130.) Shareholder Ron Holman wrote a letter stating that "as a result of [Spehar's] actions, the chance for CMGT to find funding and survive disappeared. I think Spehar is directly responsible for any losses." (Pl. 56.1 Resp. ¶ 131.) Lee M. Rask wrote that Spehar "brought a frivolous suit against the company and because of that suit [CMGT's] window of opportunity to raise capital was eliminated." (Pl. 56.1 Resp. ¶ 132.) Grochocinski forwarded at least some of these letters to Spehar's counsel. (Pl. 56.1 Resp. ¶ 134.)

Grochocinski acknowledged in a reply to Quarles' letter that she had told him that CMGT lacked funds to defend the lawsuit. (Pl. 56.1 Resp. ¶ 136.) In a draft letter to Spehar's counsel dated February 21, 2005, Grochocinski stated, "While I appreciate the fact that your client [Spehar] has a large judgment, it was entered by default largely due to the lack of funds by the debtor." (Pl. 56.1 Resp. ¶ 137.) In addition, Grochocinski knew that CMGT's estate had no assets other than the rights to certain software, all of which were sold to SC for $1,500. (Pl. 56.1 Resp. ¶¶ 138-39.)

Franco wrote a letter to the United States Trustee, copied to Grochocinski, specifically stating his opinion that the California suit was meritless, that CMGT was not funded, and therefore could not defend itself in the California suit. (Pl. 56.1 Resp. ¶ 133.) Grochocinski did not take action to determine whether this statement was true. (*Id.*)

**Spehar's Direction of the Instant Litigation**

Grochocinski received specific direction from Spehar regarding the prosecution of malpractice suit at issue here. (Pl. 56.1 Resp. ¶ 140.) In a July 28, 2006 email from Spehar to Grochocinski, Spehar stated that they needed "real fear on [their] side in dealing with [Franco, Wong and Baliga]" and recommended that they make clear to these witnesses that they were serious about "going after them" in the suit. (*Id*.) Following this direction, Grochocinski's attorneys wrote to Wong and Franco and told them that they would be named as defendants in this case if they did not agree to sign a tolling agreement. (Pl. 56.1 Resp. ¶ 142; 145.) Grochocinski did not investigate either Wong or Franco's actions, nor is he aware of anything either of them did wrong in connection with CMGT. (Pl. 56.1 Resp. ¶¶ 143-44; 146-47.)

## PROCEDURAL BACKGROUND

In late August, 2006, Grochocinski filed a two-count Complaint against Defendants in the Circuit Court of Cook County.[6] Defendants removed the case to this Court. In Count I, Grochocinski alleged that Defendant provided negligent advice to CMGT. Among other things, Count I alleged that the Defendants failed to advise CMGT to settle its dispute with SC before it escalated to litigation and, as a result, CMGT lost any hope of obtaining financing for its operations. In Count II, Grochocinski alleged that Defendants failed to defend CMGT, advised CMGT not to appear in the California lawsuit, and, as a result, the California court entered a $17 million default judgment against CMGT. Defendants moved to dismiss the Complaint, arguing that: 1) Spehar orchestrated a fraud on the judicial system; 2) Grochocinski himself proximately caused any damage resulting from Count II; 3) regardless, there were no damages resulting from Count II; and 4) Grochocinski did not adequately plead the existence of a duty, breach of duty, or proximate cause.

---

[6]The third count in the Complaint was a breach of fiduciary duty claim against Trautner, which, as mentioned earlier, Grochocinski voluntarily dismissed.

Specifically, Defendants argued that SC filed a meritless suit against CMGT in California, obtained a TRO that prevented CMGT from obtaining financing, secured a "bogus" default judgment, used the default judgment to file a single-creditor involuntary bankruptcy action against CMGT, and then "orchestrated and funded" the filing of the malpractice suit. The Court rejected these arguments. It found that SC, who is not a party to this action, was the entity that Defendants alleged perpetrated a fraud on the judicial system, and that Defendants failed to provide enough evidence proving that Grochocinski had perpetrated fraud on the judicial system. The Court granted Defendants' Motion to Dismiss in part, finding that Grochocinski could not recover for Defendants' alleged failure to advise CMGT that SC would sue and the Defendants' alleged failure to provide legal advice to CMGT's shareholders. It denied the motion as to all other grounds.

Defendants filed a motion to reconsider, again asserting that the Complaint should be dismissed because SC perpetrated a fraud against the Court and because Grochocinski failed to adequately plead damages as to Count II. Defendants argued that SC, who stood to receive the vast majority of any damages awarded, was the real party in interest, acting with the complicity of Grochocinski. Defendants contended that a victory for Grochocinski would be an absurd result because SC, a party with an admittedly meritless claim against CMGT, would be allowed to collect on the very same meritless claim from CMGT's attorneys.

This Court denied the motion to reconsider in an oral ruling, finding that there were factual issues that needed to be resolved and that the case, therefore, could not be disposed of on a motion to dismiss. Nevertheless, the Court stated that it found Defendants' position regarding fraud on the Court or "unclean hands" very persuasive. The Court acknowledged that "there [was] a question lurking about why this was handled in the way it was." As a result, the Court ordered the parties to

initially engage in discovery on only this "unclean hands" issue and, if appropriate, file a motion for summary judgment based on only this issue. Following limited discovery, Defendants filed this Motion for Summary Judgment based on their Unclean Hands Defenses

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

After this remarkable twisting of events, Defendants argue that the Court should grant summary judgment in their favor because this case, if successful, would yield an absurd result. Specifically, they argue that in order for Grochocinski to succeed in this case, he must prove that SC's claim in the California lawsuit—which led to the $17 million default judgment—had no merit. But according to Defendants, if Grochocinski succeeds in proving malpractice, he will have to turn over "the lion's share of any recovery" to SC "whom he would have just proved had no right to recovery in the first place." (Def. Mot. for S.J., May 29, 2009 at 9.) Defendants claim that Grochocinski is shielding SC by his official office as Trustee, and "fraudulently trying to help [SC] collect a meritless claim and be rewarded for causing the losses suffered by CMGT and its shareholders." *Id*. Defendants also argue that Grochocinski did not exercise proper litigation judgment because he failed to move to vacate the California default judgment and he did not properly investigate the estate's malpractice claim against Defendants before filing the Complaint.

Although not calling it by name, the crux of Defendants' argument is that Grochocinski, standing in the shoes of SC, should be judicially estopped from taking a position in this case that is contrary to the prevailing position SC took in the California litigation. If Grochocinski is permitted to argue in this case that SC's contract claim—the claim that led to the $17 million default judgment in California, the bankruptcy proceedings, and this malpractice claim—is meritless, the integrity of the judicial system would be called into question. *See Matter of Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (stating that judicial estoppel is designed to protect the integrity of the judicial system). SC, in other words, would be "'playing fast and loose with the courts.'" *Id*. (citing *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir.1953)).

Judicial estoppel "provides that a party who prevails on one ground in a prior proceeding cannot turn around and deny that ground in a subsequent one." *Butler v. Village of Round Lake Police Dept.*, 585 F.3d 1020, 1022-23 (7th Cir. 2009) (affirming the district court's grant of summary judgment based on judicial estoppel); *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 887 (7th Cir. 2004) ("Judicial estoppel prevents a party that has taken one position in litigating a particular set of facts and prevailed under that position from later reversing its position when it is to its advantage to do so.") (citation and marks omitted). Because judicial estoppel is intended to protect the courts, not the parties, a court "may raise the estoppel on its own motion in an appropriate case." *Matter of Cassidy*, 892 F.2d at 641; *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (granting the defendant's motion to dismiss based on judicial estoppel, and stating that because it "is intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an equitable doctrine invoked by a court at its discretion.'") (citations omitted).

The circumstances warranting the application of judicial estoppel are not "reducible to any general formulation of principle." *Matter of Cassidy*, 892 F.2d at 641; *Commonwealth Ins. Co.*, 398 F.3d at 887 (stating that because it is an equitable concept, the "law in this area is flexible"). There are, however, several factors that inform a court's decision of whether to apply the doctrine in a particular case. *New Hampshire*, 532 U.S. at 750. Courts first look to whether the latter position is clearly inconsistent with the earlier position. *Id.* Second, courts inquire whether the party's earlier position prevailed. *Id.* Third, courts determine whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.*

I.      **"Mutuality" of the Parties**

As an initial matter, the Court must determine whether Grochocinski can be judicially estopped from taking a position against Defendants in this litigation that is contrary to the position previously taken by SC against CMGT.[7] Unlike collateral estoppel, judicial estoppel is "concerned solely with protecting the integrity of the courts." *Montrose Med. Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 779 n.3 (3d Cir. 2001). Judicial estoppel looks to "the connection between the litigant and the judicial system," not the "relationship between the parties to the prior litigation." *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988); *see* 18B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4477 p. 624 (2d ed. 2002) (hereinafter Wright & Miller) (stating that traditional rules of mutuality may not apply "if a litigant seems to be playing the courts for fools").

Grochocinski can be judicially estopped in spite of the fact that he and Defendants were not parties to the California litigation. A number of courts have allowed a nonparty, such as Defendants in this case, to invoke judicial estoppel. *See, e.g.*, *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1286 (11th Cir. 2002) (stating that privity is not required in judicial estoppel cases); *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 n.3 (5th Cir. 1999) (same); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 255, 360 (3d Cir. 1996) (same); *Patriot Cinemas, Inc. v. General Cinema Corp. et al.*, 834 F.2d 208, 214 (1st Cir. 1987) (same); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982) (same); *Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C. Cir. 1980) (same). Judicial estoppel is concerned solely with protecting the integrity of the courts, not the

---

[7]In the Court's order granting in part and denying in part Defendants' Motion to Dismiss the Complaint, the Court stated that Defendants had not established that Grochocinski was engaged in any type of fraud against the Court. At that time, the only evidence before the Court was a facially valid default judgment entered by the California court. After reviewing the evidence that is now in the record, however, it is clear that Grochocinski is representing the interests of SC, not CMGT's estate.

relationship between the parties to the prior litigation. *See Monterey Dev. Corp. v. Lawyer's Title Ins. Corp.*, 4 F.3d 605, 609 (8th Cir. 1993) ("Judicial estoppel prevents a person who states facts under oath during the course of a trial from denying those facts in a second suit, even though the parties in the second suit may not be the same as those in the first."). While it is true that a new party should generally not be punished for another party's "unseemly conduct," 18B Wright & Miller § 4477 p. 624, there are circumstances in which it is fair to bind a nonparty to another party's actions. *See Taylor v. Sturgell*, 128 S. Ct. 2161, 2172-73 (2008) (discussing the recognized categories of exceptions to the rule against nonparty preclusion).

This is precisely one such situation. Grochocinski acted at all times as a proxy for the real party in this case, SC. *See id.* at 2173. Preclusion is appropriate "when a person who did not participate in a litigation later brings suit as the designated representative of a person who was a party to the prior litigation." *Id.* (citing *Chicago, R.I. & P.R. Co. v. Schendel*, 270 U.S. 611, 620, 623 (1926)). Because the identity of the parties is not a formal matter, but a substantive one, and in certain cases, "parties nominally different may be, in legal effect, the same," *Chicago, R.I. & P.R. Co.*, 270 U.S. at 621, the Court examines the conduct of Grochocinski and the relationship between him and Spehar.

Within days of Grochocinski's appointment as bankruptcy trustee, Spehar approached Grochocinski about filing a legal malpractice action against Defendants. Spehar told Grochocinski that he wanted Grochocinski to collect on the legal malpractice claim so SC, in turn, could collect the default judgment. Not deterred by any obstacles that might slow down his desire to get the case filed, Spehar loaned the estate $17,500 for the bankruptcy administration costs, which included the costs for bringing the claims against Defendants, agreed to split the costs of the present action with

Grochocinski's attorneys, and even hand-picked an attorney who would work on a contingency fee to bring the malpractice action—an attorney Spehar prepped with his version of the events and his ultimate goal of collecting the default judgment.

Although Grochocinski recognized that it was in the interest of the estate to vacate the default judgment so the other creditors could share whatever assets CMGT may have held, he accepted the funds, the lawyering, and Spehar's theory without question, without investigation, and without regard to his obligations to any other creditors or the estate. Indeed, it was his fiduciary duty to maximize the value of CMGT's estate for the benefit of all the creditors. *Matter of Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995); *see also Hoseman v. Weinschneider*, 322 F.3d 468, 475 (7th Cir. 2003) (stating that bankruptcy trustees have a fiduciary obligation to the claimants against the bankruptcy estate). Before filing this lawsuit, however, Grochocinski made no attempt to vacate the $17 million default judgment entered against CMGT. More importantly, he put forth no effort to investigate whether it was possible to vacate the default judgment. Grochocinski spent a mere one-half hour on the matter, and his "research" was limited to a brief review of the California statute addressing default judgments. He did not consult caselaw or treatises, speak to a California attorney, nor did he review a transcript of the hearing at which the default judgment was entered. Had he done so, he would have seen the factually unsupportable foundation on which the $17 million judgment was based.

In order to get the $17 million judgment, Spehar described CMGT to the California judge as an on-going lucrative business involving the internet connection of human resource directors linked together through a state of the art computer program. As Spehar knew at the time, he had blocked the infusion of capital into CMGT by obtaining the TRO of the infusion deal and no new

deal was permitted under the wording of the TRO. He later purchased the "valuable" computer software program for all of $1500. To present to the California judge that he was entitled to over $16 million in future earnings was a misrepresentation of what he knew about the company at that time. In truth, he was included in a string of email communications with Franco who described that the Newco deal was the only way that CMGT "would finally have something of value" and that "CMGT had no money to fight this battle." (Pl. Appx. to 56.1 Statement, Ex. 93.) Spehar was also aware that in his letter to the CMGT shareholders, Franco described the funding process as "excruciating for all of us" and told how he had personally advanced over $150,000 of his own money "to keep CMGT afloat" and was facing $40,000 in tax penalties being assessed against him. (Compl., Ex. 5.) To represent to the California judge that Spehar would obtain stock and compensation of over $16 million three years down the road from this entity that was unable to keep its head above water, and which he single-handedly prevented from obtained the much-needed capital that might give it a gasp of air, was a direct misrepresentation to the California court of the stability of the company and his likelihood of recovery from it in the future. "No fraud is more odious than an attempt to subvert the administration of justice." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 251 (1944) (Roberts, J., dissenting). Spehar had been dealing with the day-to-day battle of CMGT's financial struggles and knew first-hand that the entity could not survive without an influx of capital. He blocked that influx of capital and then went to the California judge and misrepresented that CMGT was an entity capable of paying him a percentage of its alleged worth which would equal over $16 million—knowing the entire time that it was only alive on $150,000 borrowed cash from its principal.

Grochocinski agreed to proceed with the action to not only collect the unsupported judgment but also to accuse attorneys who were in no way involved in the action to be held responsible for the artificially inflated judgment. Aside from showing no interest in vacating the default judgment as his fiduciary duty required him to do, Grochocinski failed to investigate any potential malpractice before filing this lawsuit. Most notably, Grochocinski did not speak to anyone involved with CMGT or anyone at Mayer Brown. Before filing this suit, Grochocinski never explored why CMGT failed to defend itself against SC in the California lawsuit. In fact, Grochocinski, in his deposition, demonstrated that he lacks knowledge underlying the allegations in the malpractice lawsuit that he filed, despite the fact that the Complaint was not pled "on information and belief." *See* Fed. R. Civ. P. 11(b)(3). This is of particular concern considering Grochocinski should have known an investigation was warranted. Before he filed this lawsuit, Grochocinski received letters from Franco as well as other CMGT shareholders expressing their opinion that CMGT could not defend against the California lawsuit because of its lack of funding. Franco and other shareholders also expressed their distrust for Spehar, the only individual on whom Grochocinski relied for information.[8]

Grochocinski recognized in a letter to Spehar's counsel that the $17 million judgment "was entered by default largely due to the lack of funds by the debtor." (Pl. 56.1 Resp. ¶ 137.) Additionally, due to Grochocinski's position as trustee, he had personal knowledge that CMGT had no assets other than software rights.[9] Nonetheless, instead of doing his own investigation on behalf of the estate, Grochocinski relied solely on Spehar's allegations. He was aware that Spehar was

---

[8] Grochocinski has not made hearsay objections to any of the out-of-court declarations discussed in this opinion. Regardless, the Defendants offer the letters from CMGT shareholders to prove that Grochocinski was on notice of CMGT's opinion of the California lawsuit. Out-of-court declarations can be used to show knowledge or notice of relevant facts. *See United States v. Chavis*, 772 F.2d 100, 106 (5th Cir. 1985) (allowing an out-of-court statement that was offered to prove notice).

[9] Software rights that Grochocinski sold to Spehar for $15,000.

talking to Todhunter on a daily basis, (Appx. to Def. Rule 56.1 Statement, Ex. J at 143.), he was

aware that Spehar hired Ed Joyce's ("Joyce") firm on Spehar's recommendation, and he was aware

that Spehar spoke to Joyce's firm "more often than he." (*Id*. at 196). Instead of taking control of the

case as an independent reviewer of the matter, Grochocinski merely took Spehar's orders and

followed them. A review of the 400-page deposition of Grochocinski reveals the true relationship

with Spehar.

Throughout the hours of questioning, Grochocinski was completely incapable of answering

questions about the facts underlying the case that he brought other than to say that those facts were

presented to him from Spehar or through Spehar's attorneys. He cannot explain the source of the

factual allegations regarding the original agreement between CMGT and Spehar, the theory of

malpractice, and the financial status of CMGT. To frustrate matters more, Spehar's hand-selected

attorney, Joyce, repeatedly obstructed the truth-seeking process during the questioning[10] by inserting

improper evidentiary objections,[11] by berating defendant's counsel with name-calling (*e.g.*, "You are

either hard of hearing or dumb" ), and by accusing Defendants with perpetrating their own fraud on

---

[10]Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner. *Redwood v. Dobson*, 476 F.3d 462, 468 (7th Cir. 2007) (Attorney violated the rule of preserving privilege by repeatedly telling his client not to answer yet not presenting a motion for a protective order.)

[11]Joyce repeatedly objected, for example, to the line of questioning regarding what information was relied upon by Grochocinski to support the allegations that he made in his publicly filed complaint as protected by the attorney client privilege. In *In re Thomas Consolidated Industries, Inc.*, 456 F.3d 719 (7th Cir. 2006), the court affirmed the bankruptcy court's dismissal of a case as a sanction against the trustee's lawyer for failing to comply with the court's discovery orders and for lying to the court. Grochocinski's lawyer's actions at his client's deposition mirrors some of the behavior present in *In re Thomas Consolidated Industries, Inc.* In that case, several of the defendants' interrogatories referenced specific allegations in the complaint and requested "each and every fact upon which Plaintiff bases these allegations" and asked the trustee to "identify all documents which Plaintiff contends support these allegations." *Id.* at 721. The trustee's lawyer refused to give adequate answers to the interrogatories and the defendants moved to compel. The trustee's lawyer defended his responses by saying that "interrogatories that sought the factual basis of the allegations in his complaint 'were an attempt to oppress and cause expense to Plaintiff, to have Plaintiff prepare their case for them and to improperly gain insight into Plaintiff's lawyers' preparation of the case, thereby violating the attorney work product privilege.'" *Id.* at 721-22. The bankruptcy court granted the defendants' motion to compel and told the trustee's lawyer that he was "absolutely wrong." *Id.* at 722.

the court by "taking advantage of the fact that the Court is not a bankruptcy court." (*Id.* at 207-208).

At one point during the deposition, Grochocinski's lawyer challenged the Defendants' lawyer by threatening, "Could you imagine if [another lawyer] was defending this dep? There would be a footprint on your head right now." (*Id.* at 208:16-18.) Although Grochocinski's attorney served more as a bully during the deposition than a professional, his attempts to thwart the answers from being given cannot hide the truth that his client had conducted no independent review of the case and was incapable of explaining his actions in bringing the matter. The deposition testimony makes clear that Spehar was the puppetmaster and Grochocinski his puppet.

Grochocinski's alignment with SC's interests in this case is particularly jarring because Grochocinski was required to represent the interests of the estate in this litigation, not one creditor. The purpose and duty of the trustee "is to gather the estate's assets for pro rata distribution to the estate's creditors." *In re Teknek, LLC*, 563 F.3d 639, 643 (7th Cir. 2009); *see Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1987) (stating that the "paramount duty of a trustee . . . is the amassing of estate assets for *pro rata* distribution to all creditors"). In doing so, a trustee has standing to bring any case in which the debtor has an interest, including cases like the one here for professional malpractice. *See In re Teknek, LLC*, 563 F.3d at 646 ("The estate includes any action a debtor corporation may have 'to recover damages for fiduciary misconduct, mismanagement, or neglect of duty . . . .'"). In this capacity, the trustee acts on behalf of the estate and ultimately the creditors, who will benefit upon distribution. *See Koch Refining*, 831 F.2d at 1348. A trustee also has creditor status, and is authorized to sue "for the benefit of the estate and ultimately of the creditors." *Koch Refining*, 831 F.2d at 1348.

Nevertheless, a trustee does not have standing to bring the personal claims of creditors. *See Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998); *Koch Refining*, 831 F.2d at 1348. Suits brought by a trustee on behalf of creditors must be claims that can be asserted by all creditors, not just one. A claim is "personal" "if the claimant himself is harmed and no other claimant or creditor has an interest in the cause." *Koch Refining*, 831 F.2d at 1348; *Fisher*, 55 F.3d at 879 (same). Here, while Grochocinski's suit against Defendants is couched as a professional malpractice claim brought on behalf of CMGT's estate for the ultimate benefit of all the creditors, Grochocinski is really bringing SC's personal claim against Defendants. First, many of CMGT's other identified creditors objected to this lawsuit, which was supposedly filed on their behalf. As discussed above, shareholders Franco, Carroll, Wong, Donwen, Quarles, Holman, and Rask, all of whom are listed on Schedule D, "Creditors Holding Secured Claim" against CMGT, (*see* Def. Appx. to 56.1 Statement, Ex. J (Ex. 4 to Grochocinski Dep.).), wrote letters to Grochocinski expressing their opinion that Spehar himself was responsible for CMGT's demise. (*See* Pl. 56.1 Resp. ¶¶ 127-31.) Grochocinski never contacted any of the other creditors listed on either Schedule D or Schedule F, "Creditors Holding Unsecured Nonpriority Claims" before filing this lawsuit. Grochocinski did not bring this lawsuit on their behalf; he instead served as Spehar's puppet and brought the suit to benefit solely Spehar. The email communications presented to the Court further support that Grochocinski served solely to bring a case to fuel Spehar's personal feud with Given and CMGT and to collect on a judgment that was obtained by misrepresentation. (*See, e.g.*, Pl. Appx. to 56.1 Statement, Exs. 6,7;14-18; 28-32.) The Court cannot allow Grochocinski to act as SC's personal debt-collector or to bring personal actions on Spehar's behalf in order to fulfill his personal business grudge.

Courts must "be vigilant in policing the litigation judgment exercised by trustees in bankruptcy . . . ." *Maxwell v. KPMG LLP*, 520 F.3d 713, 718 (7th Cir. 2008). Grochocinski filed this malpractice suit against Defendants at the behest of Spehar, without doing any research into the claims, speaking with any of the relevant parties except Spehar, or determining whether it was the best course of action for the estate.[12] Most damning to Grochocinski is his admission that he does not know the factual basis for most of the material claims in the Complaint. As trustee, Grochocinski is an officer of the Court and he must be held to a higher standard than a mere creditor. *See Mosser v. Darrow*, U.S. 267, 271 (1951) ("A reorganization trustee is the representative of the court[.]"); *In re Power*, 115 F.2d 69, 72 (7th Cir. 1940) (stating that "a trustee in bankruptcy stands in a different relation to the court from that of a mere creditor," and that a trustee is "an officer of the court, as well as the owner of an interest"). Because Grochocinski is acting as a proxy for SC in this case, the Court will treat SC's position in the California lawsuit as if it was taken by Grochocinski himself.

## II.    Judicial Estoppel Analysis

Having concluded that Grochocinski can be charged with the position SC's took in the California lawsuit, the Court turns to the judicial estoppel analysis. The first inquiry is whether the position Grochocinski has taken in this case is clearly inconsistent with the position SC took in the California litigation. *New Hampshire*, 532 U.S. at 750. In the California litigation, SC sought money damages and injunctive relief against CMGT for its alleged breach of contract. CMGT did not answer the amended complaint, and the California court found it in default. At the February 26,

---

[12]A trustee may be held personally liable "only for willful and deliberate violation of his fiduciary duties." *In re Chicago Pacific Corp.*, 773 F.2d 909, 915 (7th Cir. 1985) Those duties are broad, and include the duties of care and loyalty. *See Koch Refining*, 831 F.2d at 1352-53 (stating that a trustee "must be loyal to the interests of all beneficiaries and must defend those interests scrupulously"); *see also Mosser v. Darrow*, 341 U.S. 267, 271 (1951) ("Equity tolerates in bankruptcy trustees no interest adverse to the trust."); *In re Power*, 115 F.2d at 72 ("It is [the trustee's] duty to collect the assets and he is responsible for failure to do so.") The issues of whether Grochocinski breached his fiduciary duty, and, if so, what would be the appropriate remedy are not currently before the Court.

2004 prove-up hearing on the default, Spehar testified that he would have eventually assisted CMGT in an IPO and, as a result, would have received $16.9 million in fees and stock.

Here, Grochocinski must prove that SC was not entitled to the $16.9 million in fees and stock. To prevail on a claim of legal malpractice under Illinois law, a plaintiff must show that: 1) the defendant attorneys owed the plaintiff a duty of care arising from an attorney-client relationship; 2) the defendant attorneys breached that duty; and 3) the breach of duty at issue proximately caused the plaintiff to suffer injury. *See Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 394 (Ill. 2006). If the underlying action did not reach trial because of the attorney's alleged negligence, "the plaintiff is required to prove that but for the attorney's negligence, the plaintiff would have been successful in that underlying action." *Id*. This results in the litigation of a "case within a case." *See id*. (citing *Cedeno v. Gumbiner*, 806 N.E.2d 1188, 1192 (Ill. App. Ct. 2004)); *see also Warren v. Williams*, 730 N.E.2d 512, 517 (Ill. App. Ct. 2000) (holding that the plaintiff who alleged his attorney was negligent in allowing a default judgment to be entered against him was required to show that he would otherwise have successfully defended the underlying action); *James H. Anderson, Inc. v. Johnson*, No. 08 C 6202, 2009 WL 2244622, at *1 (N.D. Ill. July 27, 2009) (Coar, J.) (stating that litigation of the plaintiff's malpractice claim might require the factfinder to determine whether the plaintiff's copyright infringement action would have prevailed against the defendants in the underlying case).

Assuming Grochocinski could prove that Defendants owed CMGT a duty of care and breached that duty, to win this case Grochocinski would also have to prove that but for Defendants' negligence, CMGT would have been successful in the California litigation. In other words,

Grochocinski must prove that SC's contract claim against CMGT was baseless and that SC was not entitled to a judgment in that case.[13] This is clearly inconsistent with SC's previous position.

Further, SC's position that its contract with CMGT entitled SC to $16.9 million in fees and stock prevailed in the California litigation. The judge in that case entered a $17 million default judgment against CMGT. Neither CMGT nor Grochocinski moved to vacate the default judgment. Although default judgments do not typically have collateral estoppel effect, *see In re Gallo*, 573 F.3d 433, 437 n.4 (7th Cir. 2009), judicial estoppel is a more flexible doctrine and does not require that the party's previous position was "actually litigated" on the merits. *See, e.g.*, 18B Wright & Miller § 4477 p. 582 (noting that judicial estoppel is not as concerned with the fact of adjudication, rather, it is focused "on the fact of inconsistency itself"); *Nat'l Union Fire Ins. of Pittsburgh, Inc. v. Mfrs. and Traders Trust Co.*, 137 F. App'x 529, 531 (4th Cir. 2005) (affirming the application of judicial estoppel where state courts had accepted the parties' prior inconsistent position by entering default judgments against the parties); *Mitchell v. Iverson*, No. 06-5002, 2007 WL 1302652, at *4 (Bkrtcy. D.S.D. 2007) (holding that because the state court entered a default judgment on the defendant's breach of contract allegations, the second element necessary for judicial estoppel was present); *cf. New Hampshire*, 532 U.S. at 750 (stating that the party must have "succeed in persuading a court to accept that party's earlier position," but not discussing any need for the issue to have been actually litigated in the earlier proceedings). Spehar testified at the prove-up hearing that, pursuant to the

---

[13]Grochocinski argues that he "does not need to (and is not going to) prove that SC's contract claim was 'meritless.'" (Pl. Mot. S.J., July 13, 2009 at 19.) Instead, Grochocinski argues, he will prove that "SC had a colorable claim that should not have been 'ignored'" and that "CMGT had technical defenses that would have prevented SC from obtaining a default judgment." Leaving aside the issue of whether Grochocinski's argument would provide the causation necessary to win this case on the merits, Grochocinski admits that SC never should have obtained a judgment for damages in the California litigation. This position is clearly contrary to the position on which SC prevailed in the California litigation.

Agreement, SC was entitled to $16.9 million in fees and stock from CMGT. The California court relied on that position and entered judgment in SC's favor.

Finally, Defendants are prejudiced by Grochocinski's contrary position in this case. Had SC taken the position in the California litigation it takes now, there would be no $17 million judgment, SC would never have brought involuntary bankruptcy proceedings against CMGT, and this malpractice action never would have been filed. All the factors that typically inform the decision whether to apply judicial estoppel are present here.

Additional considerations may inform the Court's decision in "specific factual contexts." *New Hampshire*, 532 U.S. at 751. It is persuasive that SC was both the cause of CMGT's bankruptcy and would be its principal beneficiary. *See Maxwell*, 520 F.3d at 716. In *Maxwell*, a company called marchFIRST acquired a much larger company called U.S. Web, which failed thirteen months after being acquired. *Id*. at 715. U.S. Web's failure forced marchFIRST into bankruptcy. The bankruptcy trustee sued marchFIRST's auditor, claiming that the auditor breached its duty of care by approving an earnings statement that it should have known was false. *Id*. The trustee argued that if not for the auditor's negligence, marchFIRST's acquisition of U.S. Web would have fallen through and marchFIRST would have survived. *Id*. at 716.

The Seventh Circuit affirmed the district court's order granting summary judgment in favor of the auditor, holding that the trustee could not prove a causal connection between the auditor's alleged breach of its duty and marchFIRST's bankruptcy. *Id*. The court also found it persuasive that, should the trustee succeed, the vast majority of damages recovered in the lawsuit against the auditor would go to the former shareholders of U.S. Web, "even though there [wa]s no claim that U.S. Web would have survived had it not been acquired" and "the linchpin of the trustee's case wa[s] that U.S.

Web pulled marchFIRST down to its doom." *Id*. at 715-16. The court stated that "U.S. Web cannot be at once the cause of the bankruptcy and its principal beneficiary." *Id*. at 716.

Here, SC was arguably a significant cause of CMGT's insolvency[14] and was certainly the cause of its bankruptcy. Two years after CMGT retained SC to assist it in securing financing to fund CMGT's initial operations, CMGT still had not secured financing. The Trautner Deal appeared to be CMGT's best chance; in August 2003, all CMGT shareholders who voted approved the Trautner Deal and chose to accept the terms of the deal. SC obtained a TRO on September 12, 2003 that prohibited CMGT from closing the Trautner Deal. When CMGT did not appear at the preliminary injunction hearing, the court converted the TRO into a preliminary injunction.[15] After it received its $17 million judgment in the California court,[16] SC, well-aware that CMGT was insolvent, filed a single creditor involuntary bankruptcy petition against CMGT in the bankruptcy court. SC admits that it filed the bankruptcy action for the express purpose of collecting the default judgment from Defendants through a legal malpractice action. On September 15, 2004, the bankruptcy court entered an order of relief under Chapter 7 of the Bankruptcy Code.

Further, if Grochocinski were to succeed in this action, SC would be the principal beneficiary of the bankruptcy that it caused. Pursuant to the bankruptcy court's Financing Order, SC holds a

---

[14]The TRO that Spehar obtained even prohibited other entities from infusing capital into CMGT.

[15]The Court finds it curious that the California court entertained SC's motion for a TRO and then a preliminary injunction when SC's case against CMGT was a contract claim for damages. A TRO is an equitable remedy that requires the movant to demonstrate as a threshold matter that no adequate remedy at law exists. *Dept. of Fish and Game v. Anderson-Cottonwood Irrigation Dist.*, 11 Cal. Rptr. 2d 222, 228 (Cal. Ct. App. 3d 1992) (citing Cal. Code Civ. P. § 526 and stating that, among other things, "[a] party seeking injunctive relief must show the absence of an adequate remedy at law"). While the Court is not seeking to collaterally attack the California judgment, it seems clear that SC had, and ultimately received, an adequate remedy at law.

[16]The California court was rightfully skeptical of some of Spehar's claims for damages. It is one thing for SC to receive damages reflecting its finder's fee, management consulting fee, and even legal expenses. It is another for SC to receive 16.7 million in stock compensation and investment banking rights for a theoretical 2006 IPO that Spehar knew would never happen. (*See* Def. Appx. to 56.1 Statement, Ex. F.; Compl. Ex. 17.)

valid and perfected lien on the proceeds of the malpractice action. *See In re CMGT, Inc.*, No. 09 C 2822, 2010 WL 432276, at *5 (N.D.Ill. Feb. 2, 2010) (Gettleman, J.) (holding that "the language of the Financing Order unambiguously found that Spehar had a valid perfected lien, and the court never clarified a contrary intention in a timely amended order"). Indeed, the Financing Order explicitly states the following: "IT IS HEREBY ORDERED . . . by virtue of its Citation to Discover Assets, Spehar has a valid and perfected lien on the proceeds of any [malpractice action] recovery" and that "[t]he Trustee shall take all reasonable and appropriate actions to void all liens that are asserted to be superior to Spehar's valid and perfected lien in CMGT's assets . . . ." *Id*. at *2. On March 22, 2006, Spehar amended its Proof of Claim against CMGT, asserting a secured claim of $13,427,560 and an unsecured non-priority claim of $3,618,220. *Id*. at *3. Should Grochocinski succeed in this case, the vast majority of the damages would go to SC.

Although not commonly invoked, judicial estoppel is reserved for those cases where considerations of equity persuade the court that the integrity of the judicial system must be protected, and in those instances, a court should not shy from its duty to preserve that integrity. The circumstances presented in this case reveal a deliberate manipulation of the judicial system designed to benefit only one individual. Sadly, that individual had the complicit agreement of a bankruptcy trustee whose obligation to the court and to others was paramount to his dealings with this individual "creditor" and that trustee continued the manipulation through his lack of diligence and myopic devotion to Spehar's plan. Judicial estoppel is appropriate in this case.

SC convinced one court that the terms of its contract with CMGT entitled it to $17 million, and having benefitted from that decision, urges an inconsistent interpretation to gain an additional advantage at Defendants' expense. *See New Hampshire*, 532 U.S. at 755. This Court will not allow

SC to pervert the legal process in this way.  *Id.* (quoting *In re Cassidy*, 892 F.2d at 641).

Grochocinski is barred from arguing in this case that but for Defendant's negligence, CMGT would

have succeeded in the California litigation.  Without that argument, Grochocinski's malpractice

action against Defendants fails as a matter of law.  *See Warren*, 730 N.E.2d 512, 517 (Ill. App. Ct.

2000).

## CONCLUSION AND ORDER

The Court grants Defendants' Motion for Summary Judgment as to both remaining counts in

the Complaint.

Virginia M. Kendall
United States District Judge
Northern District of Illinois

Date: March 31, 2010