IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID GROCHOCINSKI, not individually, but solely in his capacity as the Chapter 7 Trustee for the bankruptcy estate of CMGT, INC., <br><br> Plaintiff, <br> v. <br><br> MAYER BROWN ROWE & MAW LLP, RONALD B. GIVEN and CHARLES W. TRAUTNER, <br><br> Defendants. | Case No. 06 C 5486 <br><br> Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

David Grochocinski ("Grochocinski"), in his capacity as Chapter 7 Trustee for the bankruptcy estate of CMGT, Inc. ("CMGT") sued Mayer Brown Rowe & Maw LLP and Ronald B. Given, one of its attorneys (collectively "Mayor Brown"), for legal malpractice. On March 31, 3010, this Court granted Mayer Brown's motion for summary judgment. Mayer Brown now moves for sanctions against Grochocinski and his attorneys, Edward T. Joyce and Associates ("Joyce") pursuant to the Court's inherent authority to enter sanctions and, as to Joyce, pursuant to 28 U.S.C. § 1927 as well. For the reasons stated below, the Court denies the Mayer Brown's motion as to Grochocinski and grants it in part as to Joyce.

I. **BACKGROUND**

   A. **Before the Complaint**

In early 2004, Spehar Capital, LLC ("SC"), a venture capital consulting firm, secured a $17 million default judgment against CMGT in California state court. (Op. at 6-7.)[1] Details of the prove-up hearing testimony, as well as the facts that led to the judgment, can be found in the Court's March 31, 2010 Memorandum Opinion and Order ("March 31, 2010 Opinion"). (Doc. 171); *see Grochocinski v. Mayer Brown Row & Maw LLP*, No. 06 C 5486, 2010 WL 1407256 (N.D. Ill. Mar. 31, 2010). In that opinion, this Court concluded that the sole owner, officer, and an employee of SC, Gerry Spehar ("Spehar"), misrepresented the financial state of CMGT to the California court and that the judgment amount was based on these misrepresentations. (Op. at 6, 21.)

Seeking to recover the $17 million judgment, SC filed a single-creditor involuntary bankruptcy petition against CMGT in the United States Bankruptcy Court for the Northern District of Illinois. (Op. at 7; Doc. 236, Ex. A ¶ 6.) Spehar admitted that he initiated the bankruptcy proceeding for the express purpose of collecting the $17 million default judgment from Mayer Brown through a legal malpractice action. (Op. at 7.) The bankruptcy court, at random, appointed Grochocinski, a long-time member of the bankruptcy court's panel of private trustees who had no professional expertise in the area of professional liability claims, as bankruptcy trustee for CMGT's Chapter 7 bankruptcy estate. (Op. at 8; Doc. 236, Ex. A ¶¶ 3-4.) As trustee, Grochocinski was responsible for marshaling and liquidating the assets of the CMGT estate and he had the capacity to

---

[1]Throughout this Opinion, the Court will abbreviate its March 31, 2010 Memorandum Opinion and Order granting summary judgment in favor of the Defendants as "(Op. at ___.)."

sue parties on behalf of the estate. (*Id*. ¶¶ 4-5.) He received very little information about CMGT beyond the name of the bankruptcy petitioner when he was appointed. (*Id.* ¶ 7.)

Soon after Grochocinski's appointment, Spehar's counsel, Judson Todhunter ("Todhunter"), an attorney Grochocinski knew from law school, contacted Grochocinski about filing a legal malpractice action against Mayer Brown. (Op. at 8; Doc. 236, Ex. A ¶ 12.) Todhunter informed Grochocinski that SC, a secured creditor, was willing to provide post-petition financing and carve out funds for the unsecured creditors so that Grochocinski could investigate and bring the legal malpractice claim. (Op. at 8; Doc. 236, Ex. A ¶ 12.) Grochocinski negotiated and received approval from the bankruptcy court for a financing agreement that granted SC the majority of any proceeds recovered from the Mayer Brown. (Op. at 8; Doc. 236, Ex. A ¶ 13; Doc. 235, Ex. B.) In exchange, SC agreed to loan the estate $17,500 for bankruptcy administration costs. (Op. at 8.) Because he had no experience investigating and bringing legal malpractice and professional liability claims, Grochocinski also retained special counsel to evaluate and prosecute the legal malpractice claim. (Doc. 236, Ex. A ¶¶ 12, 17.) Spehar recommended Edward Joyce, the principal of Joyce, and an attorney experienced in legal malpractice matters. (Op. at 8; Doc. 236, Ex. A ¶¶ 15-16.) Joyce's appointment as special counsel was approved by the bankruptcy court on November 18, 2005. (*Id.*) Joyce agreed to represent CMGT and to prosecute any malpractice claims against the Defendants on a contingency fee. (Op. at 8; Doc. 236, Ex. A ¶ 17.)

Once Joyce was appointed as special counsel, Grochocinski took little part in the investigation and prosecution of the legal malpractice claim against the Defendants. (Op. at 9-13; Doc. 236, Ex. A ¶ 18.) According to Grochocinski, "[o]ther than providing [Joyce] with information from my file, I took no part in investigating the salient facts pertaining to the legal malpractice

3

claim." (*Id.*) This is true despite the fact that many CMGT shareholders contacted him with information contrary to what Spehar had told him and Joyce. (Op. at 9; Doc. 236, Ex. A ¶ 28.) Grochocinski did little research on vacating the California state court judgment and made no attempt to vacate it. (Op. at 8-9; Doc. 236, Ex. A ¶ 10.)

Before filing this lawsuit, Joyce reviewed "contemporaneous documents," many of which were written by a Mayer Brown attorney and CMGT shareholders. (Doc. 235 at 2, 29.) He also sent CMGT shareholders letters requesting interviews and threatening litigation if they refused to sign the attached tolling agreements. (Op. at 13; Doc. 235 at 28.) Joyce did not, however, interview any CMGT shareholders, officers, or directors, or anyone from Mayer Brown before deciding to bring this case. (*Id.* at 28-29.) In contrast, Joyce was well-versed in Spehar's version of events, and Joyce knew from the beginning of its appointment that Spehar wanted to collect SC's $17 million judgment through the malpractice lawsuit. (*Id.* at 29.)

On August 10, 2006, Grochocinski participated in a conference call with, among others, Joyce, Spehar, and Todhunter. (Doc. 236, Ex. A ¶ 19.) At the call, Joyce informed the parties that there was sufficient factual and legal basis for bringing a legal malpractice claim against the Defendants. (*Id.*) Relying on this information, Grochocinski approved the filing of this case. (*Id.*) He also reviewed the complaint drafted by Joyce, but, according to Grochocinski, because he was "not involved in the events described in the complaint nor did [he] personally conduct the investigation, nor [is he] versed in the law of legal professional liability, [he] had no basis to question the content of the complaint and the advice that the lawsuit be filed." (*Id.* ¶ 20.)

**B.     These Proceedings**

In late August of 2006, Joyce filed a two-count Complaint against the Defendants in the Circuit Court of Cook County, Illinois, which Mayer Brown removed to this Court. In Count I, Grochocinski alleged that Mayer Brown provided negligent advice to CMGT. Among other things, Count I alleged that Mayer Brown failed to advise CMGT to settle its dispute with SC before the dispute escalated to litigation and, as a result, CMGT lost any hope of obtaining financing for its operations. In Count II, Grochocinski alleged that Mayer Brown failed to defend CMGT, and advised CMGT not to appear in the California lawsuit, and as a result, the California court entered a $17 million default judgment against CMGT.

The Court granted in part and denied in part Mayer Brown's motion to dismiss. First, the Court determined that Grochocinski could not recover for Mayer Brown's alleged failure to advise CMGT that SC would sue and Mayer Brown's alleged failure to provide legal advice to CMGT's shareholders. Nevertheless, the Court denied the motion as to all other grounds. Specifically, the Court found Mayer Brown's "unclean hands" argument premature. It concluded that SC, who is not a party to this action, was the entity that Mayer Brown alleged perpetrated a fraud on the judicial system, and that, at that point, Mayer Brown had not shown that the plaintiff in this case, Grochocinski, had done anything wrong. The Court later denied a motion to reconsider from Mayer Brown, finding that there were factual issues that needed to be resolved and that the case could not be disposed of on a motion to dismiss. The Court, however, ordered the parties to engage in discovery on only the "unclean hands" issue and, if appropriate, move for summary judgment based on that issue.

Mayer Brown chose to move for summary judgment on the "unclean hands" issue, and the Court granted that motion on March 31, 2010. Mayer Brown argued that the instant case, if successful, would yield an absurd result. Specifically, Mayer Brown pointed out that in order for Grochocinski to win, he had to prove that SC's claim in the California litigation had no merit. But then, if Grochocinski succeeded in proving malpractice, he would have to turn over "the lion's share of any recovery" to SC "whom he would have just proved had no right to recovery in the first place." (Doc. 136 at 9.) The Court found that the crux of the Mayer Brown's argument was that Grochocinski, standing in the shoes of SC, should be judicially estopped from taking a position in this case that is contrary to the prevailing position SC took in the California litigation. (Op. at 16.)

When it granted summary judgment to Mayer Brown, the Court made the following findings, among others: (1) Spehar secured an artificially-inflated judgment in the California litigation because of misrepresentations he made to the California court as to CMGT's worth; (2) at all times during this litigation, Grochocinski acted as a proxy for SC; (3) as such, Grochocinski could be judicially estopped from taking a position in this litigation against Mayer Brown that is contrary to the position previously taken by SC against CMGT; and (4) because Grochocinski was barred from arguing in this case that but for the Mayer Brown's negligence, CMGT would have succeeded in the California litigation, Grochocinski's legal malpractice claim failed as a matter of law.

C.     **The Sanctions Motion**

Mayer Brown now moves for sanctions against Grochocinski and Joyce pursuant to the Court's inherent authority and, as to Joyce, § 1927 as well. Mayer Brown contends that sanctions are appropriate against Grochocinski under the Court's inherent authority because: (1) the "entire lawsuit was an attack on the integrity of the judicial system"; (2) the "case was not filed in good faith

6

by [Grochocinski], who is required to . . . pursu[e] the interests of the entire estate"; and (3) Grochocinski "conducted no pre-filing investigation and does not even know the bases for the allegations in his Complaint." (Doc.177 at 9-10.) Specifically against Joyce, Mayer Brown argues that sanctions are warranted pursuant to § 1927 because: (1) there was no factual or legal basis for this lawsuit; (2) that Joyce would pursue such a claim demonstrates a "lack of respect for this Court and recklessness or gross indifference to the integrity of the judicial system as a whole," (Doc. 177 at 12); (3) Joyce persisted in this lawsuit even after Mayer Brown "brought the scam to light in their motion to dismiss," after the Court stated that Mayer Brown's "unclean hands" defense was "very persuasive," and after Mayer Brown moved for summary judgment with evidence supporting this defense (Doc. 177 at 13); and (4) Joyce engaged in unprofessional and improper tactics during Grochocinski's deposition.

Grochocinski and Joyce responded to the Mayer Brown's motion separately. Grochocinski makes two arguments in his response. First, he argues that the Court's inherent authority does not extend to a party's pre-litigation conduct and, as such, the Court has no authority to punish the parties in this case for conduct that occurred before Mayer Brown removed the case to this Court. Second, Grochocinski contends that he cannot be personally liable for sanctions unless the Court finds that he is guilty of the "willful and deliberate violation of his fiduciary duties." *See In re Chicago Pac. Corp.*, 773 F.2d 909, 915 (7th Cir. 1985). In his response, Joyce argues that sanctions are not appropriate against him in here because: (1) Grochocinski's malpractice claims had a reasonable basis in fact and law; (2) a reasonable attorney could have believed that Spehar did not lie during the California prove-up hearing; (3) a reasonable attorney could have believed that Grochocinski did not file the case solely for Spehar's benefit; (4) the Court's findings in its March

7

31, 2010 Opinion are not sufficient to support sanctions; and (5) Joyce's responses to the Mayer Brown's "unclean hands" arguments had a reasonable basis in fact and law. The Court will separately address the claims against Grochocinski and Joyce.

## II. DISCUSSION

### A. Grochocinski

In its motion, Mayer Brown ask the Court to grant sanctions against Grochocinski pursuant to its inherent authority. A district court has the inherent power "to address a full range of litigation abuses.'" *Manez v. Bridgestone Firestone N. Am. Tire LLC*, 533 F.3d 578, 585 (7th Cir. 2008) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). This includes the power to assess attorney's fees in certain circumstances, such as "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Chambers*, 501 U.S. at 45-46 (quoting *Alyeski Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)); *see also Salmeron v. Enter. Recovery Sys.*, 579 F.3d 787, 793 (7th Cir. 2009) ("Sanctions meted out pursuant to the court's inherent power are appropriate where the offender has willfully abuse the judicial process or otherwise conducted litigation in bad faith."). Accordingly, "if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Chambers*, 501 U.S. at 46 (quotations omitted).

What constitutes "bad faith" is a matter of some conflict, but the Seventh Circuit has "used phrases such as harassment, unnecessary delay, needless increase in the cost of litigation, willful disobedience, and recklessly making a frivolous claim." *Mach v. Will County Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (citing *Stive v. United States*, 366 F.3d 520, 521-22 (7th Cir. 2004) (collecting

8

cases)). The term also "has both a subjective and objective meaning, and [the Seventh Circuit] often treat[s] reckless and intentional conduct equally." *Mach*, 580 F.3d at 501. Mere negligence, however, is not enough; the imposition of sanctions under a federal court's inherent authority requires fraudulent or dilatory conduct, or a showing of bad faith. *See Kovilic Constr. Co. v. Missbrenner*, 106 F.3d 768, 773-74 (7th Cir. 1997) (concluding that the defendant's attorney was negligent, but that, because there was no evidence that his actions were fraudulent, dilatory, or taken in bad faith, sanctions were not appropriate).

Grochocinski first argues that the Court has no authority to sanction him for conduct that occurred before the Defendants removed the case to this Court because the Court's inherent authority does not extend to pre-litigation conduct. For this proposition, Grochocinski cites to *Zapata Hermanos Sucesores v. Hearthside Baking Co.*, 313 F.3d 385, 391 (7th Cir. 2002). Grochocinski, however, misreads the holding of *Zapata*. The federal courts' inherent authority may only be used to punish misconduct "occurring in the litigation itself, not in the events giving rise to the litigation (for then the punishment would be a product of substantive law—designed, for example, to deter breaches of contract)." *Zapata*, 313 F.3d at 391; *see also United States v. Fid. and Deposit Co. of Md.*, 986 F.2d 1110, 1120 (7th Cir. 1993) (citing *Chambers*, 501 U.S. at 53 and finding "[w]hile a court has the authority to preserve the integrity and, indeed the viability, of the judicial process, it does not have the prerogative to create substantive law by adding remedies not otherwise provided by law."). But the phrase "the events giving rise to the litigation" in this context means the underlying conduct that sparked the litigation, not the parties' investigation into the claims and the decision to file suit. Thus, the Court cannot sanction SC or Spehar, if they were parties, for their conduct in the California lawsuit or even their decision to file the bankruptcy petition against

9

CMGT, just as the Court could not sanction a defendant in a breach of contract case for breaching the contract. The Court's inherent power does extend, however, to Grochocinski's investigation into Mayer Brown's actions and his decision to file this lawsuit. *See Carr v. Tillery*, 591 F.3d 909, 919-20 (7th Cir. 2010) (citation omitted) (while § 1927 "is inapplicable to 'misconduct that occurs before the case appears on the federal court's docket,'" the limitations of § 1927 do not apply to the court's exercise of its inherent power); *c.f. Mach*, 580 F.3d at 501 (quotations omitted) ("[B]ad faith may occur beyond the filing of the case and may be found not only in the actions that led to the lawsuit, but also in the conduct of the litigation."); *Manez*, 533 F.3d at 585 ("The fact that some of the conduct that ultimately gave rise to the filing in the U.S. court took place outside the United States . . . does not deprive the court of its competence to adjudicate this matter."). Accordingly, the Court rejects Grochocinski's argument that it could not use its inherent power to sanction the conduct at issue here.

Because Grochocinski's conduct was merely negligent, he cannot be personally liable for sanctions in this case. "A trustee may be held personally liable only for a willful and deliberate violation of his fiduciary duties." *Chicago Pac.*, 773 F.2d at 915 (7th Cir. 1985); *see also Maxwell v. KPMG LLP*, No. 07-2819, 2008 WL 6140730, at *4 (7th Cir. Aug. 19, 2008) (citing *Chicago Pacific* and concluding that, because the bankruptcy trustee had not engaged in willful or deliberate misconduct, he could not be personally liable for sanctions). In *Maxwell*, the court addressed whether bankruptcy trustee could be personally liable for sanctions for filing a frivolous appeal pursuant to Federal Rule of Appellate Procedure 38. *Id.* at *1. The court found it persuasive that the trustee retained counsel to investigate and, if appropriate, pursue legal claims against the defendants in that case. *Id.* at *4. It noted that the trustee did not have any "professional expertise

in the areas of accounting or auditing malpractice, and so—though he regularly consulted with counsel and the experts they recommended and monitored the litigation—he ultimately relied upon counsel's judgment that th[e] lawsuit and the subsequent appeal were in the best interests of [the estate's] creditors." *Id.* Citing *Chicago Pacific*, the court ultimately concluded even though sanctions would be appropriate, the trustee himself could not be personally liable because he had not willfully violated his fiduciary duties. *Id.*

Similarly, Grochocinski cannot be personally liable for sanctions here because he did not willfully violate his fiduciary duties. To be sure, from the time he was appointed trustee—at random—for the CMGT estate, the majority of Grochocinski's work was done solely for the benefit of SC, not CMGT's other creditors. After he received very little information about the possible assets of CMGT at the time he was appointed, Grochocinski was immediately contacted by Spehar about filing a legal malpractice action against Mayer Brown so that SC, in turn, could collect on the default judgment. Instead of seeking to have the California judgment vacated, Grochocinski bought Spehar's story, accepted Spehar's money to help pay for the administrative costs, and had Joyce—Spehar's hand-picked malpractice attorney—appointed as special counsel. Grochocinski admits that once Joyce was appointed, he turned over his limited notes on the case and made no further efforts to investigate the malpractice claim against Mayer Brown. Lacking knowledge of the factual and legal bases for the lawsuit, Grochocinski nonetheless approved Joyce's draft complaint and allowed him to file this case. Grochocinski was content to rely on Joyce's advice on all matters relating to this lawsuit.

While Grochocinski's work was sloppy and negligent, it did not cross the line into willful or deliberate breach of his fiduciary duties. The Bankruptcy Code specifically provides for the

employment of special counsel, with the court's approval, "to represent or assist the trustee in carrying out the trustee's duties under [the Code]." *See* 11 U.S.C. § 327(a). Like the trustee in *Maxwell*, Grochocinski, who lacked any professional expertise in malpractice lawsuits, ultimately relied on Joyce's counsel that this lawsuit was in the best interest of CMGT's creditors. Grochocinski's reliance on special counsel to investigate and prosecute the case with little oversight is evidence that he was negligent in his fiduciary duties, not that he acted willfully and deliberately. Accordingly, he is not personally liable for sanctions here.[2]

## II.     Joyce

Mayer Brown seeks sanctions against Joyce pursuant to both the Court's inherent authority and § 1927. Although a court's inherent power may be limited by statute or rule, such rules do not "displace[] the inherent power to impose sanctions for . . . bad-faith conduct . . . ." *Chambers*, 501 U.S. at 46; *see also Mach*, 580 F.3d at 501 (quoting *Methode Elecs., Inc. v. Adam Techs., Inc.*, 371 F.3d 923, 927 (7th Cir. 2004)) (noting that the Federal Rules have not "robbed" courts of their inherent power to impose sanctions). Nevertheless, because "the inherent power of the court 'is a residual authority, to be exercised sparingly,' and only when other rules do not provide sufficient basis for sanctions," the Court will first determine whether Joyce's conduct is sanctionable under § 1927. *See Dal Pozzo v. Basic Mach. Co., Inc.*, 463 F.3d 609, 614 (7th Cir. 2006) (citation omitted); *Kovilic Const. Co.*, 106 F.3d at 772-73 (a court's inherent power must be invoked with caution, particularly where the matter "is governed by other procedural rules, lest . . . the restrictions in those rules become meaningless").

---

[2] Alternatively, the Court notes that it need not rely on *Maxwell* in this case because Grochocinski's conduct, while negligent, is also not enough to warrant sanctions under the Court's inherent authority. *See Kovilic Const. Co.*, 106 F.3d at 773 (appellate courts have upheld exercise of a court's inherent authority where the conduct was in bad faith or fraud, but rejecting it when the conduct was "questionable, but not egregious, unduly dilatory, or contumacious.").

12

Section 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Section 1927 sanctions are appropriate in situations in which "counsel acted recklessly, counsel raised baseless claims despite notice of the frivolous nature of these claims, or counsel otherwise showed indifference to statutes, rules, or court orders." *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184-85 (7th Cir. 1992) (collecting cases).

While more than a showing of ordinary negligence is necessary to support an award of sanctions under § 1927, "the bad faith standard has an objective component, and extremely negligent conduct, like reckless and indifferent conduct, satisfies this standard." *Id*. at 1185. Accordingly, a finding of subjective bad faith is only necessary "if the conduct under consideration had an objectively colorable basis." *Dal Pozzo*, 463 F.3d at 614. Otherwise, objective bad faith will suffice. Objective bad faith "does not require a finding of malice or ill will; reckless indifference to the law will qualify." *Id*. "'If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious.'" *Id*. (quoting *Riddle & Assocs. P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005)); *see also Walter v. Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1988) (quotations and emphasis omitted) (a court may impose sanctions under this section where an attorney "has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice, or where a claim is without a plausible legal or factual basis and lacking in justification."). When determining whether an attorney's actions were objectively reasonable, the "may infer intent from a total lack of factual or legal basis for a suit." *Id*. (quotation omitted).

As alluded to above, § 1927 does not apply to "'misconduct that occurs before the case appears on the federal court's docket,' or in other words to 'improper conduct in the run up to litigation.'" *Carr*, 591 F.3d at 919 (quoting *Bender v. Freed*, 436 F.3d 747, 751 (7th Cir. 2006)). Accordingly, the Court may only sanction Joyce under this statute for conduct that occurred after the Mayer Brown removed this case to federal court. In other words, sanctions are only available for Joyce's decision to persist in this lawsuit after Mayer Brown raised its "unclean hands" defense and for Edward Joyce's unprofessional behavior during Grochocinski's deposition.

The Court, in its discretion, declines to exercise its discretion to impose § 1927 sanctions on Joyce for continuing the suit after Mayer Brown raised its "unclean hands" defense. Joyce's responses to Mayer Brown's motions to dismiss and for summary judgment were not frivolous. The Court declined to dismiss the case, finding that discovery was necessary to determine if the "unclean hands" defense had merit. The Court ultimately granted Mayer Brown's motion for summary judgment under the doctrine of judicial estoppel, without passing judgment on whether, in fact, Mayer Brown committed malpractice. Judicial estoppel, while tailor-made for a case like this, is not a commonly used doctrine.

Edward Joyce's conduct in Grochocinski's deposition is another matter. As the Court found in its March 31, 2010 Opinion, during that key deposition Joyce repeatedly obstructed questioning with improper interruptions, objections, insults ("You're either hard of hearing or dumb"), and accusations that Mayer Brown's motions were "a fraud." His unprofessional and childish behavior culminated with a threat to Mayer Brown's counsel: "Could you imagine if [another lawyer] was defending this dep? There would be a footprint on your head right now." (Op. at 23-24.) Joyce's behavior cannot be excused as zealously defending his client - it is obvious he was improperly trying

14

to make it harder for Mayer Brown's counsel to reach the truth. In his opposition to Mayer Brown's motion, Joyce does not defend Joyce's behavior at the deposition; it notes only that it ultimately won the only discovery dispute fully adjudicated on the merits. In short, attorneys that behave unprofessionally during depositions make litigation harder on lawyers, parties, and courts and—most importantly—may prevent the truth from coming out. *See In re Rimsat, Ltd.*, 212 F.3d 1039, 1043 (7th Cir. 2000) (upholding sanctions for improper conduct during depositions and collecting cases finding the same). Pursuant to § 1927, and recognizing that Mayer Brown would have taken Grochocinski's deposition in any event, the Court finds that the excess amount of attorneys' fees and costs that resulted from Joyce's conduct is one-half of the legal fees Mayer Brown paid for its counsel to prepare for and take Grochocinski's deposition. Joyce must also pay one-half the costs of the deposition. In addition, to ensure Mayer Brown is not worse off for bringing a successful sanctions motion, he must pay one-half of the legal fees Mayer Brown incurred in bringing and briefing this motion (the other half of the fees were presumably spent on Grochocinski).

A court's inherent power to impose sanctions for bad-faith conduct is broader than § 1927 as it "extends to a full range of litigation abuses." *Chambers*, 501 U.S. at 46; *see also Carr*, 591 F.3d at 920 (the court's interpretation of § 1927 "does not leave victims of unreasonable and vexatious litigation remediless . . . . The limitations of section 1927 do not apply to the exercise of that [inherent] power."). Thus, the Court must determine whether Joyce acted in bad faith, vexatiously, wantonly, or for oppressive reasons during the investigation and filing of this malpractice lawsuit. *See Chambers*, 501 U.S. at 45-46. For similar reasons as above, and recognizing that the Court's inherent power should be used sparingly, the Court declines to enter sanctions beyond those outlined above. Even if the malpractice claims against Mayer Brown were

15

destined to fail, the Court has not found they are frivolous. The Court expects that tangible and intangible costs imposed by this order will be sufficient to deter such improper conduct in the future. *See Kapco v. C & O Enters.*, 886 F.2d 1485, 1496 (7th Cir. 1989) (finding that "the amount of the sanction must be a carefully measured response to the sanctioned conduct," upholding the district court's imposition of sanctions to punish an attorney, and recognizing that "the imposition of sanctions carries intangible costs for the punished lawyer.").

### III.　CONCLUSION

For the reasons set forth above, and pursuant to both § 1927 and its inherent power to enter sanctions, the Court denies the Mayer Brown's motion for sanctions as to Grochocinski, and grants in part Mayer Brown's motion as to Joyce. By July 8, 2011, Mayer Brown must file its fee petition detailing: (1) one-half the attorneys' fees and costs it incurred in preparing for and taking Grochocinski's deposition; (2) one-half of the Grochocinski deposition costs; and (3) one-half the attorney's fees and costs it incurred to bring the sanctions motion. Any response to the bill of costs is due July 22, 2011.

_____
Virginia M. Kendall
United States District Judge
Northern District of Illinois

Date: June 30, 2011